Page 1

IN THE CIRCUIT COURT FOR SUMNER COUNTY, TENNESSEE
AT GALLATIN

KATHERINE WISE GENTRY,          )
                                )
          Plaintiff/Wife,       )
                                )
vs.                             )   No. 2014CV393
                                )
JOHN ANTHONY GENTRY,            )
                                )
          Defendant/Husband.    )

_____

TRANSCRIPT OF PROCEEDINGS
Tuesday, March 10, 2015

_____

APPEARANCES:

For the Plaintiff/    Ms. Pamela A. Taylor
Wife:                 Stites & Harbison
                      401 Commerce Street, Suite 800
                      Nashville, TN  37219


For the Defendant/    Ms. Sarah Richter Perky
Husband:              Hollins, Raybin & Weissman
                      Fifth Third Building
                      424 Church Street, Suite 2200
                      Nashville, TN  37219




Reported By:

Carolyn J. Bertram, LCR, RPR, CCR

Page 2

                    INDEX
WITNESS                          PAGES
JOHN ANTHONY GENTRY:
    Direct Examination by Ms. Perky ........ 55 - 107
    Cross-Examination by Ms. Taylor ........ 107 - 162
    Redirect Examination by Ms. Perky ...... 162 - 169
    Recross-Examination by Ms. Taylor ...... 170 - 175

DANCHO GJORGJIJEVSKI:
    Direct Examination by Ms. Perky ........ 183 - 190
    Cross-Examination by Ms. Taylor ........ 190 - 196
    Redirect Examination by Ms. Perky ...... 196 - 198

KATHERINE WISE GENTRY:
    Direct Examination by Ms. Taylor ....... 200 - 207

Page 3

                 EXHIBITS
Number        Description              Page
1    Financial comparison, financial      57
     statements for 2007 and W-2s for 2008
     forward
2    Revenue growth of Sweet Wise from 2006   60
     to 2013, with attached Forms 1120S
3    Confirmation of patent application   74
4    2011-2014 gross profits from THE MAT,    75
     and supporting documents
5    Discretionary spending and deferred  81
     revenue summary, and supporting documents
6    Notice of Separation                 86
7    Summary of Mr. Gentry's compensation   91
     and benefits, and supporting documents
8    Credit card statement                95
9    Summary of Ms. Perky's attorney fees  106
10   E-mail regarding garage door        118
11   March 2011 original patent application  127
     in Ms. Gentry's name
12   April 2014 e-mail from Mr. Gentry to   132
     Ms. Gentry
13   K-1s for 2010, 2011, 2012, and 2113  138
14   July 13, 2014 e-mail string         141
15   Credit card statement showing 8/8/14   146
     charge to Carrabba's

Page 4

                 EXHIBITS
Number        Description              Page
16   Capital One transaction list from    149
     9/4/14 through 11/21/14
17   October, 2, 2014 letter             156
18   E-mail from Mr. Gentry to insurance  157
     agent
19   Photograph of Mr. Gentry with Mercedes  159
20   December 1, 2014 e-mail regarding meal  160
     expenses
21   E-mail regarding meal expenses      166
22   August 2014 e-mail regarding meal    170
     expenses
23   Mr. Gentry's income and expense     203
     statement
24   Ms. Gentry's income and expense     203
     statement
25*  2013 tax return                     208

     * To be provided

Page 5

        (The aforementioned cause came on to be heard Tuesday, March 10, 2015, before the Honorable Joe Thompson, Judge, beginning at approximately 2:48 p.m., when the following proceedings were had, to-wit:)

        MS. PERKY:  One preliminary thing. Mr. Gentry has a hearing impairment.  I believe there's some device that --

        THE COURT:  Right.  I'm going to ask you folks to allow me to take about a ten-minute break or so for two reasons.  One, to get that equipment set up.  Now, the equipment I have -- or that was provided to me -- I have two microphones.

        MS. PERKY:  Okay.

        THE COURT:  Now, I have this that I never turn on, but I'm going to.  So I can -- you can hear me a little bit better.  I don't know if Mr. Gentry can hear me --

        MR. GENTRY:  Pretty well.

        MS. PERKY:  He says he can hear you with that.

        THE COURT:  Okay.  If he can hear me pretty well, then probably what I will do is -- I have two other microphones, and we'll just have to share those as need be.  But let's break until 3 o'clock, and

                                    2 (Pages 2 to 5)

TRANSCRIPT OF PROCEEDINGS          MARCH 10, 2015

Page 6

1   I'll come back and we'll have the equipment up here and
2   see if we can't get ourselves ready for this hearing;
3   okay?
4           MS. PERKY:  Thank you, Your Honor.
5           THE COURT:  All right.  Thank you.
6               (Recess taken from 2:50 p.m.
7                to 3:07 p.m.)
8           THE COURT:  Okay.  The first thing I
9   want to do, since we've got several matters pending in
10  this case -- and this is Katherine Wise Gentry vs. John
11  Anthony Gentry.  I want to make sure that we're on the
12  same page as far as what we're hearing today.
13          I believe there was an order that,
14  essentially, deferred the hearing on the second amended
15  petition for civil contempt until today.  So that's one
16  of the things that we're here on.  Is that correct?
17          MS. PERKY:  Yes, Your Honor.
18          MS. TAYLOR:  Yes, Your Honor.
19          THE COURT:  All right.  Then we
20  also have Mr. Gentry's motion to determine control of
21  business and partner compensation and for other relief?
22          MS. PERKY:  Yes, Your Honor.
23          THE COURT:  All right.  We also have
24  the plaintiff's motion to compel, and the defendant's
25  motion to compel and for attorney's fees.

Page 7

1           Is that correct?  Both parties have
2   motions to compel?
3           MS. PERKY:  Yes, Your Honor.
4           MS. TAYLOR:  Yes, Your Honor.
5           THE COURT:  All right.  Then we have
6   the wife's motion to amend her original complaint.
7           And I think that's all I have.
8           MS. PERKY:  That's all I have too,
9   Your Honor.
10          THE COURT:  All right.  Have you
11  provided -- Ms. Taylor, have you provided counsel for
12  Mr. Gentry with a copy of the proposed amended
13  complaint yet?
14          MS. TAYLOR:  No, Your Honor.  But I
15  have it with me.
16          THE COURT:  Okay.
17          MS. TAYLOR:  I'm happy to give her a
18  copy right now.
19          THE COURT:  Well, she might -- you
20  know, I don't know whether she opposes it or doesn't
21  oppose it.  And she's probably not going to know that
22  either until she sees it.  So if you can give her a
23  copy of that, and perhaps she can begin reviewing that,
24  maybe, while we're talking about some other things.
25  Maybe not.  I don't know, but at least we can start

Page 8

1   that.
2           MS. TAYLOR:  I've told Ms. Perky that
3   it's a very straightforward amendment.
4           THE COURT:  Okay.
5           MS. PERKY:  It's an
6   amendment/supplement.
7           THE COURT:  All right.
8           And, Mr. Gentry, are you hearing me
9   okay?
10          MR. GENTRY:  Yes, sir.
11          THE COURT:  Okay.  Do you need more
12  time to review it, or do you -- have you seen it enough
13  to say "I object" or enough to say "I don't object"?
14          MS. PERKY:  I don't have any objection
15  to her amended complaint.
16          THE COURT:  All right.  So we're going
17  to grant the motion, wife's motion to amend.  All
18  right.
19          MS. TAYLOR:  Thank you, Your Honor.
20  My apologies for not sending it.  It just slipped my
21  mind.  I should have done that earlier.
22          THE COURT:  Okay.  You know the case
23  better than I do, but my thought is it's probably a
24  good idea to go ahead and deal with these motions to
25  compel, these competing motions to compel up front.

Page 9

1   What do you think?
2           MS. PERKY:  We're happy to do that,
3   Your Honor.  My concern is, I just want to make sure
4   we're going to have enough time to address the petition
5   that's been pending since October.  You know, I don't
6   want us to get too bogged down with the motions to
7   compel discovery and then us not get that addressed,
8   which has been pending significantly longer than either
9   of these motions to compel.
10          THE COURT:  All right.  With that
11  said, what sort of out-of-court commitments do either
12  one of you or any of the parties have?  What's my time
13  frame?  I'll be here all day, but . . .
14          MS. TAYLOR:  I am open, as long as we
15  can take a break at some point in time if we're going
16  to stay past 6:30 or so, and ask the dog walker to go
17  take care of the dogs again.
18          THE COURT:  All right.
19          MS. PERKY:  I have a very
20  understanding husband, and as long as I can make a
21  phone call, I'm sure he'd be happy to take care of
22  child care arrangements.  I can stay as long as the
23  Court needs us to.
24          THE COURT:  All right.  Since we don't
25  have any of those issues, let's go ahead and deal with

3 (Pages 6 to 9)

TRANSCRIPT OF PROCEEDINGS      MARCH 10, 2015

Page 10

1    the motions to compel.
2            Who filed first?
3            MS. TAYLOR: Ms. Gentry.
4            THE COURT: All right. Ms. Taylor, do
5    you want to tell me about your motions?
6            MS. TAYLOR: Do you want me to tell
7    you about the motion to compel or all --
8            THE COURT: Mm-hmm. Let's just start
9    with the motions to compel.
10           MS. TAYLOR: We filed discovery -- so
11   if Your Honor --
12           THE COURT: Now, is he hearing her?
13           MS. PERKY: He was hearing her. We
14   were hearing it for a second. I don't know if she's
15   bending over --
16           THE COURT: You may have to hold it in
17   your hand and put it up close to your mouth.
18           MS. TAYLOR: I'm sure he can hear.
19   Thanks. No one's ever accused me of being quiet.
20           THE COURT: It's coming through now.
21   I can hear that.
22           MS. TAYLOR: Thank you.
23           Your Honor, the case was filed in
24   April of 2014. We sent discovery -- let me get the
25   exact date.

Page 11

1            THE COURT: September 4, 2014?
2            MS. TAYLOR: I'm trying to find it.
3            THE COURT: It's in your motion.
4            MS. TAYLOR: Thank you, Your Honor. I
5    don't have it in front of me.
6            We sent the discovery, then, in
7    September. Mr. Gentry was then represented by Rob
8    Turner. We did not get the discovery for over 30 days.
9    I communicated with Mr. Turner by probably a phone call
10   and sent a letter to him asking that the discovery be
11   completed. We also sent it to Mr. Turner's office in a
12   Word version on September 24th of 2014, so they could
13   proceed with answering it that way.
14           It was answered on October the 2nd,
15   2014 -- that's the day of the notary seal -- and sent
16   to me.
17           The basis of my motion to compel is
18   that there are numerous missing documents. Again, it
19   was -- it's dated the 2nd of October. We did not
20   receive it until later that month.
21           And the responses provided by
22   Mr. Gentry, in terms of bank accounts and credit cards,
23   only go through July or August of 2014. So what I had
24   requested were the additional and updated documents
25   that he would have had in his possession when the

Page 12

1    discovery was sent over in October and to update that.
2            I did receive a letter from Ms. Perky
3    saying that he did not have the documents at the time
4    it was answered. I think he did have some of them, I
5    would submit to the Court. At the same time, I'm
6    certainly willing to have an order that says he updates
7    from the date of his last discovery through the current
8    time at a given date.
9            THE COURT: Now, are you referring to
10   her letter of March 2nd, 2015?
11           MS. TAYLOR: Yes, Your Honor. I do
12   not have it in front of me, but yes.
13           MS. PERKY: Your Honor, if it helps, I
14   attached my March 2nd letter. You have it --
15           THE COURT: I've got it.
16           MS. TAYLOR: I have it, actually, here
17   in front of me.
18           Your Honor, we would show that in that
19   letter, or the request for production, it states
20   that -- one moment, Your Honor.
21           THE COURT: Sure.
22           MS. TAYLOR: Your Honor, I am not
23   seeing the response. I have so many papers here.
24           THE COURT: I understand.
25           MS. TAYLOR: I'm sorry I can't find my

Page 13

1    copy of the letter, put my hands on it right now. I do
2    know that there was an account -- I believe it's an
3    account ending in numbers 2557.
4            THE COURT: That's what your letter
5    refers to, yes.
6            MS. TAYLOR: Yes. I believe the
7    response was that account was inactive and had been
8    inactive, and if Ms. Gentry wanted those that she could
9    pay $6 a page.
10           I would submit to you, Your Honor,
11   that if you look at Mr. Gentry's bank statements for
12   2014 on Account 9524, there are actually transfers
13   between Account 9524 and Account 2557.
14           So it is, I submit to the Court, not
15   correct to say it was inactive, as there are transfers
16   between that. Given that, I think the burden should be
17   on Mr. Gentry to provide all of those statements on
18   Account 2557.
19           THE COURT: Let me stop you right
20   there. Are you saying there were transfers after
21   January 2015 into the 2557 account?
22           MS. TAYLOR: No, Your Honor. I'm
23   saying there were transfers -- I haven't seen the
24   records after January 2015. The records that I saw in
25   2014 --

4 (Pages 10 to 13)

Page 14

1    THE COURT: Okay.
2    MS. TAYLOR: -- show transfers between
3  those two accounts on a few occasions.
4    THE COURT: Okay.
5    MS. TAYLOR: The same with the
6  accounts in the name of eStart Solutions. It's my
7  understanding Mr. Gentry now has that business moving
8  along, and I would ask that we get all the statements
9  on those.
10    We've identified the credit card
11  statements that are not answered. We also asked --
12  this is in my letter to Ms. Richter of February 19,
13  2015. It should be attached to the pleadings.
14    THE COURT: It is. It is.
15    MS. TAYLOR: Okay. We asked to update
16  his answers to the interrogatories to reflect his
17  efforts to seek employment, information to reflect the
18  new Mercedes automobile he has obtained during the
19  divorce, and the other interrogatories that I state
20  just to update.
21    Then we had, as I said, the computer
22  purchased by Sweet Wise. We wanted that returned as an
23  asset of the business. And there was also a camera.
24  In a discussion with Mr. Gentry's prior attorney, he
25  did return some of the items associated with Sweet

Page 15

1  Wise, one of which was a camera. However, the SD card
2  was not in the camera, and that should be provided in
3  response to the request for production of documents.
4  And then as we stated, the MacBook, and then the return
5  of the original documents and computers.
6    So, again, a reasonable date for the
7  completion of all those is what we would ask from the
8  Court.
9    THE COURT: Okay. Thank you,
10  Ms. Taylor.
11    Ms. Perky. And I know you have a
12  motion pending as well, so we'll talk about that in a
13  little bit.
14    MS. PERKY: Sure, Your Honor.
15    With respect to -- first of all, Your
16  Honor, Mr. Gentry responded fully and completely to
17  discovery. That's our position. I think that what
18  Ms. Taylor is requesting for us to do is to update our
19  discovery.
20    We've also propounded discovery which
21  has not been answered. It's three months overdue.
22  We've asked for them to respond. And instead of
23  responding, they've said, Actually, now we want you to
24  supplement and update with documents and information
25  that you've received since you provided your discovery

Page 16

1  responses back in November to the present.
2    Your Honor, I don't think that that's
3  the way discovery works. I think that they have an
4  obligation to respond. And then if a party says, I
5  would like for you to update it, then you do it.
6    So, I mean, for me, I don't feel like
7  this motion was necessarily filed in good faith, and we
8  would like attorney's fees for it.
9    With respect to Request for Production
10  No. 4, the operating agreement, there isn't such an
11  agreement in existence. We responded to that.
12    With respect to Request No. 4, she
13  asked for in his original --
14    THE COURT: Let me say --
15    MS. PERKY: I'm sorry.
16    THE COURT: You say a formal operating
17  agreement does not exist. Your use of the word
18  "formal," am I supposed to interpret that as a written
19  operating agreement?
20    MS. PERKY: No operating agreement.
21  You can strike "formal" and just say no operating
22  agreement.
23    THE COURT: Okay. All right.
24    MS. PERKY: There is no document that
25  is responsive to that request.

Page 17

1    THE COURT: All right.
2    MS. PERKY: Request No. 7, we did in
3  his original discovery responses not have six months of
4  payments for back in 2012. We provided that in
5  response to Ms. Taylor's letter.
6    Then the rest of the documents that
7  she's requesting are ones from the time that he gave
8  his responses to the present. Again, we don't feel
9  like we have an obligation to do that until after
10  Ms. Gentry responds to discovery.
11    THE COURT: Do you necessarily
12  disagree with Ms. Taylor that there has been some
13  activity post 2007?
14    MS. PERKY: Your Honor, there has been
15  one single transfer of $8 from this inactive account,
16  because that's all that was left, I think, that was in
17  the account.
18    Correct?
19    MR. GENTRY: I just opened the account
20  back in 2006. I think it was $8. It might have been
21  $50. I'm pretty sure it was $8. No activity until I
22  closed the account in 2014 or early 2015.
23    THE COURT: All right.
24    MS. PERKY: So his testimony would be
25  there was a single transfer of $8. That's all we're

5  (Pages 14 to 17)

## Page 18

1  dealing with, Your Honor.
2       THE COURT:  All right.
3       MS. PERKY:  And, again, Ms. Gentry has
4  put Mr. Gentry in the position that he doesn't have the
5  money to pay 200-something dollars to get her
6  statements for an account that's inactive and has only
7  had $50 in it.
8       We said, We're fine if you want to
9  explore that.  We're happy to do that.  We'll give you
10 a release.
11      But, I mean, she's the person holding
12 the purse strings at this point, and he just doesn't
13 have the funds to do that, Your Honor.
14      The PayPal account, Your Honor, was
15 opened in January of 2015.  Of course, it wasn't
16 available.  Those statements were not available at the
17 time he gave his discovery responses.  We don't feel
18 like he should have to give those until after she
19 responds.
20      Request 18 is all the credit card
21 statements that she's asking for him to, again, update.
22 We've provided all the statements up until his response
23 was provided to counsel.
24      THE COURT:  Tell me about No. 20,
25 Interrogatory No. 20.

## Page 19

1       MS. PERKY:  Interrogatory 20, she is
2  asking for documentation of support that he pays to his
3  mother.  That was not requested in Interrogatory
4  No. 20.
5       THE COURT:  Okay.
6       MS. PERKY:  Instead, they're adding
7  questions that they would like to have been in
8  Interrogatory No. 20.  She did the same thing in
9  Interrogatory No. 26.  She asked him for additional
10 information that was not requested in the original
11 discovery that was propounded to him.
12      Of course, he doesn't have an
13 obligation to provide that information.  He also
14 doesn't have an obligation, in my mind, Your Honor, to
15 provide updated information, things that have happened
16 since he last responded to discovery, if she hasn't
17 even responded to discovery for the first time that
18 was, back in November, propounded to her.
19      THE COURT:  So your argument,
20 essentially, is there are three answers to all of your
21 requests:  Number one, it doesn't exist; number two --
22 well, maybe four answers -- number two, if you want
23 this, you can get it, we don't have the money for it;
24 number three, you didn't ask for it originally; and,
25 number four, you're asking us to update, and we

## Page 20

1  shouldn't have to update until you at least provide an
2  initial response.
3       MS. PERKY:  Exactly, Your Honor.
4       THE COURT:  And what responses -- and
5  you've gotten no responses whatsoever from Ms. Gentry?
6       MS. PERKY:  Nothing, Your Honor.
7       THE COURT:  All right.  Ms. Taylor,
8  tell me about that.
9       MS. TAYLOR:  Your Honor, I will, if I
10 can make one comment first.  For example, just so we're
11 sure, as to updating the discovery, I understand the
12 rules of that.  But Mr. Gentry did not provide all of
13 the statements from, say, July or August through the
14 date that he sent the answers to us on, I think it was
15 November the 9th.  It's dated earlier, but we didn't
16 get them until November 9th.  So my motion was to get
17 that and obtain that information that he had but did
18 not send with the original discovery.
19      On No. 26, they say we're asking for
20 information we did not request.  The follow-up question
21 was in response to Mr. Gentry's discovery answer.  When
22 we asked for the names that he expected to call as an
23 expert witness at trial, he said he did not know the
24 expert witnesses, but he provided names of seven or
25 more nonexpert witnesses.  So my follow-up question was

## Page 21

1  to update something he had answered in his first
2  discovery.
3       On No. 20, the follow-up question was
4  again in response to his question where we asked him to
5  provide documentation of support to his mother.  He
6  itemized his living expenses in there and put spending
7  money for his mother as a category.  That's what led to
8  my follow-up question by letter.
9       Your Honor, I was just trying to
10 identify issues we had so that we could move forward.
11      As to Ms. Gentry's discovery, Your
12 Honor, that is actually my fault that it didn't get
13 out.  My client has been working on it, because she is
14 the owner of the business and they asked for these
15 records, there's a large volume of records to be -- to
16 be produced.
17      In addition to this, Mr. Gentry's
18 former attorney and I had agreed that we would use Vic
19 Alexander, at Kraft Brothers CPA, to do an evaluation
20 of Sweet Wise.  Mr. Alexander was asking for
21 information that was different from, in some respects,
22 what was requested in the discovery.
23      Because Mr. Turner and I were trying
24 to get all the information to Mr. Alexander, then we
25 spent all our time working on that as opposed to

6  (Pages 18 to 21)

Page 22

1    finalizing this discovery, Ms. Gentry's discovery.
2        A lot of the information was the same.
3    What I sent to Mr. Alexander was also shared with
4    Mr. Gentry.  So much of this has actually been provided
5    not through the formal discovery.  Ms. Gentry and the
6    people at my office who are helping with this have
7    finalized the discovery and it has been, quite frankly,
8    on my desk to review the final draft and send out.
9            Mr. Turner and I did not -- and I know
10   this is prior to Ms. Perky and the motion, but we had
11   an agreement that we were working on the information to
12   send to Mr. Alexander before we finished the formal
13   discovery.  So that's where we were on that.
14           We can certainly have that to
15   Ms. Perky within seven days, Your Honor.
16           THE COURT:  Okay.  She asked for 15,
17   but if you want to shorten it, that's fine.
18           MS. TAYLOR:  I was trying to be
19   generous, but I'll take 15.
20           THE COURT:  All right.  Tell me about
21   this SD card.
22           MS. PERKY:  Your Honor, my client did
23   agree to return certain things to Ms. Gentry.  He says
24   he returned the camera the way that he had it.  He says
25   he doesn't know about an SD card.  He doesn't have an

Page 23

1    SD card.  He didn't take it out and just put it in his
2    pocket.  He doesn't have it.
3            So, I mean, that's kind of where we
4    are.  He doesn't have it.  He returned what he had,
5    and that's what he's got.  I mean, the only other thing
6    we have is the MacBook computer.
7            Which, again, Your Honor, we're going
8    around and around, and they keep maintaining that it's
9    business property and she wants all the business
10   property back.  But it's our position that they're
11   co-owners of this business.
12           And the proof is going to show, Your
13   Honor, that they've used marital funds to purchase all
14   their stuff.  I mean, they're small business owners who
15   run all of their expenses through the businesses.  And
16   even though Sweet Wise, the business, might have
17   technically purchased the laptop, it's been something
18   that Mr. Gentry's always used it, similar to the car
19   she took away from him.  He didn't have a car after --
20   I mean, that's what we're talking about here.
21           We're not talking about him coming
22   into the business and absconding with materials and
23   putting them in his car and running away.  That's not
24   what happened here, Your Honor.
25           THE COURT:  All right.  Is the -- is

Page 24

1    it a MacBook or is it a Mac?
2            MS. PERKY:  I think it's a MacBook.
3            THE COURT:  All right.  Is that the
4    only laptop computer or the only computer Mr. Gentry
5    has?
6            MS. PERKY:  Is that the only computer
7    you have?
8            MR. GENTRY:  It's a notebook I use for
9    travel and I use it for --
10           MS. PERKY:  I know.  But do you have
11   another computer?
12           MR. GENTRY:  I have a desktop also.
13           MS. PERKY:  He also has a desktop.
14   It's the only laptop he has.
15           THE COURT:  What does Ms. Gentry have?
16           MS. GENTRY:  I only have a laptop.
17           THE COURT:  All right.  Ms. Taylor, is
18   what she's wanting the information off of the laptop or
19   the laptop itself?
20           MS. GENTRY:  The laptop itself.  We
21   bought it for business use.
22           THE COURT:  Okay.  All right.  Here's
23   what we're going to do.
24           You have any response on the SD card,
25   Ms. Taylor?

Page 25

1            MS. TAYLOR:  The SD card is necessary
2    for the use of the camera.  So if he's been using the
3    camera, or anyone's been using it, they've had to have
4    the SD card in there.
5            THE COURT:  Usually a camera will have
6    a little memory.  You can take, you know, 8, 10, 12
7    pictures, maybe a few more.  The SD card usually will
8    allow you to store a lot more on it.  But he's saying
9    he doesn't have it.  Is there information that you
10   have --
11           MS. TAYLOR:  I'm technologically
12   challenged, and so your information on the SD card has
13   already -- has surpassed mine.
14           My client states that this camera will
15   not power up without it.
16           MS. GENTRY:  And it also has a number
17   of pictures we've taken at different events that I
18   would like for promotional use.
19           THE COURT:  All right.  Tell me
20   about -- I mean, he's saying he doesn't have it.  I'll
21   be honest with ya.  It wouldn't seem to me the SD card
22   would prevent it from powering up.  Obviously, it has
23   data on it, wherever it is.  But he's saying he doesn't
24   have it.  I don't know that I can force -- I mean,
25   that's what his -- that's what his position is.

7 (Pages 22 to 25)

Case 3:17-cv-00020   Document 49-2   Filed 04/17/17   Page 7 of 56 PageID #: 1390

Page 26

1    MS. TAYLOR:  Your Honor, I would say
2  if he says the SD card is missing, I would ask that he
3  be ordered to produce it if he finds it.
4    THE COURT:  Sure.
5    MS. TAYLOR:  And if, for some reason,
6  Ms. Gentry found it at the business, she would so
7  notify the Court immediately.
8    THE COURT:  And if he's got a
9  MacBook --
10    MS. PERKY:  We're agreeable to that.
11    THE COURT:  And if he's got a MacBook,
12  he can download everything that's on the SD card onto
13  the MacBook, and then leave it on the SD card and have
14  the data two different places until this thing is
15  resolved.
16    MS. TAYLOR:  If he is going to make --
17  are you saying the MacBook should be returned to the
18  business or --
19    THE COURT:  Well, I need to think
20  about that a little bit.  I'm going to reserve that.
21  Because I think maybe as we talk about these other
22  matters, I might get a better clarification on that.
23    MS. TAYLOR:  I would also submit, Your
24  Honor, that if he does maintain it through day or
25  evening, however we described that, if your decision is

Page 27

1  that he maintain it, that we be allowed to have a
2  computer expert go in and download it so that we have
3  everything that's off of it.
4    THE COURT:  Just make an image of it?
5    MS. TAYLOR:  Just make an image, but
6  have it done by an outside person at LogicForce.
7    MS. PERKY:  Your Honor, that's going
8  to -- I mean, if we give this computer to LogicForce,
9  they're going to have it for three or four weeks to do
10  all this.
11    THE COURT:  Oh, Ms. Perky, no, they
12  won't.  And LogicForce is not the only entity that's
13  done it.  I did an image about three weeks ago and they
14  had it back within 24 hours.
15    MS. PERKY:  Okay.  Well, I'm fine --
16  as long as we put some kind of qualifications on it.  I
17  mean, it kind of defeats the purpose --
18    THE COURT:  Now, for them to do a
19  forensic analysis, yes, it would take that long, but
20  just to make an image is a matter of hours.  So the
21  image itself should not take any length of time.
22    Okay.  On the answers --
23    MS. TAYLOR:  Your Honor --
24    THE COURT:  Go ahead.
25    MS. TAYLOR:  Pardon me for

Page 28

1  interrupting.  However, the statement going back to
2  this Account 2557, I can go through the papers and find
3  there are at least two, if not more, transfers between
4  that account and the 9524 account, I believe both in
5  2014 -- don't know if they go back further -- in the
6  range of a hundred dollars each.
7    I will submit to the Court, I'm trying
8  to be reasonable here.  If Mr. Gentry will obtain the
9  records on that account for 2014, which he should have
10  access to because there were transfers that year.  I'll
11  look at them.  If I decide that I need more information
12  from that, then I will send an authorization and I'll
13  do --
14    THE COURT:  And you're talking about
15  information from the sending account, not the receiving
16  account?
17    MS. TAYLOR:  The 2557.  We have the
18  information on the receiving account, 9524.  But the
19  sending account -- there were transfers between the two
20  accounts.  I don't know which one was the sending and
21  the receiving.  But in the Account 9524, you see
22  transfers between the two accounts.
23    THE COURT:  All right.  Let's do this.
24  I'm going to give you the 15 days to respond to
25  Mr. Gentry's discovery.  And then that will put us at

Page 29

1  the 25th, which will be, what, a Wednesday?
2    And then we're going to give -- we're
3  going to give Mr. Gentry another 30 days after that day
4  to update his responses, to supplement his responses.
5    You sort of inherited the case first,
6  so let's have a new day here.  Let's get as much
7  updated as we can and back to them within 30 days, the
8  25th, which I guess would put us at the --
9    MS. PERKY:  And what about
10  Interrogatories 20 and 26?
11    THE COURT:  Well, you know, yeah, I
12  want him to go ahead and answer that.  He's going to
13  get asked it in deposition anyway.  It's going to come
14  up.  It's going to be --
15    MS. PERKY:  Your Honor, the problem
16  that we've got here is we want to make sure that we're
17  following the rules here so there isn't, like, creep.
18  You know what I'm saying?
19    THE COURT:  Oh, sure.
20    MS. PERKY:  You know, we've got to end
21  written discovery at some point and move on so that we
22  can get these parties divorced.
23    THE COURT:  Oh, no.  I'm sort of
24  looking at where we are now.  Past where we are now,
25  I'm going to look a little more carefully at what's

8  (Pages 26 to 29)

TRANSCRIPT OF PROCEEDINGS     MARCH 10, 2015

Page 30

1   being asked for.
2            MS. PERKY: Sure. Because we have
3   satisfied discovery before today's hearing.
4            THE COURT: And let me say this, just
5   so we're all on the same page, Ms. Taylor. If she gets
6   your discovery and she has some follow-up questions
7   that might not be on all squares but are sort of the
8   same nature as 20 or 26 that you asked, I'm probably
9   going to let her update those as well.
10           So I want everybody to get an initial
11  set, a review by opposing counsel, and then a response
12  out to where we both think we're all on the same page.
13           MS. TAYLOR: I have no objections,
14  Your Honor. I will be cooperative with Ms. Perky on
15  that. Certainly, if she has an update, we'll try to
16  answer with information we have available.
17           And to the extent -- I don't know if I
18  should make offers in the middle of the courtroom, but
19  if we want to update on an every-two-month basis, if
20  we're still going on, as to bank accounts and credit
21  cards, I have no objections to exchanging those on a
22  personal basis. I do think there's a responsibility to
23  each party and each attorney to keep the information
24  moving as the case moves long.
25           THE COURT: I don't think she's

Page 31

1   objecting. I think she's objecting because she hasn't
2   gotten anything from you. I don't think she's
3   objecting to updating or supplementing in principle, I
4   think she's saying, I just need to get something first
5   before I supplement.
6            MS. TAYLOR: I understand that, Your
7   Honor. And, again, this was the issue with
8   Mr. Turner --
9            THE COURT: I know. I know. I'm
10  trying to say, new day. Everybody swap responses.
11  You've had a chance to ask her to update, supplement,
12  even provide a little new information. I'm going to
13  give her the same opportunity after she receives your
14  responses.
15           MS. TAYLOR: Thank you so much.
16           THE COURT: All right. And, then,
17  what we're going to do on the SD card is if he finds
18  it, then he -- he can -- I don't think there's any
19  reason why he shouldn't be able to make a copy of the
20  data and keep it, not necessarily use it except for
21  purposes of the litigation, to the extent he needs to
22  use it for the purposes of the litigation, and then
23  provide the original to Ms. Gentry.
24           All right. Now, I want to hear a
25  little bit more about the MacBook. But I think --

Page 32

1   Ms. Taylor, am I hearing you correctly that if your
2   client could get an image of that drive, then
3   pending -- pending maybe a mediation or something of
4   that nature, she wouldn't necessarily be opposed to him
5   using it in the interim?
6            MS. TAYLOR: Yes, Your Honor. We're
7   not going to pack the whole case up over the MacBook.
8            THE COURT: Okay. All right.
9            MS. TAYLOR: It was owned by the
10  business. When other employees have left, they've
11  returned theirs. If we can get the image and we
12  will --
13           THE COURT: And I'm not deciding
14  ultimate ownership of the Mac for right now. He says
15  he uses it to travel, and he has a desktop. She has a
16  laptop. So let's get an image of it made. LogicForce
17  I know can do it. There are other companies that can
18  do it. It shouldn't take very long.
19           Are you-all all downtown? LogicForce
20  I know --
21           MS. TAYLOR: LogicForce is probably
22  one block between Ms. Perky's office and my office. We
23  could meet there and grab lunch downstairs.
24           MS. PERKY: Get a glass of wine.
25           THE COURT: That's right. And the

Page 33

1   image should not take more than just a few hours,
2   Ms. Perky.
3            MS. PERKY: And whose expense will
4   that be, Your Honor?
5            THE COURT: Let me just sort of
6   reserve that until I hear this. I'm trying to remember
7   the last time I had images made, what they charged.
8   I'm thinking it's a three- or four-hundred-dollar
9   charge for a hard drive image, if I remember correctly.
10           MS. TAYLOR: It depends on how far
11  they go into it. If they discover that something's
12  been erased, they will notify us, if things have been
13  deleted, and that can get a little more complicated. I
14  think we can work with them and get an answer.
15           THE COURT: All right. Let me make
16  sure that we're on the same page. I'm ordering that he
17  provide the image. That's what Ms. Perky is asking me
18  to determine, with respect to who's going to pay for
19  the cost of the image.
20           From that point on, you may choose to
21  have it forensically analyzed. And I'm not doing
22  anything with that yet.
23           MS. TAYLOR: Yes, Your Honor.
24           MS. PERKY: So who's got to pay for
25  the image?

9 (Pages 30 to 33)

Page 34

1        THE COURT:  I haven't done anything
2  with the image yet.  I want to hear the testimony in
3  this hearing, get a better idea where these parties are
4  financially before I decide that.
5        I'm just saying that for purposes of
6  today, the only LogicForce or similar company charge
7  I'm dealing with is the image charge, not the forensic
8  analysis charge.
9        MS. TAYLOR:  If my client decides that
10  she wants to have a forensic analysis at the same time
11  it's in their possession, then she will pay for that.
12        THE COURT:  That's right.  And then we
13  can deal with that later on if there's some sort of
14  modification of data or anything like that.
15        MS. TAYLOR:  Yes, your Honor.
16        THE COURT:  All right.
17        MS. TAYLOR:  Also, in the original
18  discovery, there are still original documents in the
19  possession -- original business documents in the
20  possession of Mr. Gentry, and these are documents that
21  are outside of the documents on the computer.
22        THE COURT:  Are they documents that
23  have independent, legal significance, like a title, or
24  a deed?  Or are these simply, you know, a QuickBooks
25  account or -- do the documents themselves have

Page 35

1  independent, legal significance?
2        MS. TAYLOR:  Some of them do, in the
3  sense they're the corporate tax returns for prior
4  years, say '08, 2008 and 2009.  The -- there were some
5  documents that a prior accounting firm prepared for the
6  business prior to the time Mr. Gentry took over, and
7  those documents are in his possession.
8        THE COURT:  Okay.  Those documents I'm
9  fine with them providing a copy of.
10        MS. PERKY:  We've already done it,
11  Your Honor.
12        THE COURT:  Okay.
13        MS. PERKY:  We provided both a copy on
14  a stick and also hard copies to them.
15        THE COURT:  Okay.
16        MS. PERKY:  So, I mean, we're going
17  around and around about issues that aren't even --
18        THE COURT:  Well, I mean, that's why I
19  asked.  If we're talking about a title or a deed, a
20  stock certificate, then the fact it's an original, I
21  think, has some legal significance.  But it doesn't
22  sound like -- you know, tax returns, the IRS, you can
23  get a copy of your IRS returns from the IRS.  So --
24        MS. TAYLOR:  Your Honor, if we can get
25  copies -- one of the issues is that many of these

Page 36

1  documents relate to the years prior to the marriage.
2  So they were Ms. Gentry's documents for the business
3  she had even before the marriage, and those are now in
4  his possession.
5        But I'm certainly willing to move this
6  along, get the copies of all those now, and reserve the
7  fact at the final hearing that he be ordered to return
8  the originals.
9        THE COURT:  That's a different issue,
10  obviously.  And if she's willing to say let's wait and
11  decide that until then, yeah, I'm not going to do
12  anything with that now.  We can just wait until final
13  hearing.
14        MS. PERKY:  But I just want it clear
15  for Your Honor, we've already provided copies of every
16  single document.
17        THE COURT:  I think what she's saying
18  is, with respect to returns that existed before Mr. and
19  Ms. Gentry were married, that --
20        MS. PERKY:  Return to the business.
21        THE COURT:  Yeah.  But she's not even
22  pushing that right now.  She's saying let's move that
23  along and let's not let this hold us up.
24        Does that handle our motion to
25  compel -- our competing motions to compel?

Page 37

1        And by the way, on attorney's fees,
2  I'm going to reserve all attorney's fees questions
3  until -- at this point -- I may reserve them until the
4  end of this hearing.  I may reserve them until later.
5  I don't know.  But I'm at least going to reserve it for
6  now.
7        MS. TAYLOR:  Your Honor, if I could,
8  so it's clear, on that Account 2557, could we do
9  possibly, as I suggested, have Mr. Gentry get the ones
10  for 2014 to date, and if we want behind that, we get an
11  authorization?
12        MS. PERKY:  Your Honor, we are happy
13  to provide them, but he doesn't have the funds -- I
14  mean, it kind of depends on what Your Honor decides
15  today.  If he --
16        THE COURT:  Let's do this.  What
17  months -- you said there were three transactions?
18        MS. TAYLOR:  Two or three.
19        THE COURT:  All right.  Whatever
20  months those cover, provide those statements.  That's
21  not a lot.
22        MS. PERKY:  The months --
23        THE COURT:  Of the transactions.
24        MS. PERKY:  We don't -- he says he
25  doesn't know what months they're even talking about.

10  (Pages 34 to 37)

TRANSCRIPT OF PROCEEDINGS       MARCH 10, 2015

Page 38

1   He testified about an eight-dollar transfer.
2           THE COURT: Now, hang on here a
3   second. If she's saying that there's a transfer from
4   Checking Account 9524 to the whatever -- help me with
5   the number, Ms. Taylor.
6           MS. TAYLOR: There are transfers
7   between Account 9524 and Account 2557.
8           THE COURT: Okay. That's enough. Are
9   either of those accounts open now?
10          MR. GENTRY: The 2557 is closed.
11          THE COURT: That wasn't my question.
12          MS. PERKY: I mean, yes, the other
13   account is open. That's the -- yeah.
14          THE COURT: All right. It's going to
15   show on the statement that there was a transfer from
16   that account to the other account.
17          MS. TAYLOR: That's how we found out
18   about it.
19          THE COURT: So he can tell from his
20   9524 checking account which months are necessary for
21   the -- I'll just write it down on a piece of paper --
22   2557. Am I getting that right? Whatever that number
23   is, whatever the closed account number is.
24          He should be able to tell, Ms. Perky,
25   from the 9524 account that is still open, here are the

Page 39

1   two or three transactions. It may only be one month.
2   It may be two months. It's going to be a maximum of
3   three months. He can provide those statements.
4   Anything past that, they can get with an authorization.
5           Now we're sort of coming to our second
6   petition and our motion to determine control of the
7   business. Tell me, Ms. Perky, what are the -- what are
8   the distinct issues that you're wanting me to address
9   in these two motions?
10          MS. PERKY: First, Your Honor, we
11   want -- it's a petition for civil contempt. So we'd
12   like a finding with respect to that, if she's in
13   contempt of the statutory restraining order for the
14   conduct that she's engaged in.
15          Also, we want the Court to determine
16   who is going to be running this business from now until
17   the final hearing -- I mean, not a determination of who
18   owns the business; I think that's an ultimate issue
19   for, of course, the Trial Court to make at the final
20   hearing -- just to say who's going to run it.
21          Obviously, these parties cannot get
22   along and we need one person to be in control. And
23   then, also, the person who doesn't necessarily have
24   control of the business, what kind of access they're
25   going to have to books, records, that kind of thing, so

Page 40

1   they can make sure that the business is being run
2   properly.
3           Also, Your Honor, we have the issue of
4   money. We would like for the Court to order that
5   husband's draws as an owner of the business resume. In
6   December of 2014, she -- Ms. Gentry allegedly
7   terminated Mr. Gentry and stopped any kind of, you
8   know, draws that he received from the business,
9   although, at that time, they were receiving the same
10   amount of compensation.
11          And in the alternative, if the Court
12   says, No, we believe what she says, he was just an
13   employee, then we want pendente lite support and we
14   want it consistent with what he had been earning in the
15   business, his draws from the business. Otherwise, Your
16   Honor, Ms. Gentry is going to be receiving, you know,
17   not only her compensation but also what Mr. Gentry's
18   compensation was, and she'll be dissipating a marital
19   asset.
20          THE COURT: All right. Tell me
21   again -- all right. So I've got three things. You
22   want a finding of contempt for violation of the
23   statutory restraining order, a decision with respect to
24   what Mr. Gentry's role is going to be with respect to
25   the ongoing operation of Sweet Wise, and then the third

Page 41

1   issue would be what form of income he's going to have,
2   either in the form of a draw or spousal support.
3           MS. PERKY: Yes, Your Honor. We're
4   also seeking compensation or reimbursement from the
5   time of December 2014 through the present. During this
6   time, Ms. Gentry has obviously been taking draws from
7   the business. Mr. Gentry has had no money whatsoever
8   and is relying on credit cards.
9           THE COURT: All right.
10          MS. PERKY: He also wants to be
11   reimbursed for his rental car that he was required to
12   acquire as the result of Ms. Gentry taking away his
13   vehicle.
14          And then we're also asking for
15   attorney's fees associated with the contempt.
16          THE COURT: Okay. Now, Ms. Taylor, we
17   don't have -- I've dealt with your motions; correct --
18   your motion to amend and your motion to compel?
19          MS. TAYLOR: Yes, Your Honor.
20          THE COURT: So we're here now on
21   Ms. Perky's. Any reason why I can't just have one
22   hearing and address all these issues?
23          MS. TAYLOR: That's seems efficient to
24   me.
25          THE COURT: Okay. Is that okay with

11 (Pages 38 to 41)

TRANSCRIPT OF PROCEEDINGS      MARCH 10, 2015

Page 42

1    you, Ms. Perky?
2           MS. PERKY: Yes, Your Honor.
3           THE COURT: Let's do that, then.
4    Since these are your motions, I'll let you begin. Oh,
5    do we have any witnesses that are going to testify? Do
6    we need the rule?
7           MS. TAYLOR: Yes, we do, Your Honor.
8           THE COURT: All right. Anybody that's
9    going to testify, you'll need to wait outside. Don't
10   talk to each other about your testimony in the case.
11   Don't talk to anybody else that might wander by until
12   you're called.
13          MS. TAYLOR: Your Honor, on the issue
14   of the civil contempt motion, I would like to make an
15   opening statement, I guess, in response to Ms. Perky.
16          THE COURT: Okay. Sure.
17          MS. TAYLOR: In contempt, it's to be a
18   finding of contempt when there is a specific act that
19   has been violated. If an order is ambiguous as to
20   interpretation, that is not an order that is to be
21   subject to contempt.
22          The allegations they have made against
23   Ms. Gentry in the petition for contempt are not orders
24   or violations that are specifically enjoined pursuant
25   to the statutory injunction.

Page 43

1           They put the statutory injunction in
2    36-4-106(d) and rely on it to claim that Ms. Gentry's
3    actions are in violation of that. There is no
4    allegation that she has transferred or assigned marital
5    property, nor has she allowed insurance to lapse.
6           There was an issue with nonpayment of
7    an insurance bill because BlueCross BlueShield coded it
8    incorrectly. But once Ms. Gentry found out about that,
9    she had everything put back so the health insurance
10   was, in fact, reinstated, even though Mr. Gentry didn't
11   want health insurance. And we have not destroyed
12   evidence.
13          So they make a very broad statement
14   that Ms. Gentry has removed him from all of the
15   parties' bank accounts. The parties had no joint bank
16   accounts. There were no personal bank accounts. He
17   was a signer of the business account, and he was
18   removed as a signer, but he's not an owner. He was
19   never on the title to the account. He was only a
20   signer on that one account. There were no other joint
21   accounts.
22          They claim that she canceled his
23   business debit -- credit card, which was eventually
24   canceled after a request not to use it for personal
25   use. But I submit to the Court that there is nothing

Page 44

1    in this injunction that prohibits someone from
2    canceling a credit card if it's being misused.
3           THE COURT: Okay. What about No. 8 in
4    their second amended petition? Respondent is willfully
5    and deliberately failing to pay the parties' marital
6    and business -- well, forget the business part. Let's
7    just assume, for example, you're right about that. I'm
8    not saying you are, I'm just saying for purposes of
9    this. -- at the time to timely pay the parties'
10   marital bills and debts.
11          Eleven. Respondent has awarded
12   herself substantial bonuses to dissipate the company's
13   assets.
14          I'm taking 12 to, essentially, be a
15   subset of 11, withdrawing $5600 in extra compensation.
16          Seventeen. Are there any credit cards
17   other than the business credit cards that are at issue
18   here?
19          MS. PERKY: No. I mean, we're just
20   talking about the business cards. I mean, there's
21   one --
22          THE COURT: All right. There aren't
23   any joint, individual credit cards that have been
24   canceled?
25          MS. TAYLOR: No, Your Honor.

Page 45

1           MS. PERKY: No, Your Honor.
2           THE COURT: Okay. All right. So what
3    about 8 and 11, to the extent it deals with marital
4    debts and dissipating the assets of a marital -- or
5    dissipating the value of a marital asset? Even if he
6    doesn't have stock ownership interest, he may have some
7    sort of marital interest in the value of Sweet Wise.
8           MS. TAYLOR: Regarding No. 8, my
9    client has timely paid the business bills and debts.
10   So -- and I would submit to you, Your Honor, in a
11   petition for contempt, you have to be specific as to
12   the --
13          THE COURT: Which debts haven't been
14   paid?
15          MS. TAYLOR: -- time, date, place,
16   what hasn't been paid.
17          THE COURT: Okay.
18          MS. TAYLOR: There is no specificity
19   here, and that claim should be dismissed. There's just
20   this broad statement.
21          Regarding marital bills, the parties
22   have not been living in the same home since June -- or
23   July -- June or July of 2014, and they have had no
24   joint marital bills to pay.
25          They previously lived in a home on

12 (Pages 42 to 45)

Page 46

1   Navajo Court in Goodlettsville. Ms. Gentry and her
2   children from a prior marriage moved out in June.
3   Mr. Gentry always paid the bills to that home.
4   Ms. Gentry has paid the bills to the residence that she
5   is renting. So, again, there's no -- there's no
6   marital bill that was unpaid.
7          THE COURT: Okay.
8          MS. TAYLOR: Again, we had the issue
9   with the health insurance when BlueCross did not code
10  the payment correctly. But once that was determined,
11  it was immediately -- Ms. Gentry sent e-mails and said,
12  Immediately we'll take care of that and get back on the
13  policy.
14         That was not an act by her. That was
15  an act by BlueCross BlueShield.
16         THE COURT: All right. Before we
17  begin with our proof, the very first case I did was a
18  case very similar to this. We had a business that was
19  owned by one of the parties beforehand. The parties
20  were married. The small -- I think that was an S corp
21  versus -- is this an S corp, I think? I can't
22  remember. I think it is a corporation.
23         Neither of those lawyers ever provided
24  me a lot of law on what happens when you have this sort
25  of relationship. So I'll ask both of you before we

Page 47

1   begin, are there cases out there where this -- where
2   the Court of Appeals or Supreme Court has given the
3   lowly trial courts some guidance with respect to how
4   you deal with this circumstance? I don't think there's
5   any dispute that he doesn't have stock certificates in
6   his name; correct?
7          MS. PERKY: Well, I think at some
8   point they had -- I mean, they had discussed putting
9   stock into his name, and she had agreed to do that.
10  And she had also agreed and he had agreed to put five
11  shares of the stock in this other gentleman who's out
12  in the hall's name.
13         MR. GENTRY: She issued the stock.
14         MS. PERKY: She issued the stock and
15  then she refused to give it to him, essentially. She
16  got mad at him and said, Well, if we're not getting
17  back together, I'm not going to give it to you.
18         THE COURT: All right. But right now
19  he doesn't have possession of any stock certificates
20  that show he has an ownership interest.
21         So what I'm asking is, given that set
22  of circumstances, is there any guidance for me out
23  there with respect to how I handle this claim of
24  employee versus owner?
25         MS. PERKY: Your Honor, I didn't bring

Page 48

1   the case law with me because I wasn't -- I wasn't aware
2   that this was going to be an issue. However, I've done
3   extensive research.
4          The Court of Appeals has held on
5   numerous times that you can have an implied business
6   relationship, whether or not there are stock
7   certificates entered or not. They've had cases where a
8   husband and a wife, the husband has a business before
9   the marriage. The wife, you know, joins up with him
10  and works really hard, you know. If it's like a house
11  cleaning business, she's on the floor cleaning the
12  house and everything, doing the same kind of thing he's
13  doing. And the Court says, Yeah, it was his business
14  before, it's all in his name, and we're going to find
15  an implied business partnership.
16         THE COURT: So that would be the
17  theory that you're pursuing now. Wouldn't a lot --
18  wouldn't a substantial portion of the relief that
19  you're requesting turn on how that legal issue is
20  resolved, whether it's in your favor or against your
21  client?
22         MS. PERKY: I don't think so, not
23  today, Your Honor. I don't think we're asking for you
24  to determine whether or not this business is a joint
25  venture or not. I think that what he's asking for is

Page 49

1   either, one, he's been in a -- he is an owner of this
2   business and he's entitled to the draws, or,
3   alternatively, that he is entitled to pendente lite
4   support consistent with what he's always received.
5          THE COURT: All right. I'll give you
6   that we're going -- I know we're going to hear
7   testimony about what his needs are, what his expenses
8   are. But you also are asking for me to hold Ms. Gentry
9   in contempt. And a lot of the issues do relate to the
10  business.
11         You're asking that Mr. Gentry be
12  allowed to have a say in running this business on a
13  day-to-day basis. And, certainly, that would -- that
14  question would turn on whether there is, in fact, an
15  implied business relationship or not. And, again, I
16  don't know the answer. I don't know how I'm going to
17  resolve that question today.
18         MS. PERKY: Your Honor, I mean, it's
19  our position that the Court, in my understanding, wants
20  to maintain the status quo; right? If somebody files
21  for divorce, we want to make sure it stays the same,
22  that someone doesn't go in and try to take away all the
23  money, change all the accounts, and leave the other
24  person destitute. That's what's happened in this case.
25  We're just trying to get back to the status quo.

13 (Pages 46 to 49)

TRANSCRIPT OF PROCEEDINGS      MARCH 10, 2015

Page 50

1       The status quo was he was in the
2   business running it with her.  And, actually, our proof
3   is going to show that he ran the business and she kind
4   of stepped out of the business.  He was much more
5   involved in the business than she was and he was
6   primarily responsible.  We have an employee out in the
7   hall who will testify to the same.  It was Mr. Gentry
8   who really ran this business, not Ms. Gentry.
9       For her to push him out of the
10  business and not give him any access to the business --
11  this is probably the largest marital asset that they
12  have.
13       THE COURT:  But isn't the status quo
14  the financial status quo?  Isn't that what you're
15  talking about?
16       MS. PERKY:  Well, I don't think -- not
17  if they run a business and that's where all their
18  income comes from.  I mean, I think it's also
19  maintaining a status quo with respect to all the
20  assets.  I don't think one party is allowed to take a
21  business and do something completely different with it
22  than what's done during the marriage.
23       I mean, if she decided to take all the
24  money out of the business -- you know what?  I'm going
25  to bankrupt the business.  That would be dissipation of

Page 51

1   a marital asset.
2       THE COURT:  Okay.  Sure.  Ms. Taylor,
3   you sort of see where I'm thinking.  And if I keep on
4   asking you questions, we are going to be here until
5   6:30, and I don't want to do that.  I want to get to
6   the proof pretty quickly.  But I will let you, since I
7   asked Ms. Perky a few questions on that, tell me what
8   your thoughts are on that.
9       MS. TAYLOR:  I do not know of cases
10  where there has been an implied partnership in a
11  marital estate.  You may have a business in one party's
12  name they had before the marriage.  The other party may
13  make claims that he or she worked in the business
14  during the marriage.  And the issue goes to the
15  appreciation in value during the marriage and their
16  claims to that.  That is very separate from the
17  ownership of this business.
18       THE COURT:  Okay.
19       MS. TAYLOR:  Which I think that's
20  where we are.  I also submit to the Court that the
21  statutory injunction does not provide one party, who at
22  that point in time is an employee of the business, to
23  be a bad employee or an employee who does things they
24  shouldn't be doing and then hide behind the injunction
25  and say, I continue to work here and obtain money no

Page 52

1   matter how I act.
2       We have a situation, I submit to the
3   Court, when we get into the proof, that will show that
4   Mr. Gentry quit.  He returned all the files.  He quit.
5       Then they discussed some time when he
6   came back.  Ms. Gentry tried to work with him.  Then
7   before the determination there were issues with misuse
8   of company funds by him.  That's our allegation.
9       There were issues of behavior that was
10  not acceptable in the workplace.  Tennessee is an
11  at-will state.  You can terminate an employee, which is
12  what happened.
13       At the same time, prior to the
14  termination, Mr. Gentry is saying, I am going to
15  transition out of Sweet Wise.
16       He has another business he's going to
17  start.  I'm transitioning out; see how you do it
18  without me.  And then we get to the point there's an
19  at-will termination.  So that is what happened.  Again,
20  he can't provide that.
21       THE COURT:  Okay.
22       MS. TAYLOR:  In terms of, also, the
23  contempt and the status quo, you had asked about the --
24  awarding a bonus.  We submit to you that Mr. Gentry --
25  we don't deny what Mr. Gentry did in the business, nor

Page 53

1   do we deny all that Ms. Gentry did, the fact that she's
2   had this business since 2001 -- or its precursor, same
3   name.
4       The injunction enjoins both people --
5   let's see.  While you continue expenditures to maintain
6   the standard of living, the usual and ordinary course
7   of operating a business are not restricted by this
8   injunction.
9       So if a bonus was made -- and, again,
10  the bonus, they make a claim that she took extra
11  compensation, and there's no proof of a date or any
12  information on that.  As an owner, she could take extra
13  compensation.  It needs to be accounted for to the
14  Court, and Mr. Alexander will certainly do that.
15       In addition, the proof will show that
16  previously in the calendar year of 2014, Mr. Gentry
17  took additional money out of the company that should
18  rightfully be considered as income, not a business
19  expense.
20       So I submit to you that that's not
21  contempt and it's not a situation to make someone an
22  implied owner of the business.  There's not that.
23       Also, Your Honor, in this business,
24  the K-1s that were prepared each year by Mr. Gentry, as
25  the accountant, all show Ms. -- say, Ms. Gentry,

14 (Pages 50 to 53)

Page 54

1    100 percent shareholder. So the documents he's
2    preparing to file with the IRS all show Ms. Gentry as
3    the 100 percent owner.
4            THE COURT: Okay. All right.
5    Ms. Perky, I'm going to let you begin with your proof.
6    I'm most interested in his income and expenses and his
7    need to continue some form of income. I don't want
8    to -- well, let's start with that, and then you can put
9    on the additional proof you think is necessary to
10   establish the elements that you would posit are
11   required to create this business relationship; okay?
12           All right. I know, look, I'm new.
13   Just bear with me. I'm trying to make sure I figure it
14   out. Some of these issues aren't easy for me.
15           MS. PERKY: Me either, Your Honor.
16   I'm going to call Mr. John Gentry to
17   the stand.
18           THE COURT: All right. Now,
19   Mr. Gentry, go ahead and sit there and let Reverend
20   Duncan swear in you.
21               (Witness was sworn.)
22           THE COURT: All right. Now, can he
23   hear you through the -- see the microphone that's right
24   in front of you? That should be working.
25           MS. PERKY: Mr. Gentry, can you hear

Page 55

1    me?
2            THE WITNESS: Yes.
3            THE COURT: Okay. We ought to be able
4    to work through that for right now.
5
6            JOHN ANTHONY GENTRY,
7    was called as a witness, and having been duly sworn,
8    was examined and testified as follows:
9
10               DIRECT EXAMINATION
11   BY MS. PERKY:
12   Q.    Please state your name for the Court.
13   A.    John Anthony Gentry.
14   Q.    Mr. Gentry, when were you married?
15   A.    Say again.
16   Q.    When were you married?
17   A.    September 5th, 2009.
18   Q.    And what was your employment in 2007?
19   A.    Prior to joining Sweet Wise, I was a
20   certified public accountant, director of finance for a
21   service industry company in Washington, D.C. I managed
22   the budget of about 17, $18 million, a payroll for
23   a thousand employees and all of the corporate services,
24   HR, IT, everything on the corporate side of the
25   business.

Page 56

1    Q.    And what was your compensation in 2007?
2    A.    About 86, $87,000.
3    Q.    And then in 2008 where were you employed?
4    A.    In 2008 I had -- was working with this
5    company in Washington, D.C. They went out of business.
6    And I started probably toward the end of 2008 helping
7    Kathy with Sweet Wise without compensation.
8    Q.    Okay. And how much did you -- how much did
9    you earn in 2008 from outside Sweet Wise?
10   A.    2008 was a partial year. About 62, 63,000.
11           MS. PERKY: Okay. I've got an
12   exhibit, Your Honor.
13           THE COURT: You can give it to
14   Reverend Duncan, here.
15   BY MS. PERKY:
16   Q.    And, Mr. Gentry, can you identify this
17   document for me, please?
18   A.    It's a comparison of Kathy's W-2 income to
19   my W-2 income.
20   Q.    Okay. And the documents that are attached
21   behind it, were those the documents that you used in
22   order to create this itemization on the first page?
23   A.    Yes, they are. It's financial statements
24   for 2007, and then our actual W-2s for 2008 forward.
25           MS. PERKY: I'd like that entered as

Page 57

1    the first exhibit, Your Honor.
2            THE COURT: All right. That will be
3    Exhibit No. 1.
4               (Marked Exhibit 1.)
5    BY MS. PERKY:
6    Q.    And what was Ms. Gentry's employment at the
7    time of the marriage, Mr. Gentry?
8    A.    Kathy was a sous chef, and she made cakes
9    out of her home for extra money before she started
10   Sweet Wise.
11   Q.    Okay. When was Sweet Wise started?
12   A.    Sweet Wise, in its initial form, as I
13   started working with her, was a mom-and-pop sort of
14   cake, candy, and pastry supply store. That was started
15   in 2006.
16   Q.    And according to your spreadsheet, what was
17   Ms. Gentry's gross income from Sweet Wise in 2007?
18   A.    2007, I don't know exactly. It's
19   commingled with payroll taxes and also with another
20   part-time employee, but it was -- the total account
21   balance was $13,400. My guess is probably around
22   11,000 or 12,000 was her payroll.
23   Q.    Okay. And what about in 2008?
24   A.    2008, her W-2 was $11,500.
25   Q.    Okay. And can you identify -- can you

15 (Pages 54 to 57)

Page 58

1  identify this document for me, please?
2  A.      This is a graph showing the revenue growth
3  of Sweet Wise from 2006 to 2013.
4  Q.      And are the documents that are attached
5  behind the itemization the documents that you used in
6  order to create the itemization?
7  A.      Those are the 1120S's, the corporate tax
8  returns for the company.
9          MS. PERKY:  I would like that entered
10  as the next exhibit, Your Honor.
11          THE COURT:  All right.  That will be
12  Exhibit 2.
13          MS. TAYLOR:  Your Honor, I would like
14  to look at that and see if there is an objection.
15          THE COURT:  All right.
16          MS. TAYLOR:  Your Honor, I certainly
17  object to some of this information, as it goes back to
18  2006, 2007, and 2008 regarding Sweet Wise.  If we refer
19  back to the discovery information that we were alluding
20  to, some of those were the documents that we did not
21  have.  Mr. Gentry has the originals.  And, also, that
22  business in 2006, 2007, 2008 was before the marriage,
23  owned by Ms. Gentry.  So I don't know his -- his access
24  to those records, nor have they been provided.  Those
25  are the original records we were asking for.

Page 59

1          MS. PERKY:  Your Honor, would you like
2  for me to respond, Your Honor?
3          THE COURT:  Yes, I would.
4          MS. PERKY:  In response, Your Honor,
5  the documents have been provided to counsel.  Those
6  were the documents that were copied and provided to
7  counsel.  They were also -- I want to clarify, Your
8  Honor, that he hasn't done anything underhanded to get
9  these documents.  He had access to all of this stuff
10  when he worked at the business.  And the copies of all
11  of these documents are in the possession of opposing
12  counsel; the originals are not.
13          And so I think that -- and, again, I
14  think that this information, Your Honor, is going to be
15  relevant to the Court to kind of see the -- to get the
16  financial picture for these parties in order to set
17  support or to set whatever his draw is going to be from
18  the company going forward, and to see what kind of
19  efforts he has made in growing this business.
20          I think it's very relevant to kind of
21  see the big financial picture, Your Honor.  I mean, I
22  don't know what their proof is going to be.  I hope
23  that they're not going to get up and try to say that
24  the business isn't successful and making money, but
25  they might.  And so I need to put that proof on through

Page 60

1  my client.
2          THE COURT:  All right.  I'm going to
3  let the exhibit come in.  Ms. Taylor, you're going to
4  certainly have the opportunity to cross-examine him
5  with respect to this chart.
6          You know, ultimately, I think the
7  chart probably will have some relevance.  As far as
8  today's hearing, it might only have relevance with
9  respect to the date of the marriage forward, but
10  certainly there's no harm in this coming in.
11          So I'm going to let it come in, and
12  then you can cross-examine him on it.
13          MS. PERKY:  Thank you, Your Honor.
14          (Marked Exhibit 2.)
15  BY MS. PERKY:
16  Q.      Mr. Gentry, what was Sweet Wise's annual
17  revenue in 2006?
18  A.      2006, it was $116,000.
19  Q.      What about 2007?
20  A.      It dropped down to 91,250.
21  Q.      And what about in 2008?
22  A.      149,000.
23  Q.      Now, in late 2009, did you have any
24  discussions with Ms. Gentry about joining Sweet Wise?
25  A.      I did.  I was looking at an opportunity to

Page 61

1  take a position with Gap, which is a large clothing
2  manufacturer, an excellent opportunity, a lot of growth
3  potential with Gap.
4          I had been working with Kathy since 2008,
5  just helping her organize the store, organize
6  inventory, get it functioning the way a business should
7  function, and I saw an opportunity.  People would come
8  in the store and say, you know, Hey, I really like this
9  store.  And that's something you don't hear very often.
10          So I talked to Kathy and said, you know,
11  I've got this opportunity with Gap, but I think there's
12  a great opportunity for us to partner together with
13  Sweet Wise and we can take this thing off.
14          And so we made a joint decision together
15  that we would partner together and continue to try to
16  build Sweet Wise.
17  Q.      So did you forego other employment
18  opportunities in order to work at Sweet Wise?
19  A.      I did not pursue the Gap position.  I
20  declined a second interview with them and I did not --
21  customarily, after the first interview, I would follow
22  up with a thank-you letter and tell them how excited I
23  would be to join the company.  And I didn't pursue
24  that, either, after Kathy and I agreed we wanted to
25  partner in Sweet Wise.

16 (Pages 58 to 61)

Page 62

1    Q.      So after you joined Sweet Wise in 2009,
2   tell the Court what kind of things you did.
3    A.      Well, Kathy was the expert baker and cake
4   decorator.  She's really good with that part of the
5   business, where I was the expert with the business side
6   of the company.
7           I created every process, every system for
8   Sweet Wise, from how we interview and hire employees,
9   to how we fulfill orders that we ship out, to creating
10  internal controls, safeguarding cash for the company,
11  really just everything.
12          I started out in 2009 and I built a pricing
13  model, where I took the cost and assigned a certain
14  markup percentage based on the cost to achieve a
15  certain level of profitability.  So I looked at Kathy
16  and said, How much money do you want to make?
17          And she said, Well, I would like to make a
18  $100,000 a year.  That would be great if I could do
19  that.
20          So I said, Okay, well, we'll build a
21  pricing model that will achieve that level of income
22  for the company and we'll see what happens.
23          And the company just started taking off
24  from a profitability point initially there.  After
25  that, I just continued on.

Page 63

1           We started -- Kathy was kind of purchasing
2   on the fly.  It was very expensive for shipping
3   charges.  So I started pooling, and instead of
4   purchasing, you know, two or three or four times a
5   week, we started purchasing once a month and having it
6   come in on a pallet.  The first year, that probably
7   saved us seven or ten thousand dollars in shipping
8   charges.  Which, at that time, for the company, that
9   was pure profit.  That was a big change for the
10  company.
11          We had Roland Mesnier, the White House
12  pastry chef, that came in and taught a class on pulled
13  and blown sugar.  I took an interest in it.  Pulled and
14  blown is kind of the pinnacle of pastry arts, and I
15  spent about 80 to 100 hours learning how to do this.
16  We created a class at Sweet Wise, and I taught the
17  class.
18          We wanted to expand the business and open
19  up a classroom, but we didn't feel we could afford the
20  classroom space.  And I said, Well, we'll use the
21  revenue from the sugar class to pay for the classroom.
22          So all of the revenue that was generated
23  from that new class that I started paid for us to
24  double our space.  And I taught that class for the
25  first several months.

Page 64

1           THE COURT:  All right.  Tell me again,
2   since I'm not familiar with these terms, what type of
3   sugar?
4           THE WITNESS:  You can take table sugar
5   and you can cook it with water and corn syrup, and you
6   can shape it like --
7           THE COURT:  All right.  What's the --
8           THE WITNESS:  It's really, really --
9           THE COURT:  What's the term of art?
10  Blown?
11          THE WITNESS:  Blown sugar.
12          THE COURT:  Okay.  thank you.
13          THE WITNESS:  So once we had the new
14  classroom space, I started negotiating with Groupon.
15  And, typically, Groupon normally does a revenue share
16  of 50-50, and I said, That is not going to work for us,
17  we need to go to 70-30.  And nobody gets that, but I was
18  able to get that with Groupon.
19          And when we first launched our first
20  Groupon campaign, from that point forward our Saturday
21  business doubled, as well as our weekly traffic picked
22  up significantly.
23          From there, we used the money and the
24  profit from that and we rebuilt our Web site.  I
25  started outsourcing -- one of the gentlemen that's

Page 65

1   going to testify today is from Macedonia.  It's in
2   Eastern Europe.  It's a little small country north of
3   Greece.
4           The functions that we outsource over
5   there, they pay about 10 cents on the dollar to what we
6   would pay here.  So I started outsourcing the
7   purchasing to Dancho, paying him $25 a week.  He was
8   happy to make that kind of money.  It was, you know, a
9   fair amount for him, and it was next to free for the
10  company.
11          A company like Sweet Wise -- that's --
12  you know, outsourcing to Europe like that is something
13  like Dell Corporation or somebody would do.  That's not
14  something that a small mom-and-pop operation would be
15  able to accomplish.
16          Because of my experience in
17  Washington, D.C., with bringing labor over on J-1 visas
18  for summer work programs, I maintain a lot of
19  relationships with people in Eastern Europe.
20          So we continued to outsource all of
21  our customer service.  I trained our accountant, who
22  does all of our bookkeeping, all of our financial
23  reporting.  He's in Bulgaria.  And we outsource all of
24  our marketing and IT over there as well.
25          On a yearly basis, outsourcing to

17 (Pages 62 to 65)

Page 66

1    Eastern Europe saves us between 150,000 and $250,000
2    every year.
3              Building our Web site, we probably
4    saved $300,000 -- easily $250,000 we saved in building
5    our Web site over there.
6              We continued to develop -- we built a
7    mobile Web site. We built a wholesale Web site. We
8    added a gallery where customers could upload pictures.
9    On average, we would spend a thousand dollars a
10   month -- in U.S. dollars that would be about $10,000 a
11   month -- on the development. All the ideas for
12   development came from me.
13             I would see something cool on a Web
14   site and say, Hey, I want to do that. And I would work
15   with the guys, build -- I would write the logic
16   myself -- "if this, then that" clauses -- for the
17   programming that went into the Web site.
18             Toward the end, in 2014, I was annoyed
19   with our largest supplier, who is a wholesale company,
20   and I said, You know what? I'm kind of tired of doing
21   business with you guys, and we're going to start doing
22   manufacturer-direct. We're big enough to do it.
23             So I went in and I actually ran the
24   cash register in the store to help pay for that so that
25   we could afford to start buying bulk. And it was a

Page 67

1    tremendous change for the business. It cut our cost of
2    goods sold by 30 percent to be able to buy
3    manufacturer-direct instead of buying from a
4    wholesaler, which allowed us to start acting like a
5    wholesaler.
6              And I created a new niche market for
7    us. So, typically, you could go out and buy, say, a
8    bakery box and buy maybe a single box for a dollar or
9    six boxes for $5 or something, and the next option was
10   to buy a case of 500. So I created a niche market and
11   we started repackaging as Sweet Wise and selling. So
12   instead of buying 1 or 500, you could buy 25 or you
13   could buy a hundred. And that was probably the biggest
14   contributor to our success in 2014.
15             At the end of 2014, we fired our
16   shipping manager and I decided to go in and start
17   shipping myself. So as a certified public accountant,
18   I went in and started packing boxes and printing U.S.
19   labels -- UPS labels and sending these packages out.
20   And I did that because I wanted to evaluate the
21   efficiencies of the processes at Sweet Wise and how we
22   shipped boxes.
23             And what I found was just by
24   increasing the cubic inches, maybe adding another 100
25   cubic inches to a box or adding another inch to the

Page 68

1    length, we were able reduce our shipping cost by almost
2    $50,000 a year. Not just from changing the size of the
3    boxes, but I also negotiated a new dimensional weight
4    factor with UPS.
5              UPS takes length times width times
6    height, and they divide it by a factor, and that's a
7    surcharge that they add on. So even though you have
8    maybe 10 pounds in a box, if the box is really big,
9    they'll charge you for 20 or 30 pounds, which increases
10   your shipping a lot.
11             So by my going in there and shipping
12   for August, September, October, part of November,
13   almost four months shipping, we found a way to save the
14   company $50,000 a year.
15             And right up at the end, I think the
16   day before I got fired, I negotiated a 40,000-dollar
17   sale with a company in the UK.
18   BY MS. PERKY:
19   Q.        Okay. So how many hours -- you've told the
20   Court a lot about all the things that you did for the
21   business. How many hours per week did you work
22   approximately?
23   A.        It varied tremendously. I would get on a
24   project and really dig in, and sometimes I would work
25   as much as 300 to 360 hours a week. It wasn't uncommon

Page 69

1    for me to work a 60-, 70-hour week sometimes.
2    Q.        Stop, stop, stop. You said 360 hours per
3    week. I don't think that's possible.
4    A.        Per month. Per month.
5    Q.        Per month. Okay.
6              THE COURT: All right.
7              THE WITNESS: About 60 hours a week.
8    BY MS. PERKY:
9    Q.        Sure.
10   A.        And then sometimes I would pull back. I'd
11   get off of a project and I would cut back and maybe do
12   10 or 20 hours a week for a couple weeks before I would
13   dig into the next project.
14   Q.        So has this been your sole source of
15   employment since 2009?
16   A.        Yes, it has.
17   Q.        And you've gone into detail about the type
18   of things that you did at the business. What types of
19   things did Ms. Gentry do at the business after you
20   joined in 2009?
21   A.        When I first started, I think Kathy was
22   kind of burned out. She had talked about -- she was
23   thinking about closing the business, wasn't really sure
24   that she wanted to stay in it. You know, if you're
25   only making 10,000 or $11,000 a year and you're working

18 (Pages 66 to 69)

Page 70

1   40 hours a week, it's not a very good use of your time.
2   And she was just kind of burned out, being in there day
3   in and day out. So Kathy really stepped out.
4          But what she did do initially in the first
5   year -- I went in and ran the cash register. I did the
6   storeroom. I did everything in the business. But
7   Kathy was there for me on the phone when a customer had
8   a question saying, Hey, how do I bake this cake, or,
9   How do I use this chocolate, or something. I would
10  call Kathy on the phone, and then Kathy would explain
11  it to me and the customer at the same time. So that's
12  how I learned the cake decorating and the bakery side
13  of the business as well.
14  Q.      Did Ms. Gentry also make videos?
15  A.      Pardon?
16  Q.      Did Ms. Gentry also make videos?
17  A.      Oh, yeah. Kathy's actually -- one of the
18  main drivers for our business, through our marketing,
19  are YouTube videos that we made. I had been working
20  with the Web site developer and I said, Hey, I want to
21  get a video on our Web site to showcase -- we have a
22  patent-pending product, and I wanted to showcase that
23  in a video and use that to sell. And they had
24  suggested you can go do that on YouTube.
25         So I started researching with YouTube and I

Page 71

1   created a Sweet Wise channel for -- and we started
2   loading YouTube videos. Kathy is the star of all of
3   our videos. She is exceptional in how she presents
4   herself and presents knowledge to the viewers so that
5   it's really easy for them to understand, take away a
6   great skill from watching a five-minute video of
7   Kathy's.
8   Q.      So, on average, how many hours per week
9   would she work after you joined up in 2009 doing the
10  videos and the other things that you've mentioned to
11  the Court?
12  A.      Typically five, ten hours a week. She'd do
13  a couple hours of prep time and then -- and then, you
14  know, maybe an hour to shoot videos. Toward the end,
15  she started approving all of our artwork for our
16  newsletters and that sort of thing.
17  Q.      Now, the annual revenue for Sweet Wise, did
18  it increase dramatically after you joined in 2009?
19  A.      Yes.
20  Q.      Okay. And how much was it in 2014?
21  A.      I'm not sure of the final number in 2014.
22  It should be close to 1.6 or 1.7 million.
23  Q.      Okay. And did you and Ms. Gentry -- I
24  heard you mention you-all created certain tools for the
25  business together. Can you describe to the Court what

Page 72

1   those are? Say that again.
2   A.      Say that again.
3   Q.      The tools for the business that you
4   created. Did you create tools for your business?
5   A.      Oh, yeah. We have a patent-pending
6   product. I was watching Kathy teach a class early on,
7   back in 2009, and she was using two sheets of vinyl
8   that she had bought at a craft store and was showing
9   the students how to put fondant onto a cake using this
10  method.
11         The method that she was teaching, it takes
12  a skill -- something that professionals have a
13  difficult time with, and it makes it so easy that a
14  12-year-old can accomplish a professional look. It
15  makes it real easy. As I was watching Kathy show the
16  students how to use the tool, I'd see the students'
17  mouths drop, like, wow, that's really cool.
18         So I saw an opportunity to create a
19  product, which we did. We have a patent pending for
20  that product now. We have distribution going all over
21  the world. We ship from Nashville all over the world.
22  We have resellers in Australia, in the UK, in Germany,
23  France. I think Italy, Spain. It's quite popular in
24  Canada, and it does really well in the United States as
25  well.

Page 73

1   Q.      Mr. Gentry, what's the name of this
2   product?
3   A.      It's called "THE MAT." We have four
4   versions: THE HOME MAT, THE PRO MAT, THE MINI MAT, and
5   THE Original MAT.
6   Q.      Okay. Could you identify that document for
7   me, please?
8   A.      Is it the patent?
9   Q.      Did he hand it to you?
10  A.      I didn't see it.
11         MS. PERKY: Mr. Court Officer, I
12  believe there's two copies of it with the Court,
13  possibly.
14         THE COURT: I do have two copies.
15         MS. PERKY: If you'll hand it to the
16  witness, Your Honor -- I mean, Mr. Court Officer.
17         THE COURT: It's his birthday. You
18  can call him that. I'm not kidding about that part.
19  It is his birthday.
20         MS. PERKY: Happy birthday.
21         THE WITNESS: This is a -- it's a
22  filing receipt, a confirmation from the United States
23  Patent and Trademark Office.
24  BY MS. PERKY:
25  Q.      Who's listed as the inventors of THE MAT?

19 (Pages 70 to 73)

Page 74

1   A.      It shows Kathy, my wife, and myself.
2   Q.      And are you aware of what portion of Sweet
3   Wise's annual net income is derived from sales of THE
4   MAT?
5   A.      Substantially all of the income from the
6   business comes from THE MAT. If we pulled out the
7   profitability from this product, we would have to start
8   dropping wages and maybe cutting positions. We would
9   definitely have to change the business model.
10          We have discretionary spending of around
11  $150,000 a year. We would have to eliminate that to
12  offset the loss of profit from the product.
13          MS. PERKY: Your Honor, can I enter
14  that as Exhibit No. 3, please?
15          THE COURT: All right.
16          (Marked Exhibit 3.)
17  BY MS. PERKY:
18  Q.      Mr. Gentry, can you identify this document
19  for me, please?
20  A.      This schedule shows the profit, the gross
21  profit from the sale of our mat from 2011 through 2014.
22  Q.      Okay. And the documents that were attached
23  behind, are those what you used in order to create this
24  itemization?
25  A.      These are downloads. The supporting

Page 75

1   documentation are downloads from our point-of-sale
2   system.
3   Q.      And what does -- it looks like what
4   portion -- what is the total product profit for THE MAT
5   from 2011 to 2014?
6   A.      The total profit's $821,000.
7           MS. PERKY: We'd like that entered as
8   the next exhibit, Your Honor.
9           THE COURT: All right. Number 4.
10          (Marked Exhibit 4.)
11  BY MS. PERKY:
12  Q.      And what sorts of things did you do,
13  Mr. Gentry, in becoming the co-inventor of THE MAT?
14  A.      Pardon me?
15  Q.      What kind of things did you do in order to
16  become the co-inventor of THE MAT? What was your
17  involvement?
18  A.      Well, I gave a description just now of how
19  we came up with the idea for selling the product.
20          I had initially gone to a business partner
21  of ours, who is this wholesaler that I ended up later
22  getting rid of. But I went to them and said, Hey, I
23  have a great product. I'd like you to sign a
24  noncompete/nondisclosure, and come look at it, and
25  maybe we can work together on this.

Page 76

1           So they did. They signed the
2   noncompete/nondisclosure and they came out to our
3   store. We introduced them to the product and they
4   said, Wow, I've never seen a product work like that.
5   Is it food safe?
6           And being an accountant and not a food
7   product manufacturer, I didn't realize that that was
8   important. Which, it obviously is. And I said, No,
9   it's not.
10          I went to the company that we were buying
11  the vinyl from and asked them if it's food safe. They
12  said no. I asked them could they make it food safe.
13  They said no.
14          So I went to this company that had signed
15  the nondisclosure/noncompete and said, Why don't you
16  guys try to find somebody that can make it food safe.
17          And they tried for about eight months,
18  maybe a year, and they were not successful. They
19  couldn't find anybody to make this material with the
20  same characteristics that it needed to function and
21  they couldn't make it food safe.
22          I didn't give up. I continued to contact
23  plastics manufacturers, and I found two. One was
24  O'Sullivan Plastics, which is a medical supplier. They
25  make blood bags, and the blood bag material is actually

Page 77

1   very similar to our material. And, obviously, a blood
2   bag is food safe.
3           And I found another company, up in
4   Washington State, called Achilles. And Achilles is who
5   we ultimately went to for fabrication of material.
6           So we did our first -- we did a couple test
7   runs with them, 3,000 pounds of material. And then we
8   started going with full production with them. Once we
9   tested it, it worked out great.
10          From that point, we wanted to add artwork
11  to the material. And I kept sending samples out to
12  printing company after printing company, and they would
13  all come back and say, No, we can't print to it. No,
14  we can't print to it.
15          Probably I sent out 50, maybe a hundred
16  samples, to no avail. But I'm pretty tenaciously
17  persistent, so I kept on it. Eventually, I just gave
18  up and said, Well, if we can't print the material, we
19  need to change the material.
20          So I called the company up in Washington
21  State and said, Hey, can we change the finish on one
22  side to make it maybe porous or a matte finish or
23  something and leave the other side polished?
24          I think it was kind of a, you know, "Oh,
25  good grief, why didn't we think of that before." And

20 (Pages 74 to 77)

Page 78

1    it was from that point we were successfully able to get
2    ink to adhere to the material, which is when we really
3    launched the product for the first time. When we did
4    our first print run, we shipped out hundreds of them on
5    the first day.
6            One of the ways -- an interesting aside,
7    one of the ways --
8    Q.     I think the Court understands what THE MAT
9    does and your involvement. I understand this is your
10   life, but let's kind of keep moving.
11           So did you and Ms. Gentry take similar
12   draws from the business after you joined?
13   A.     Yes, pretty much the same.
14   Q.     Okay. And are those itemized on Exhibit 1?
15   A.     Through our compensation? Yes.
16   Q.     Yes. And so in 2011 did y'all start doing
17   something a little differently that kind of upped your
18   compensation?
19   A.     You'll see an adjustment there, 23,400,
20   which I explain down at the bottom of the paragraph
21   there. My compensation, I was receiving 650 a week.
22   And one week out of a month, we would take an additional
23   $1,950, which we used to pay for the mortgage on our
24   marital residence. So, effectively, the company was
25   paying our mortgage for us, but it was just showing up

Page 79

1    in my compensation for tax purposes.
2    Q.     And so who determined the monthly draws
3    that Ms. Gentry would receive and what you would
4    receive?
5    A.     Generally, I would approve or say, Yeah, we
6    can afford that, or, No, we can't. Or I could move
7    money around. It was generally a joint discussion.
8    Q.     So, say that Sweet Wise had a couple bad
9    months. Would you take the same draw or would it be
10   modified?
11   A.     No, I would -- we would continue to take
12   the same draw. But I would take steps to -- if we did
13   have a bad month, you know, maybe we'd let somebody go
14   and I would go work in the store, or we would cut
15   hours, or you know, we would work on doing a promotion
16   or something to offset that and get revenues back up
17   where we need to be.
18   Q.     Were any personal expenses paid through the
19   business?
20   A.     A lot of our personal expenses were paid
21   through the business. Our cell phones, our cable and
22   Internet at the house, our dining expenses, our cars,
23   our gas expense, our cell phones. Pretty much -- most
24   all of our expenses were paid through the business.
25   Q.     And why did you do --

Page 80

1    A.     Or by the business.
2    Q.     Why did you do that?
3    A.     Pardon me?
4    Q.     Why did y'all do that?
5    A.     It's a tax advantage. Instead of paying
6    with post-tax dollars, that we've had income taken out
7    on, we're paying for it with pretax dollars.
8    Q.     And did you and Ms. Gentry mutually agree
9    to do this?
10   A.     Yes.
11   Q.     Can you identify this document for
12   me, Mr. Gentry?
13   A.     There's two pieces on here: discretionary
14   spending -- so that's money we can choose to spend or
15   not to spend for meals, entertainment, travel, and
16   auto, on the top half -- and the deferred revenue.
17           The deferred revenue comes from the sales
18   of Groupon, Living Social campaigns, the daily deals.
19   You've probably seen them. The students that come in
20   and use them, it's not a hundred percent. So over the
21   last three years, we've accumulated $93,000 in the
22   deferred revenue in the company, which is pure profit
23   that hasn't been recognized and it hasn't been taxed,
24   but it's money that's come into the company from our
25   Groupon deals.

Page 81

1    Q.     And are these documents that are attached
2    to the back of the itemization the documents that
3    you've used in order to create the document?
4    A.     Yes.
5            MS. PERKY: We'd like that entered as
6    the next exhibit, Your Honor.
7            THE COURT: I think we're up to 6.
8    Let me double-check. No, just 5. All right.
9            (Marked Exhibit 5.)
10   BY MS. PERKY:
11   Q.     Now, after filing for divorce, did
12   Ms. Gentry's behavior in the workplace change towards
13   you?
14   A.     Well, Kathy started coming in every day.
15   She generally only came in once a week to shoot videos
16   prior to that. Then she started coming in every day
17   for several hours, three to five hours, typically. She
18   became very hypercritical of me. She also started
19   asking me to account for my time.
20           And toward the end, she actually started
21   requiring me to report to her my daily accomplishments.
22   And when I would ask her what she was working on, she
23   would tell me that I'm an employee and it's none of my
24   business what she's working on.
25   Q.     And so prior to her filing for divorce, did

21 (Pages 78 to 81)

Page 82

1   she require you to do a reporting of the things that
2   you accomplished in any given day?
3   A.      Say again, please.
4   Q.      Prior to her filing for divorce, did she
5   require you to report to her the things that you
6   accomplished in any given day?
7   A.      No, never.
8   Q.      Okay.  Were there any kind of, like,
9   reviews that she sat down with you at the end of the
10  year to talk about the things that you did well or
11  didn't do well, and whether or not you were being a
12  good employee?
13  A.      No.  We never had anything like that.
14  Q.      Now, after she filed for divorce, did
15  Ms. Gentry make any efforts toward you to push you out
16  of the business?
17  A.      Yes, she did.  When I told her that I
18  wanted to get a divorce, the first thing she did was
19  she wouldn't return the stock certificate and canceled
20  my bank debit card for the company.
21  Q.      Did she tell you beforehand that she was
22  planning on canceling that bank debit card?
23  A.      Say again.
24  Q.      Did she tell you beforehand that she was
25  planning on canceling that bank debit card?

Page 83

1   A.      No.  I found out.  I went to get gas and my
2   card was declined.
3   Q.      Okay.
4   A.      And then from there, she told me that I
5   couldn't buy gas on the company credit card.  I think
6   that was around August.  And then in October, she told
7   me to turn in my company vehicle, that I wasn't allowed
8   to use it anymore.
9   Q.      And when you say "company vehicle," did you
10  have another vehicle that was your personal vehicle?
11  A.      No.  I had given my personal vehicle to her
12  son.
13  Q.      And when was that?
14  A.      Pardon me?
15  Q.      When was that?
16  A.      That was when we purchased the company car
17  for me.  And I believe that was in 2012.
18  Q.      Okay.
19  A.      So I gave my car to Logan -- her son,
20  Logan.  And then he later traded that in for a little
21  Nissan, small car.
22  Q.      Okay.  So at that point did the company
23  purchase a vehicle for your use?
24  A.      At the same time that I gave Logan my car,
25  the company bought that car for me.

Page 84

1   Q.      And that was the only vehicle that you had?
2   A.      Yes.
3   Q.      At some point did she take away that
4   vehicle?
5   A.      Yeah.  She e-mailed me, I think it was
6   around October 6th or something, and told me to turn in
7   the vehicle.
8   Q.      Did she tell you why?
9   A.      She said it was because I was put putting
10  the company at risk, drinking and driving.
11  Q.      Okay.  Do you know how she would be aware
12  of whether or not you were drinking and driving?  Were
13  y'all hanging out socially together during this time?
14  A.      We would always go out and have dinner and
15  have a couple glasses of wine at dinner.  Certainly
16  nothing illegal, and well within the legal limits,
17  which is the same way that I was behaving when she
18  confiscated my car.
19          What I found out was that Kathy was using
20  the "Find My iPhone" app, and she was tracking me.  And
21  the night before my car was confiscated, she pinged me
22  on the -- she used the "Find My iPhone" app probably
23  every five or ten minutes for about three or four hours
24  while I was out.  I think she pinged me maybe 20, 30
25  times that evening.

Page 85

1   Q.      Did you know that she was doing that?
2   A.      I didn't at the time.
3   Q.      Did you know that she had the ability to
4   track you on your phone?
5   A.      No, I didn't.
6   Q.      Is your cell phone paid through the
7   business?
8   A.      Pardon?
9   Q.      Your cell phone, was it being paid through
10  the business?
11  A.      It was paid through the business.
12  Q.      Is that how she gained access to it in
13  order to ping you?
14  A.      No.  I think she used her daughter's iPad,
15  which had the log-in into my iTunes account, because
16  Lindsey, her daughter, would use it to buy apps through
17  my iTunes account.  So it had a stored password that
18  she'd use.
19  Q.      Did Ms. Gentry also let your health
20  insurance lapse?
21  A.      Pardon me?
22  Q.      Did Ms. Gentry also allow your health
23  insurance to lapse?
24  A.      She did.  I received the notice from
25  BlueCross BlueShield for nonpayment.  I forwarded that

22 (Pages 82 to 85)

TRANSCRIPT OF PROCEEDINGS        MARCH 10, 2015

Page 86

1    on to Paveo, in accounting, and asked him if he knew
2    what was going on with it.  And I didn't do anything
3    after that until I received the notice that my health
4    insurance was canceled.
5    Q.       Now, in December, things are escalating at
6    this point; correct -- between you and Ms. Gentry?
7    A.       Yes.
8    Q.       And in December of 2014, were you actually
9    terminated by Ms. Gentry?
10   A.       Yes.  She sent me an e-mail -- I had gone
11   to Washington, D.C., to see a military retirement
12   ceremony for an old friend of mine.  And on my way
13   back, or when I got home, I had an e-mail from Kathy
14   saying that I was no longer needed at Sweet Wise and
15   that I was fired.  And she filed a Notice of Separation
16   with the Department of Labor that was quite libelous.
17   Q.       Mr. Gentry, can you identify this document
18   for me?
19   A.       Yes.  This is the separation notice that
20   Kathy filed with the Tennessee Department of Labor.
21            MS. PERKY:  I'd like that entered as
22   the next exhibit, Your Honor.
23            THE COURT:  All right.  That's
24   Exhibit 6.
25            (Marked Exhibit 6.)

Page 87

1    BY MS. PERKY:
2    Q.       And what does it have listed under 6 as her
3    reasons for your termination?
4    A.       She states that I violated several company
5    policies, but not limited to theft, inappropriate
6    spending of company funds, job abandonment,
7    insubordination, and harassment.
8    Q.       And under -- are you aware whether under
9    the State of Tennessee Department of Labor and
10   Workforce, whether or not an officer of a company, you
11   have to file a Notice of Separation?
12   A.       Officers and owners of the company are not
13   subject to Department of Labor oversight, so this
14   document should have never been filed.  It's certainly
15   not helpful to my career.
16   Q.       And did she do anything else after she
17   allegedly terminated you in December of 2014?
18   A.       She sent me an e-mail notifying me that she
19   was going to tell all of the employees in the company
20   that I was fired and no longer welcome at Sweet Wise
21   property and that they should call the police if they
22   see me.
23   Q.       Did she change the locks to the business?
24   A.       She changed the locks.  She changed all the
25   security access to all the bank accounts, all the

Page 88

1    credit card accounts, to the remote access to the
2    server, the on-line store.  She closed my -- or changed
3    the password on my e-mail account so I couldn't access
4    my company e-mail anymore.  Really everything, just
5    locked me out completely.
6    Q.       Did she remove you as signatory on all the
7    financial accounts for the business?
8    A.       She did remove me as a signatory.  I think
9    that was a bit before, though.
10   Q.       Mr. Gentry, why did you let her do this?
11   A.       In the beginning, I really was hopeful that
12   we would continue to run the business together.  I
13   think we made a really good team, with her creativity
14   and with my business savvy.  And I was hopeful -- you
15   know, where we've taken the business right now, it's
16   poised for the next growth spurt, and there's some
17   really great opportunity for the business.
18            I've never had more fun working for another
19   company.  I really enjoyed working with Sweet Wise and
20   building that business up.  And I hope to continue that
21   with Kathy.
22            So in the beginning, when she canceled my
23   bank card, okay, if that makes you feel better, if it
24   will give us a little bit of peace, we'll move forward.
25   But it just kept getting worse and worse.

Page 89

1    Q.       And at the time that Ms. Gentry pushed you
2    out of the business, what was your weekly salary?
3    A.       We both made $1500 a week.
4    Q.       Okay.  So that's exactly the same salary
5    that Ms. Gentry received?
6    A.       Exactly the same.
7            THE COURT:  What was that number
8    again, Mr. Gentry?
9            THE WITNESS:  Excuse me, sir?
10           THE COURT:  What was that number
11   again?  I think I heard you right.
12           THE WITNESS:  The base weekly pay was
13   1,500 per week, 78,000 per year.
14           THE COURT:  Okay.
15   BY MS. PERKY:
16   Q.       Mr. Gentry, can you identify this document
17   for me, please?
18   A.       This is a listing of my compensation and my
19   benefits that were paid by the company.
20   Q.       Okay.  And are the documents that are
21   attached to the back of the itemization the documents
22   you used in order to create the document?
23   A.       Yes.  Those are all supporting
24   documentation from bank statements, credit card
25   statements, and so forth.

23 (Pages 86 to 89)

Page 90

1    Q.      So the business paid for your auto payment,
2    which was the Lexus 450h; correct?
3    A.      Say again.
4    Q.      The business paid -- prior to your
5    termination, the business paid your auto payment for
6    your Lexus 450H; correct?
7    A.      That's correct, yes.
8    Q.      The business also paid for your auto
9    insurance?
10   A.      That's correct.
11   Q.      The business gave you periodic bonuses;
12   correct?
13   A.      Correct.
14   Q.      The business also paid for your cell phone?
15   A.      Correct.
16   Q.      The business paid for your home, cable, and
17   Internet?
18   A.      Yes.
19   Q.      The business paid for your average dining
20   expenses, which was put on the company credit card;
21   correct?
22   A.      That's correct.
23   Q.      The business also paid for your health
24   insurance cost?
25   A.      That's correct.

Page 91

1    Q.      And the business also paid for your fuel
2    cost for your car?
3    A.      Yes, it did.
4    Q.      Was there ever any time that y'all didn't
5    include all the gas that was charged on the card and
6    tried to differentiate between personal and business
7    usage?
8    A.      No. Everything is commingled.
9    Q.      Is that the same with expenses put on the
10   credit card for dining?
11   A.      Yes.
12   Q.      Okay. Isn't it true that oftentimes y'all
13   would pay for massages or other personal things like
14   that and put it on the business credit card?
15   A.      Yes. Actually, in the beginning, Kathy had
16   a recurring fee for a massage on a company credit card,
17   that we, you know, would both go over to Oriental Chi
18   in the mall and get a back rub after lunch or
19   something.
20            MS. PERKY: I'd like this entered as
21   the next exhibit, Your Honor.
22            THE COURT: All right. I believe
23   we're up to 7 now.
24            (Marked Exhibit 7.)
25   ///

Page 92

1    BY MS. PERKY:
2    Q.      So your total monthly compensation, then,
3    including your salary, bonus, and all the expenses that
4    were paid by the business is how much?
5    A.      It's almost 9,000 per month.
6    Q.      Now, is this itemization consistent also
7    with your monthly needs?
8    A.      Yes, it is.
9    Q.      And is this compensation substantially
10   similar to exactly what Ms. Gentry receives from the
11   business as compensation?
12   A.      She -- a little bit more, but essentially
13   the same.
14   Q.      And would you like for the Court to order
15   that each party's draws from the business be limited to
16   this $8,840 per month?
17   A.      Yes, I do, unless we both agree to
18   additional compensation.
19   Q.      Okay. Alternatively, would you like for
20   the Court to order that you receive pendente lite
21   support in that amount?
22   A.      Yes, I would.
23   Q.      Now, Mr. Gentry, do you have any concerns
24   about Ms. Gentry's use of business funds since filing
25   for divorce?

Page 93

1    A.      Say that again, please.
2    Q.      Do you have any concerns about Ms. Gentry's
3    use of business funds since filing for divorce?
4    A.      She compensated herself with two bonuses, I
5    think a little less than $3,000. We had agreed that we
6    would bonus equally, and then she instructed payroll to
7    not bonus me.
8    Q.      Okay. Do you know what she used that for?
9    A.      Say again.
10   Q.      Do you know what she used the money for?
11   A.      Part of it was for her son's tuition, and
12   part of it was garage doors in her house.
13   Q.      And did she also pay for her son's gas and
14   auto insurance through the business?
15   A.      She did.
16   Q.      Now, Mr. Gentry, what draws, if any, have
17   you received from the business since December 2014?
18   A.      Through the last hearing -- we had a motion
19   to continue -- I had received about 7,700, which was
20   about five weeks of pay.
21   Q.      So you haven't received anything other than
22   that --
23   A.      No.
24   Q.      -- since December of 2014?
25   A.      No, I have not.

24 (Pages 90 to 93)

Page 94

1    Q.      Okay.  Now, how have you paid your
2    expenses, then, after being pushed out of the business?
3    A.      I've been living off of credit cards.  I'm
4    about completely maxed out.
5    Q.      And has Ms. Gentry continued to take her
6    draws from the business?
7    A.      I assume so.
8    Q.      Would you like to receive -- for the Court
9    to award you a proportionate share of draws from the
10   business since December 2014?
11   A.      Yes, I would.
12   Q.      And how much do you estimate that to be?
13   A.      A little less than 19,000.
14   Q.      Is that also included here on Exhibit 7?
15   A.      Say again.
16   Q.      Is that also included here on Exhibit 7,
17   how you came up with that number?
18   A.      Yes.
19   Q.      Okay.  Now, what did you do about
20   transportation after Ms. Gentry took your car?
21   A.      Initially, I rented a car, thinking that I
22   would have an opportunity to be heard in court and that
23   I would have my company car returned back to me.  But
24   it was taking so long, I went out and took out a
25   personal loan and went to purchase -- or leased a

Page 95

1    vehicle.
2    Q.      Prior to leasing a vehicle, did you rent a
3    vehicle?
4    A.      I rented a vehicle for about a month and a
5    half.
6    Q.      Okay.  Now, Mr. Gentry, can you identify
7    this document for me, please?
8    A.      It's a credit card statement.
9    Q.      And what does -- are there highlighted
10   entries on this credit card statement?
11   A.      There's two highlighted items, on page 1
12   and page 3, that show my rental car fees.
13   Q.      And so what was the total amount of
14   expenses you incurred in having to rent a car after
15   Ms. Gentry took your car?
16   A.      It was about $1800.
17   Q.      Would you like the Court to order that she
18   reimburse you that sum?
19   A.      Yes, I would.
20   Q.      Now, Mr. Gentry, how are you proposing that
21   the Court order that Sweet Wise be run during the
22   pendency of these proceedings?
23           THE COURT:  Before you answer that, do
24   you want this made an exhibit?
25           MS. PERKY:  Yes, Your Honor.  Thank

Page 96

1    you.
2            THE COURT:  All right.  It will be
3    Exhibit 8.
4                (Marked Exhibit 8.)
5            THE COURT:  All right.  Go ahead,
6    Mr. Gentry.
7    BY MS. PERKY:
8    Q.      How are you proposing that Sweet Wise be
9    run during pendency of the divorce?
10   A.      How do we run the business?
11   Q.      Mm-hmm.
12   A.      I think it would be better if I ran the
13   business during the pendency.
14   Q.      Why do you think that?
15   A.      Why?  I have lots of great ideas to keep
16   moving the company forward.  It will increase both of
17   our wealth.  And I'm quite adept at managing the
18   business.
19   Q.      If, alternatively, the Court orders that
20   Ms. Gentry runs Sweet Wise during the pendency of the
21   divorce, what kind of accounting and access would you
22   like to have to the business?
23   A.      I would like to have access to all the
24   on-line accounts, all the credit card accounts, the
25   remote server access, as well as our on-line store.

Page 97

1    Q.      And at this point, do you have access to
2    those things?
3    A.      I don't have access to any of it anymore.
4    Q.      Why not?
5    A.      Kathy changed all the passwords, locked me
6    out of everything.
7    Q.      Would you also like to have unrestricted
8    communications with Dancho and Paveo, your two
9    employees at Sweet Wise?
10   A.      Yes, I would.
11   Q.      And why would you like that?
12   A.      It would help me keep the pulse of the
13   business and find out what's going on, make sure that
14   it's continuing to be run and functioning properly.
15   Q.      Would you also like to be returned as
16   signatory on all the financial accounts?
17   A.      Say again.
18   Q.      Would you also like to be returned as
19   signatory on all the financial accounts?
20   A.      Yes, I would.
21   Q.      Do you have any concerns, Mr. Gentry, that
22   Ms. Gentry will sabotage your business relationships
23   with employees, vendors, suppliers, customers?
24   A.      I am -- I am concerned.  She's already
25   filed a slanderous notice with the Department of

25 (Pages 94 to 97)

Page 98

1  Tennessee Labor -- or Tennessee Department of Labor,
2  and I'm concerned that she might do that with customers
3  or vendors if I run the business.
4  Q.        Would you like for the Court to issue a
5  restraining order enjoining and restraining both of you
6  from discussing the pending litigation and from
7  speaking derogatorily about one another during the
8  pendency of these proceedings?
9  A.    Yes, I would.
10 Q.        Now, has Ms. Gentry also contacted your
11 patent attorneys to contest your status as co-inventor
12 of THE MAT?
13 A.        There's an office action from the U.S.
14 Patent and Trademark Office that was e-mailed for us to
15 respond -- or to give our response to, and it was
16 e-mailed to my old e-mail address at Sweet Wise. Kathy
17 contacted the attorney, told them that I'm not an
18 inventor, I'm not an employee of Sweet Wise. And she
19 inadvertently created a conflict of interest with our
20 patent attorney firm.
21      So now our patent attorney is saying we
22 need to resolve this conflict of interest or we're
23 going to withdraw. If they withdraw, it's going to be
24 nearly impossible for us to find another patent
25 attorney and engage them to protect or to continue our

Page 99

1  patent application. So, really, it's jeopardizing our
2  patent with her actions.
3  Q.        Okay. And did they explain to you why they
4  felt like there was a conflict of interest?
5  A.        Because Kathy's disputing my inventorship,
6  and because she's telling them that I'm terminated from
7  Sweet Wise. So in the eyes of the attorney -- Sweet
8  Wise has been paying the legal bills. And so in the
9  eyes of the attorney, the company has an interest, I
10 have an interest as an inventor, and Kathy has an
11 interest. Because Kathy has said that I'm terminated
12 from the company, that's created this conflict of
13 interest with Bass Berry.
14 Q.        Would you like for the Court to
15 specifically restrain and enjoin Ms. Gentry from
16 representing to any person or entity that you're not a
17 co-inventor of THE MAT during the pendency of
18 this proceeding or to undermine your status as the
19 co-inventor?
20 A.    Yes, I would.
21      MS. TAYLOR: Your Honor --
22      THE WITNESS: I think --
23      THE COURT: Hang on just a second,
24 Mr. Gentry. There's an objection. I need to hear from
25 Ms. Taylor.

Page 100

1       MS. TAYLOR: I object to these
2  requests for restraining orders that we've not been
3  notified to as it relates to this hearing. And, so,
4  these are just coming out of the blue here, would you
5  like this and would you like that. Nowhere in this do
6  I recall seeing any requests for such information.
7       THE COURT: All right. Ms. Perky,
8  I'll let you respond to that.
9       MS. PERKY: Paragraph 26, Your Honor.
10 We do specifically ask that the Court restrain and
11 enjoin Ms. Gentry from discussing the pending divorce
12 proceedings or speak derogatorily about Mr. Gentry with
13 the business's employees, vendors, suppliers, and
14 customers.
15      With respect to the patent issue, Your
16 Honor, this just occurred a couple weeks ago. My
17 concern is if we don't get -- this is almost like an
18 emergency. If we don't get something down, Your Honor,
19 they could lose the patent on THE MAT. And this has
20 made them almost a million dollars.
21      So, I mean, I think that everybody
22 should be very concerned about Ms. Gentry's unilateral
23 actions to compromise this patent, because it's going
24 to -- you know, I don't think she realizes it, but it's
25 going to hurt both of them in the end.

Page 101

1       THE COURT: Okay. And you're talking
2  about Paragraph 26 of your second amended petition?
3       MS. PERKY: No. Paragraph 26 of my
4  motion to determine control of the business and partner
5  compensation.
6       THE COURT: Okay. Sorry. I'm going
7  to let her ask the questions. Whether she gets the
8  relief or not is another question altogether. Of
9  course, I do have some concern about an asset which I
10 would think both parties want to preserve. I don't
11 know what -- I'm sure there's going to be some
12 discussion about how best to address that. I can't
13 imagine anybody that doesn't want that to proceed.
14      MS. TAYLOR: I think that is up to the
15 patent application and the subsequent, if any, patent
16 litigation. Through the testimony of Ms. Gentry, you
17 will see that this patent was initially requested only
18 in Ms. Gentry's name in 2011. It was not until two
19 years later that Mr. Gentry --
20      THE COURT: Does this Court not have
21 the ability to, at some point, divide either -- award
22 the patent or divide the proceeds from the patent? And
23 I don't know the answer. I'm asking that question.
24      MS. TAYLOR: It depends, as I
25 understand the law, whether or not the patent is

Page 102

1  granted.  If the patent is granted to both of them,
2  then those rules apply.
3          If the patent is not granted, which is
4  the position it's in now, the product -- i.e., THE
5  MAT -- is produced by Sweet Wise, the cost and expenses
6  are paid by Sweet Wise, and the revenue goes to Sweet
7  Wise right now.  It is just a product with a patent
8  pending on it.
9          THE COURT:  Okay.  I'm going to let
10 her ask these questions, and then I want to hear from
11 Ms. Gentry, obviously, on it.
12         And before we do that, how close are
13 you, Ms. Perky, to being finished?  We've been going --
14         MS. PERKY:  I'm just a couple
15 questions away from being done with him, and then I've
16 got one witness out in the hall.
17         THE COURT:  We're going to take a
18 break after him; okay?  So I'll let you finish up with
19 him and then we'll take a break.
20 BY MS. PERKY:
21 Q.     Now, Mr. Gentry, would you like for the
22 Court to restrain and enjoin Ms. Gentry from
23 representing to any person or entity that you're not a
24 co-inventor of THE MAT and from taking any action to
25 undermine your status of the co-inventor of THE MAT

Page 103

1  during the pendency of these proceedings?
2  A.     Yes, I would.  Her actions are risking our
3  patent, and it's undermining our patent, and it's
4  making it less enforceable.
5  Q.     And was THE MAT created during the
6  marriage?
7  A.     Yes.
8  Q.     Okay.  Regardless of how it's titled, it
9  was created during the marriage?
10 A.     Yes, it was.
11 Q.     Would you also like to have exclusive
12 control over business decisions concerning THE MAT
13 during the pendency of the proceedings?
14 A.     Yes, I would.
15 Q.     Now, has Ms. Gentry deleted e-mails from
16 the business server, Sweet Wise's business server?
17 A.     What's the question?
18 Q.     Has Ms. Gentry deleted e-mails from the
19 business server?
20 A.     I believe she has.  I received a suspicious
21 e-mail from Kathy saying, Hey, has anybody's password
22 been changed?
23         And then maybe an hour later, there was a
24 follow-up e-mail from her saying, Hey, I just had some
25 e-mails that were deleted.  Is anybody else having any

Page 104

1  problems?
2          And then another hour later, Oh, it looks
3  like everything was fixed.  I called GoDaddy.  They
4  said, yeah, they had some issues with an upgrade and
5  they had e-mails that were deleted.  Sorry for the
6  inconvenience.  Everything will be okay.
7          I am quite confident that GoDaddy, one of
8  the largest e-mail and domain providers in the country,
9  wouldn't release an upgrade that would delete e-mails.
10 If they did release an upgrade, I'm quite certain that
11 they would have backups of e-mails and that all the
12 data could be restored.
13         And, additionally, Kathy never calls
14 GoDaddy herself.  We always call Paveo, who's our
15 e-mail administrator.  Whenever we have issues with
16 e-mail, it always goes to Paveo.
17         The e-mails that were deleted were e-mails
18 discussing ownership of Sweet Wise, and they were also
19 e-mails that portrayed Kathy in a bad light, where she
20 was harassing --
21 Q.     Back up just one second.  So do you keep
22 all of your e-mails, all of your business e-mails?
23 A.     My e-mails are very organized.  I am
24 meticulous in how I manage my e-mails within folders.
25         I also -- I e-mailed Dancho and asked him

Page 105

1  if he had copies of some of the e-mails regarding
2  ownership discussions.  And he wrote me back and said,
3  Well, I'm surprised, and maybe not so surprised, but I
4  can't find any e-mails with ownership discussions, and
5  there were a lot of them.
6          So Dancho also had e-mails deleted from
7  his, as well as mine, and I think another employee
8  also.
9  Q.     As a result, would you like for the Court
10 to specifically restrain and enjoin Ms. Gentry from
11 deleting e-mails from the business server or otherwise
12 destroying evidence?
13 A.     Yes, I would.
14 Q.     Now, Mr. Gentry, have you incurred
15 significant attorney fees in having to file this
16 petition for contempt and motion to determine control
17 and compensation for the business?
18 A.     Yes, I have.
19 Q.     Can you identify this document for the
20 Court, please?
21 A.     This is an itemized listing of your fees,
22 for representation in this case.
23 Q.     And do you have the ability to pay these
24 fees?
25 A.     I do not.

27 (Pages 102 to 105)

Page 106

```
 1    Q.      And how have you paid for your fees for the
 2  preparation for today?
 3    A.      With a credit card.
 4    Q.      And would you like for the Court to award
 5  you these fees today?
 6    A.      Yes, I would.
 7            MS. PERKY:  That's all I have for this
 8  witness, Your Honor.
 9            THE COURT:  All right.
10            MS. PERKY:  Oh, I'd like that entered
11  as the next exhibit.
12            THE COURT:  I believe it's No. 9.  So
13  that will be the next exhibit.
14            (Marked Exhibit 9.)
15            THE COURT:  All right.  We're going to
16  take about a 10-minute break so everybody can use the
17  restroom, make phone calls, do whatever.  And we'll
18  come back and we'll let Ms. Taylor cross-examine
19  Mr. Gentry.
20            (Recess taken from 5:13 p.m.
21             to 5:33 p.m.)
22            THE COURT:  All right.  I apologize.
23  I shouldn't have let people know I was on a break.
24            All right.  We're ready for
25  Ms. Taylor's cross-examination.  Mr. Gentry, I'll ask
```

Page 107

```
 1  you to retake the stand.
 2            Now, do you need to move that speaker
 3  near you, Mr. Gentry?
 4            THE WITNESS:  Is she going to stand
 5  there?
 6            THE COURT:  Well, I was going to say,
 7  Ms. Taylor, if you want to -- does it help you if you
 8  can see the person's mouth moving when they're asking
 9  the question?  You're free to come up here, if you feel
10  comfortable doing it.  I'm not going to make you do it,
11  but you're certainly free to.
12            MS. TAYLOR:  I may try to change to
13  this side of the table, but I do need to stay here
14  where my information is.
15            THE WITNESS:  I can hear her pretty
16  well.
17            THE COURT:  Okay.  That's fine.
18
19            CROSS-EXAMINATION
20  BY MS. TAYLOR:
21    Q.      Mr. Gentry, let me ask you some questions
22  about your income.  You're a certified public
23  accountant; correct?
24    A.      Yes, I am.
25
```

Page 108

```
 1    Q.      Okay.  How long have you been a CPA?
 2    A.      Since 1998.
 3    Q.      Did you let your CPA qualifications lapse
 4  during the marriage?
 5    A.      Yes, I did.
 6    Q.      Did you reinstate them recently?
 7    A.      Yes, I did.
 8    Q.      When?
 9    A.      I believe it was in January.
10    Q.      Of what year?
11    A.      December '14 or January '15.
12    Q.      That would have -- actually, it would have
13  been back in the spring of 2014 when the divorce was
14  filed; correct?
15    A.      No, that's not correct.
16    Q.      Do you recall sending an e-mail to
17  Ms. Gentry saying --
18            MS. PERKY:  Your Honor, I believe that
19  Mr. Gentry wasn't finished testifying.
20            THE WITNESS:  No, probably what you're
21  thinking of is Sweet Wise paid for my CPE subscription,
22  where I go in and do my continuing professional
23  education on-line.  And so Sweet Wise paid for that in
24  the spring of 2014.  And then I really started hitting
25  the CPE hard in 2014, 2015, to help me with eStart.
```

Page 109

```
 1  BY MS. TAYLOR:
 2    Q.      What is eStart, Mr. Gentry?
 3    A.      eStart is a business service provider.  We
 4  do web design, graphic art design, as well as
 5  accounting and bookkeeping services.  And I outsource
 6  all the Web design and art design over to Eastern
 7  Europe.
 8    Q.      That is the new business that you have
 9  started within the last year; correct?
10    A.      We've launched, but I haven't been able to
11  afford advertising or any marketing because I don't
12  have any money.  So we've got the Web site up and
13  running, but we haven't -- I haven't been able to
14  actually really pursue the business that much.
15    Q.      Actually, the reason you haven't pursued
16  the business is because you don't want to have that
17  business ongoing as a source of revenue for you during
18  the divorce; correct?
19    A.      No, that's not correct.  Actually, I worked
20  quite hard.  I went down to the Tennessee Secretary of
21  State and obtained a list of some 3,000 addresses that
22  are new businesses that started since October 1st, and
23  I'm working on the postcard.  I just received the final
24  version of it today.
25            So as a way to market to these new
```

28  (Pages 106 to 109)

Page 110

1  businesses, we're going to send them a postcard and
2  say, Hey, you just started a new business; what's next?
3  It's a really cool postcard.
4  Q.      And when are you going to be sending out
5  this postcard?
6  A.      When I have the money to pay for it.
7  Q.      Do you expect to do that in the next week
8  or so?
9  A.      If I can, sure.
10  Q.      And that business will be a source of
11  revenue for you; correct, Mr. Gentry?
12  A.      It will take time to grow the business. I
13  expect it will be very slow at first. Starting eStart
14  was something that I thought of about two years ago and
15  it's been in the planning for a while. It was
16  something that I was going to work on in conjunction
17  along with Sweet Wise.
18  Q.      Do you recall when we were here at the
19  motion in January, that was one of the things that was
20  discussed with the Court, that continuing to today
21  would give you time to see how you could get eStart
22  going and be producing income --
23  A.      I've done a lot of work. I actually gave
24  Sarah about 700 pages of e-mails and research and
25  documentation that I've gotten from the Secretary of

Page 111

1  State, and artwork that I've been working on for the
2  company.
3  MS. TAYLOR: One moment, Your Honor.
4  (Brief pause.)
5  BY MS. TAYLOR:
6  Q.      And you deny telling people that you are
7  trying to hold off on starting that business during
8  this divorce?
9  A.      I did say that I'm going to hold off
10  starting it, on advice of counsel, back last April.
11  And against counsel's advice, I wanted to get the
12  business going.
13  Q.      So that will be income-producing soon;
14  correct?
15  A.      Hopefully.
16  Q.      Mr. Gentry, I'm going to show you -- you
17  signed up for match.com, have you not, during this
18  divorce proceeding?
19  A.      I did.
20  MS. PERKY: Objection, Your Honor, as
21  to relevance.
22  THE COURT: All right. Hang on,
23  Mr. Gentry.
24  Tell me, Ms. Taylor, what the
25  relevance is.

Page 112

1  MS. TAYLOR: Well, one, Your Honor,
2  Mr. Gentry is having relationships outside of the
3  marriage. He's spending money on other women. He's
4  going out. He's claiming that he has no money and he
5  wants Sweet Wise to pay him all of this income each
6  month, when, at the same time, he's on match.com. He's
7  dating. He's going out. He's talking about planning
8  trips. I believe it goes to the relevancy of the
9  support.
10  THE COURT: All right. I'm going to
11  let you ask him with respect to monies he's expending,
12  whether it be for this or any other activities. So you
13  can ask.
14  MS. TAYLOR: I'll come back to that
15  one in a minute, Your Honor.
16  THE COURT: All right.
17  BY MS. TAYLOR:
18  Q.      You have been dating; correct, Mr. Gentry?
19  MS. PERKY: Objection as to relevance,
20  Your Honor. I think Your Honor has said the question
21  should be tailored as to the expenses he's incurred
22  related to any of his activities.
23  THE COURT: Tell me again, Ms. Taylor.
24  Is that what you're trying to get at?
25  MS. TAYLOR: Yes, Your Honor.

Page 113

1  THE COURT: All right. I mean, that's
2  what I'm interested in. If you think he's spending
3  money elsewhere, you can certainly ask him questions
4  about that.
5  BY MS. TAYLOR:
6  Q.      You're spending money on your match.com Web
7  site; correct? -- or page, whatever your account is.
8  A.      After we separated in June, in August, when
9  I first secured counsel with Rob Turner's office, I
10  asked him -- I didn't -- I thought since I was
11  separated that I was allowed to date.
12  I asked one of the attorneys in his office,
13  and she said as long as you keep -- you know, go Dutch
14  that it's fine. And I asked Rob Turner, and he said,
15  Well, you wouldn't be the first one to have a
16  girlfriend if somebody's getting divorced. What I --
17  THE COURT: Mr. Gentry. Mr. Gentry,
18  her question is are you spending money on your
19  match.com account. It's a pretty straightforward
20  question.
21  THE WITNESS: Not now, sir, no.
22  THE COURT: All right.
23  BY MS. TAYLOR:
24  Q.      You were for many months; correct,
25  Mr. Gentry?

29 (Pages 110 to 113)

Page 114

1    A.    I until I obtained counsel with Sarah. And
2  I told Sarah, filled her in, and she said, Get off
3  match.com. And so the same day, I got off.
4    Q.    So you spent money on another, what, senior
5  dating Web site?
6    A.    Not that I know of, no.
7    Q.    If it shows up on your credit card records,
8  what is that?
9    A.    Probably some site that I went on and put a
10 credit card on, and I stopped it right away.
11   Q.    Mr. Gentry, you said in this exhibit that
12 your compensation was about $8,839 a month when you add
13 all these payments in; correct?
14   A.    That's exactly right, yes, ma'am.
15   Q.    And you're asking that that money be paid
16 to you; correct?
17   A.    Correct.
18   Q.    You have not presented this Court with an
19 income and expense statement today showing any need for
20 this, have you?
21   A.    I suppose not.
22   Q.    Of these amounts that you claim as
23 discretionary spending as shown in Exhibit 5, these
24 were monies paid on behalf of the business -- or by the
25 business that were not necessary for running the

Page 115

1  business; correct?
2    A.    That's correct.
3    Q.    And discretionary spending, if it is paid
4  by a business, is to be included in the income of the
5  employee or owner; correct?
6    A.    Unless it's a de minimis fringe benefit or
7  if there's a business purpose.
8    Q.    And, in fact, all of this discretionary
9  spending that took place in the business was not
10 included in income to you for your W-2 forms, was it?
11   A.    Not for Kathy or I, correct.
12   Q.    So the information you're now trying to
13 give to the Court is to show that you spent the money
14 but you did not, as the CPA or the financial person of
15 the business, report it on the tax returns?
16   A.    I don't understand your question.
17   Q.    If you paid for a trip in the business, you
18 did not take that as personal income, did you?
19   A.    No. Those are business-purpose trips.
20   Q.    When you went skiing in Macedonia, that was
21 a business-purpose trip?
22   A.    Yes. IRS -- IRS law allows for a couple
23 days over a weekend when it's included with
24 business-purpose travel. We outsource a lot to Eastern
25 Europe, so I would go over there every year and meet

Page 116

1  with the IT development and the art designers to
2  further our relationship.
3           And also the ski trip was a team-building
4  trip. You know, these guys work for us day in and day
5  out, and so it was an opportunity to conduct -- to
6  connect with them, and build camaraderie, and improve
7  loyalty for the business.
8    Q.    You used it to spend a month in Macedonia
9  in February of 2014; correct?
10   A.    Say again, please.
11   Q.    You spent a month in Macedonia, skiing, in
12 February 2014; correct?
13   A.    No, I didn't spend a month skiing in
14 Macedonia. I went over there for, I think, three
15 weeks. It might have been a little bit longer than
16 that. Part of the time was spent in Bulgaria. Part of
17 the time was in -- was skiing. You know, I think,
18 typically, when we go skiing, we spend about five days.
19   Q.    But when you have personal expenses on such
20 a trip, you're supposed to report that as your personal
21 income; correct?
22   A.    No, ma'am. It's a business-purpose trip,
23 and the meals and the travel expenses are deductible
24 for business purposes.
25   Q.    Even the personal meals?

Page 117

1    A.    Even the personal bills?
2    Q.    Personal meals.
3    A.    It's a business trip, so all of the meals
4  are business meals.
5    Q.    If Mr. Alexander, who is doing the
6  evaluation, says otherwise, would you defer to him?
7           MS. PERKY: Calls for speculation.
8           THE WITNESS: No --
9           THE COURT: Hang on, Mr. Gentry. Hang
10 on. Don't answer. Did you hear her make the
11 objection?
12          THE WITNESS: No, sir.
13          THE COURT: All right.
14          MS. PERKY: I'll try to stand over
15 here, because it's not -- my thing isn't working.
16          THE COURT: All right. What's your
17 response to that, Ms. Taylor? I'm not really -- I
18 understand what his testimony is, and we're going to
19 get to Mr. Alexander. So unless you've got a specific
20 area you're going with this, I know what you're getting
21 at.
22          MS. TAYLOR: Thank you, Your Honor.
23 BY MS. TAYLOR:
24   Q.    Mr. Gentry, I'm going to hand you an e-mail
25 here dated July the 3rd of 2014, and see if you

30 (Pages 114 to 117)

Page 118

1   recognize this e-mail you sent.
2   A.      Yes, I recognize it.
3   Q.      So Ms. Gentry had a garage door repair at
4   her home; correct?
5   A.      Correct.
6   Q.      And you said that should be recorded as a
7   repair and maintenance cost for the business because a
8   company vehicle was stored there?
9   A.      Yes.
10  Q.      Ms. Gentry's response was to put it as
11  income to her; correct?
12  A.      Yes.
13  Q.      That was a disagreement you-all had on an
14  ongoing basis was the fact that she wanted you to
15  correctly put personal income as income?
16  A.      No, that was not a typical disagreement
17  that we had.
18          MS. TAYLOR:  I'd like to mark this as
19  the next exhibit, Your Honor.
20          THE COURT:  It will be Exhibit No. 10.
21          (Marked Exhibit 10.)
22  BY MS. TAYLOR:
23  Q.      Mr. Gentry, in your petition for contempt,
24  you allege that Ms. Gentry did not pay marital bills.
25  What marital bills did she not pay?

Page 119

1   A.      With regard to that, it was prepared by Rob
2   Turner's office, who --
3   Q.      My question is, what marital bills did she
4   not pay?
5          MS. PERKY:  Objection.  He's answering
6   and she's not allowing him to answer the question.
7          THE COURT:  All right.  Let him finish
8   his answer.  If he doesn't answer your question,
9   Ms. Taylor, I'm going to let you ask it again.  If he
10  doesn't answer it then, then I'll get him focused.  But
11  let him finish his answer.
12         MS. TAYLOR:  Thank you.
13         THE COURT:  All right, Mr. Gentry.  Do
14  you remember the question?
15         THE WITNESS:  That was just kind of, I
16  think, a boilerplate response that Rob Turner's office
17  put in there, and I interpreted that as part of
18  business expenses that were being paid late.
19         There was a Comcast bill, a phone bill
20  for the store, that was paid late.  My auto
21  registration went to the store, and Kathy gave it to me
22  two months after my registration expired on my car.
23  And my health insurance was paid late.
24         And we had stopped taking vendor
25  discounts because Kathy had taken over the check

Page 120

1   writing for the business.  So, in my opinion, when
2   we're not taking vendor discounts when we should, those
3   bills are being paid late.
4          There's, obviously, a Comcast bill --
5   we have a copy of it here -- that was paid late.
6   There's a late fee on it.  That's what I was referring
7   to on that.
8   BY MS. TAYLOR:
9   Q.      Those are bills of the business?
10  A.      Yes, ma'am.
11  Q.      Mr. Gentry, you have talked about your work
12  in Sweet Wise.  Now, Ms. Gentry had Sweet Wise for
13  years before the marriage; correct?
14  A.      That's not correct.  She had a cake
15  decorating business that was by the name "Sweet Wise."
16  The business was completely transformed in 2006 to a
17  baker's supply store.  2006 is when she began
18  operations.
19  Q.      And then you married in 2009, so that would
20  be several years later; correct?
21  A.      Yes.
22  Q.      And from 2006 to 2009, she had a candy and
23  cake decorating supply company?
24  A.      That's correct, yes.
25  Q.      It's been located in the same location, on

Page 121

1   Music Valley Drive, since that date?
2   A.      That's correct.
3   Q.      Then when you were saying that you turned
4   down the job offer at the Gap, that was because the Gap
5   did not offer you the job you really wanted; correct?
6   A.      No, ma'am.  I didn't follow up, and I
7   turned down a second interview.
8   Q.      In going through the business, you then
9   started working at Sweet Wise, and Ms. Gentry agreed,
10  and you-all were working there together; correct?
11  A.      Say that -- I didn't understand you.
12  Q.      You are the one who asked to come to work
13  at Sweet Wise; correct?
14  A.      No.  Actually, I believe what happened was
15  her parents suggested, since I was looking for work --
16  this was before Gap.  Her parents had suggested, Hey,
17  since he's not doing anything, why don't you ask him to
18  help at Sweet Wise.
19         And prior to that, Kathy had been a little
20  bit embarrassed to introduce me to the store because it
21  wasn't doing very well.  And then she eventually asked
22  me and said, Hey, can you come help me out.
23  Q.      You were paid for all your work there;
24  correct?
25  A.      No.  I worked for free for a portion of

31 (Pages 118 to 121)

Page 122

1  2008 and a good portion of 2009.
2  Q.      Well, the reason you worked for free for
3  part of 2008 is because, at that point in time, you
4  were receiving unemployment benefits from the State of
5  Maryland; correct?
6  A.      That's correct.
7  Q.      And you told Ms. Gentry you did not want to
8  be paid by the business or it would impact your ability
9  to earn the unemployment benefits?
10 A.      No.  At that point in time, Sweet Wise and
11 helping her wasn't in my line of business.  It wasn't
12 typical work for me, working in a small retail store
13 like that, so I considered it more like helping a
14 friend.  When we decided -- when I turned down the Gap
15 or didn't pursue the Gap position and we decided to
16 partner together, at that point is when I started
17 taking compensation.
18 Q.      That was when your unemployment ran out;
19 correct?
20 A.      No.  It's when I stopped reporting
21 unemployment because I took a position in Sweet Wise.
22 Q.      Mr. Gentry, you were talking about this
23 class you taught at Sweet Wise about the pulled sugar;
24 correct?
25 A.      Mm-hmm.

Page 123

1  Q.      And the pastry chef who came to teach it
2  was someone who was very well known; correct?
3  A.      Correct.
4  Q.      That person came because of their long-term
5  contacts with Ms. Gentry in the business?
6  A.      That's correct.  Kathy's exceptional at
7  making friends with celebrities.
8  Q.      You talked about this class you taught and
9  how much income it brought in.  Ms. Gentry has taught
10 many more classes to bring in revenue than you ever
11 thought about teaching, did she not?
12 A.      No, not really.  She taught a fondant
13 class, and they were infrequent because we didn't have
14 a classroom at the time.  So maybe she would teach, you
15 know, one every couple months, something like that.
16         And then by -- we got the classroom in
17 January of 2010.  And in July of 2010, we hired two
18 employees, Kelly Stewart and Heather White, and Kathy
19 trained those two on becoming class instructors.
20         Where I never took compensation for the
21 sugar class, for the classes that Kathy did teach, when
22 instructors called in, Kathy took classroom -- class
23 instructor pay.
24 Q.      You were paid by Sweet Wise, so you, in
25 fact, were paid for those classes --

Page 124

1  A.      Well --
2  Q.      -- as part of your salary?
3  A.      -- we were both compensated, our salaries.
4  I never took additional compensation for my sugar
5  class.  All that revenue stayed in the company.  Kathy
6  did take separate compensation, in addition to her
7  salary, for teaching classes.
8  Q.      And also some of the classes she taught,
9  the income went into the business?
10 A.      Say that again, please.
11 Q.      Some of the classes she taught, the income
12 went into the business; correct?
13 A.      Well, all of the classes we taught, the
14 revenue went in.  But there were costs associated with
15 being an instructor that came out for her.
16 Q.      And going into the pastry world, she's
17 taught classes in Buttercream I and Buttercream II?
18 A.      Say that again.
19 Q.      She taught classes in Buttercream I and II?
20 A.      Yes, ma'am.
21 Q.      She and also taught Fondant I and II?
22 A.      That's correct.
23 Q.      She also taught classes about cookies?
24 A.      Yes.
25 Q.      Cupcakes?

Page 125

1  A.      Correct.
2  Q.      Modeled gumpaste?
3  A.      Modeling chocolate and gumpaste, sure.
4  Q.      Celebrity classes?
5  A.      A celebrity has taught the class, yes.
6  Q.      And then she did one called "Topsy-Turvy"?
7  A.      Yes.
8  Q.      She did a class called "Wedding Cake
9  Basics"?
10 A.      Yes.
11 Q.      Those are among others.
12         Mr. Gentry, on this product, THE MAT, in
13 fact, Ms. Gentry created the prototype for this product
14 in about 2006 or 2007, before she even knew you;
15 correct?
16 A.      Kathy had been taught this method by
17 another cake decorator that owned another store like
18 Sweet Wise.  That person showed Kathy this method using
19 craft store vinyl, which is not food safe.  That was
20 the method that Kathy was teaching and that's what she
21 was selling in the classroom was nonsafe -- nonsafe
22 vinyl, nonfood-safe vinyl.
23         So the idea for the product was to create
24 something that was food safe that we could sell as a
25 food-preparation item.  Kathy was just selling vinyl

32 (Pages 122 to 125)

Page 126

1   prior to meeting me.
2   Q.      But she did the prototype for what became
3   THE MAT?
4   A.      Well, that came out of, actually, a book
5   that was written back in the 1970s, I believe, by the
6   Winebackers (phonetic).
7           MS. TAYLOR:  Your Honor, I submit that
8   the witness is not being responsive to the questions.
9           THE COURT:  Ask your question again,
10  Ms. Taylor.
11  BY MS. TAYLOR:
12  Q.      Was Ms. Gentry using the prototype for THE
13  MAT in the Sweet Wise business in 2006 and 2007 before
14  she even met you?
15          MS. PERKY:  Your Honor, I would
16  object.  I think it's asked and answered, it's just not
17  the answer that she wants.
18          THE COURT:  That answer, Mr. Gentry,
19  is either "yes," or "no," or "I don't know."
20          THE WITNESS:  I would say I don't
21  know.  I mean, I look at it and say it's the food-safe
22  product that's the real product, you know, coming up
23  with that.  So . . .
24  BY MS. TAYLOR:
25  Q.      The product was actually for being able to

Page 127

1   roll the fondant between two pieces of vinyl?
2   A.      Yes, ma'am.
3   Q.      And that is, in fact, what she was doing?
4   A.      Yes, it was.
5   Q.      Now, when the first patent was applied for,
6   that was in 2011 and just in Ms. Gentry's name;
7   correct?
8   A.      That's correct.
9           MS. TAYLOR:  Your Honor, I'd like to
10  make this as the next exhibit.
11          MS. PERKY:  Your Honor, I would object
12  to it being entered as an exhibit until after -- if
13  Mr. Gentry can identify it.
14          THE COURT:  Okay.
15  BY MS. TAYLOR:
16  Q.      Mr. Gentry, have you seen this patent
17  application before?
18  A.      Yes.
19  Q.      Okay.  You know this is the original patent
20  application that was submitted in Ms. Gentry's name
21  only in March of 2011?
22  A.      Yes, I do.
23          THE COURT:  All right.  I think it's
24  sufficiently identified.
25          MS. PERKY:  No objection, Your Honor.

Page 128

1           THE COURT:  That will be No. 11.
2               (Marked Exhibit 11.)
3   BY MS. TAYLOR:
4   Q.      It was not until two years later that the
5   amended application was submitted; correct?
6   A.      That's correct.
7   Q.      Now, in terms of talking recently with the
8   patent attorney, you're the one who first called the
9   patent attorney to talk to them about the divorce;
10  right?
11  A.      No, that's not correct at all.
12  Q.      And if there's an e-mail from the patent
13  attorney saying he received a phone call from you,
14  that's incorrect?
15          MS. PERKY:  Calls for speculation,
16  Your Honor.
17          THE WITNESS:  I don't know --
18          THE COURT:  Hang on, Mr. Gentry.
19  Do we have the e-mail?  Are you going
20  to show him the e-mail?
21          MS. TAYLOR:  I'll have to find it,
22  Your Honor.
23          MS. PERKY:  Your Honor, I would object
24  to the e-mail anyway.  It's hearsay.  It's an
25  out-of-court statement by an attorney.  The attorney is

Page 129

1   not even here for me to cross-examine or put on any
2   evidence at all, or even know if it's a complete chain
3   of the e-mail.  I mean . . .
4           THE COURT:  Do you have a response to
5   that, Ms. Taylor?
6           MS. TAYLOR:  The response is
7   Mr. Gentry is the one who brought up this line of
8   questioning, and he is testifying that Ms. Gentry
9   contacted the patent attorney and that's what he was
10  told.
11          I can bring in Ms. Gentry's testimony
12  to testify that when -- she received a phone call from
13  the patent attorney after Mr. Gentry had called.
14          THE COURT:  All right.  I think that's
15  probably the better way to get there.
16  BY MS. TAYLOR:
17  Q.      With regard to the business, Mr. Gentry,
18  when Ms. Gentry filed for divorce in April of 2014, you
19  told her you were going to quit the business; correct?
20  A.      No.
21  Q.      You told her you gave her all the business
22  files?
23  A.      What had happened was a particularly
24  excruciating night, where Kathy was yelling at me, and
25  I just wanted peace.  And I told Kathy, you know, I

33 (Pages 126 to 129)

Page 130

1  don't want to fight you for the business, you can have
2  it. I just -- it's not worth it to me to fight over
3  this thing.
4       My meaning in that was that I would receive
5  the value that I've created out of the business but
6  Kathy could keep the business and continue to run the
7  business, and I would not contest that. And that's
8  still my position.
9       When I told Kathy that, she immediately
10 said, Give me your credit card right now.
11      And in a beaten-down state of just wanting
12 a night's peace, I gave her my credit card. And then
13 she wanted all of the checks and everything. And I
14 said, You know, fine, whatever.
15      And so it's not quitting. It was
16 acquiescing to try to find some peace.
17 Q.    I'll show you your e-mail to Ms. Gentry.
18 Do you recall this e-mail of April 28, 2014?
19 A.    Yes, I do.
20 Q.    So you voluntarily put all the payables and
21 subfiles on the table and gave them to her?
22 A.    I just testified to that.
23 Q.    At that point in time, Ms. Gentry began
24 paying the bills for the business?
25 A.    She began signing the checks, yes.

Page 131

1  Q.    And she has continued to do so through that
2  day?
3  A.    Yes.
4  Q.    Or through this day.
5       Ms. Gentry -- you did not go to the
6  business for several weeks; correct?
7  A.    It was for a couple of weeks. I had told
8  Kathy, after a counseling session, that I was going
9  to -- at the time, I was thinking it was filing for a
10 restraining order, but it's a petition for a contempt
11 that was ultimately filed. And I told Kathy if we
12 didn't restore the status quo that I was going to go
13 file -- hire an attorney and file a petition.
14      And so that night, she gave me back the
15 bank card and the company credit card. And I resumed
16 my responsibilities at Sweet Wise, and she signed and
17 issued a stock certificate for 45 percent of the
18 company to me.
19 Q.    On that stock certificate, Mr. Gentry, you
20 kept asking Ms. Gentry to put your name on the
21 business; correct?
22 A.    We were already partners for the business.
23 I just wanted it to be recognized formally.
24 Q.    My question is, did you keep asking
25 Ms. Gentry to put your name as an owner on the

Page 132

1  business?
2  A.    No.
3  Q.    She's the sole owner; correct?
4  A.    I look at us as partners from when I joined
5  in 2009.
6  Q.    Are the --
7  A.    I think Kathy has also recognized us as
8  partners also.
9  Q.    Are the K-1s that you prepared and filed
10 with the IRS showing Ms. Gentry as the sole owner?
11 A.    They are. The reason that I do that is
12 there are advantages to having a woman own a business.
13 As the company grew, it was my intention to use it as a
14 woman-owned business to gain access into other
15 countries to distribute our products.
16 Q.    I'd like to show you a collective exhibit
17 of the K-1s.
18      THE COURT: Do you want to make his
19 e-mail of April 22nd an exhibit?
20      MS. TAYLOR: Yes, Your Honor. I
21 apologize.
22      THE COURT: That's all right.
23 Exhibit 12.
24           (Marked Exhibit 12.)
25 ///

Page 133

1  BY MS. TAYLOR:
2  Q.    Okay. This collective exhibit is the K-1s
3  of 2010, 2011, 2012, and 2013. And it does show
4  Katherine Wise as the 100 percent owner of the stock.
5  A.    That's correct.
6       MS. PERKY: Can I look at the
7  exhibit first?
8       MS. TAYLOR: Yes. You may have to
9  look at the one for the witness. I somehow don't have
10 an extra copy for you. My apologies.
11      I have now put together a copy I will
12 hand the witness -- do you need one or do you have one?
13      MS. PERKY: I don't have one. I would
14 love one. Thank you.
15 BY MS. TAYLOR:
16 Q.    That K-1 was prepared by you; correct,
17 Mr. Gentry?
18 A.    Pardon me?
19 Q.    That K-1 was prepared by you?
20 A.    That's correct.
21 Q.    You didn't ask Ms. Gentry to -- going back
22 to this time in April, you asked Ms. Gentry to
23 reconcile with you and work on the marriage; correct?
24 A.    Yes.
25 Q.    And she wanted to go to counseling;

34 (Pages 130 to 133)

Page 134

1  correct?
2  A.    Yes.
3  Q.    And the two of you discussed that you would
4  go to counseling and wanted her to put your name on a
5  stock certificate?
6  A.    No.
7  Q.    You don't recall that event at all?
8  A.    That didn't happen.
9  Q.    You don't recall Ms. Gentry beginning to
10 sign the certificate and said, Are you tricking me?
11 A.    No.
12 Q.    Do you recall that after that, you went to
13 one counseling session and then refused to go back?
14 A.    We actually went to four counseling
15 sessions.
16 Q.    No.  After that event, not before.
17        MS. PERKY:  Your Honor, I think his
18 testimony was that event didn't happen.
19        THE COURT:  Yeah, I think that's -- if
20 his testimony is that didn't happen, then --
21        MS. TAYLOR:  I'll have Ms. Gentry
22 testify about that Your Honor.
23        THE COURT:  All right.
24 BY MS. TAYLOR:
25 Q.    Ms. Gentry did give the business debit card

Page 135

1  back to you for use; correct?
2  A.    Yes.
3  Q.    And the business credit card?
4  A.    Yes.
5  Q.    Now, the business account is at Regions
6  bank; correct?
7  A.    That's correct.
8  Q.    You had been taken off as a signer;
9  correct?
10 A.    I don't know when I was taken off as a
11 signatory.
12 Q.    But you were taken off as a signatory at
13 some point in time; right?
14 A.    At some point in time, yes.
15 Q.    And then without discussing it with
16 Ms. Gentry in advance, you went to the bank and wrote a
17 3800-dollar check to yourself?
18 A.    That's correct.  What had happened was I
19 went to the gas station to use the bank debit card and
20 it didn't work.  I called Kathy up and said, The bank
21 debit card isn't working.
22        She said, Why did you try to use it?  And
23 then she hung up the phone on me.  I tried to call her
24 back several times and she wouldn't answer the phone.
25        Because of how she was behaving with the

Page 136

1  divorce, my assumption was, at that point in time, that
2  she was going to try to lock me out of the business.  I
3  had no money, no savings.  I've left everything in the
4  business to try to grow the business.
5        So without any money for an attorney, I
6  just -- I didn't have anything.  So I went and cashed a
7  check for $3800 to use as a retainer fee.
8        Kathy said that she would return the bank
9  card to me if I would return that $3800.  She said she
10 didn't intend to cancel the bank card, that she didn't
11 mean to, and if I didn't put the $3800 back that she
12 would also go out and take $3800 out of the bank.
13        I did return the 3800.  She did not return
14 the bank debit card.
15 Q.    She did return the bank debit card, and you
16 used it for a while; right, Mr. Gentry?
17 A.    Let me restate that.  So I went to the gas
18 station to use it.  It didn't work.  Kathy told me she
19 would have a new one issued if I returned the $3800.
20 And she did not have a new card issued.
21 Q.    We'll have Ms. Gentry testify on that.
22        MS. PERKY:  Your Honor, I don't
23 believe he was done testifying.
24        Were you?
25        MS. TAYLOR:  I thought he was.

Page 137

1        THE COURT:  I actually thought he was.
2        MS. PERKY:  All right.  I'm sorry.
3  BY MS. TAYLOR:
4  Q.    You still had a business credit card;
5  right?
6  A.    Yes.
7  Q.    And do you recall having a discussion with
8  Ms. Gentry after she requested that you not put
9  personal expenses on the business credit card?
10 A.    We actually -- when Kathy gave me back the
11 credit card, I sent an e-mail to Kathy and said, Hey,
12 let's all make sure we're in agreement here on how
13 we're going to use the card going forward.  And I said,
14 Let's use this for personal meals, and that way we're
15 using it with pretax dollars, it's effectively giving
16 us a 20 percent discount.  Instead of using a personal
17 card, we use the business card and it's a de minimis
18 fringe benefit.
19        Kathy agreed to that and said yes.  And
20 then she wrote back later and said that she had also
21 gone out for personal meals as well.
22 Q.    I'll show you an e-mail that I'd like to
23 make an exhibit, dated July 13, 2014, from -- in the
24 middle of the page, it's from you to Ms. Gentry.  And
25 then below that is your e-mail to Dancho.

35  (Pages 134 to 137)

Page 138

1      MS. PERKY:  Your Honor, I want to
2  object that there's -- it appears that this e-mail has
3  been altered.  I mean, I don't believe that he
4  highlighted it in green.
5      THE WITNESS:  This e-mail has
6  definitely been altered.
7      THE COURT:  Okay.  Hang on a second.
8  First things first.  Did you make the K-1s an exhibit?
9      MS. TAYLOR:  I hope so, Your Honor.  I
10  meant to.
11      THE WITNESS:  Your Honor.
12      THE COURT:  All right.  If you didn't,
13  we are.
14      MS. TAYLOR:  Please make them an
15  exhibit.
16      THE COURT:  That's No. 13.
17      (Marked Exhibit 13.)
18      THE COURT:  Now, with respect to this
19  e-mail, there's some highlighting on there.  Was that
20  added by you, Ms. Taylor, or is that --
21      MS. TAYLOR:  I believe that was added
22  by me.
23      THE COURT:  All right.  Other than the
24  highlighting, is there any objection to alterations,
25  Ms. Perky?

Page 139

1      MS. PERKY:  Well, I guess I would want
2  Mr. Gentry to respond whether or not this is a true and
3  correct representation of their e-mail exchange or if
4  there's been parts of the conversation that have been
5  excluded, if there were parts before or parts after.
6      THE COURT:  Sure.  All right.  I'll
7  let him testify to that.  And if you think it's
8  necessary to include other parts, we certainly can work
9  on that; all right?
10      So go ahead and ask him, Ms. Taylor.
11  BY MS. TAYLOR:
12  Q.    Mr. Gentry, in the middle of the page it
13  has, John Gentry.  It starts, Dancho.  It says in the
14  middle of that, Our cards will not be used for personal
15  spending.
16      Do you see that?
17  A.    And the paragraph down below says, Speaking
18  with Kathy today, we should set a budget for each of us
19  for restaurant and dining, and this is a de minimis
20  fringe benefit.  If Kathy and I use personal cards to
21  pay for a lunch or dinner, that meal is being paid for
22  with dollars on which we are paying personal taxes.
23  Our personal tax rate is 15 percent.  If we use a
24  company card instead, this results in, effectively,
25  receiving a 15 to 20 percent discount.

Page 140

1  It's what I just stated to the Court just
2  now.  So Kathy wrote back and said, I think this is
3  fair.  If it demands greater or less, we can revisit
4  it.
5      So right here she's approving, saying that,
6  yes, we can use this for personal expenses.
7      Now, when I said it's not used for personal
8  spending, my intent when saying that is I'm not going
9  to go to Best Buy and get a movie or something like
10  that.
11  Q.    But what you were saying is that your
12  personal -- you could use your personal card for a
13  business lunch or dinner.  That was a legitimate
14  business expense?
15  A.    Well, it's also -- you know, I was there
16  working late, sometimes until 10 o'clock, shipping,
17  when it was really heavy, when I first started in
18  there.  And an overtime meal is a de minimis fringe
19  benefit.  If you go by yourself, it's certainly tax
20  deductible.
21      MS. TAYLOR:  I'll make that the next
22  exhibit.
23      THE COURT:  All right.  That's No. 14.
24      MS. PERKY:  Your Honor, I would --
25      THE COURT:  Go ahead.  Tell me what

Page 141

1  your objection is.
2      MS. PERKY:  Again, it's an altered
3  e-mail.  This is not the original form that it was
4  sent.  It didn't have the highlighting.  Secondly, I
5  believe that he said that this isn't a true and correct
6  copy of their correspondence, that there were parts
7  before and parts after.  And, yet, we're just taking
8  out certain parts of the conversation and putting it in
9  as an exhibit.  I don't think that's proper.
10      THE COURT:  All right.
11      THE WITNESS:  There's a --
12      THE COURT:  Hang on, Mr. Gentry.
13      The alteration is the highlighting.
14  The substance -- and I understand that.  I don't think
15  anybody's suggesting that the words are altered.
16      She focused on "our cards will not be
17  used for personal spending."  He said, Yes, there's
18  more to the conversation, but then he referenced
19  language in the e-mail itself.
20      So I understand the position that
21  she's taking with her question.  I understand his
22  response is that the paragraph following that sentence
23  is clarifying what he means by that.
24      (Marked Exhibit 14.)
25      THE WITNESS:  And there's a -- Your

36  (Pages 138 to 141)

TRANSCRIPT OF PROCEEDINGS       MARCH 10, 2015

Page 142

1    Honor, if I may, there's a --
2           THE COURT:  Hang on.  Before you start
3    talking, you'd better -- I wouldn't talk unless your
4    attorney asks you a question; okay?
5           THE WITNESS:  Yes, sir.
6    BY MS. TAYLOR:
7    Q.      You've continued to use the business credit
8    card for many, many personal meals?
9    A.      I've continued to use the credit card for
10   personal meals.  We both did, and we both agreed to it,
11   yes.
12   Q.      Do you recall a letter to your attorney
13   asking that you quit using the credit card for personal
14   meals?
15   A.      I do.
16   Q.      And you continued; correct?
17   A.      Kathy had taken -- she had -- aside from
18   that, there was a contradictory e-mail that Kathy had
19   sent to me saying, Hey, I took a look at your personal
20   spending, and it's totally understandable since you've
21   been working so much in the store.  I just want to go
22   take the kids out to dinner on the credit card.  Is
23   that okay?
24          So it seemed contradictory to what was
25   stated in there.  She looked at it -- that e-mail that

Page 143

1    I'm referencing was dated very close to that letter
2    from your office.
3    Q.      So is your answer to the question, yes, you
4    continued to put your personal meals on the company
5    credit card even after being requested not to?
6    A.      My understanding of what was being
7    requested --
8           THE COURT:  Mr. Gentry.  All right.
9    Listen to her question.  She's asking you a question
10   that has a "yes" or a "no" answer.  You can say "yes,"
11   or "no," or "I don't know."  And if you want to
12   explain, I'm going to let you, but answer her question
13   first.
14          Okay.  Did you hear what I said?
15          If she asks you a question that calls
16   for a "yes" or "no" response, you can answer "yes,"
17   "no," "I don't know."  Then explain your answer; okay?
18          THE WITNESS:  Yes, sir.
19          THE COURT:  Okay.
20   BY MS. TAYLOR:
21   Q.      Did you continue to use the company credit
22   card for your personal meals when you were requested to
23   quit doing so through counsel?
24   A.      No.  The -- where I was requested through
25   counsel, my understanding was to, like, not go out to

Page 144

1    dinner or something like that.  The other personal
2    meals, I was working in the store.  Every time I work
3    in the store, I go to lunch.
4    Q.      Every time an owner works in a store,
5    that's not a deductible business expense.
6           MS. PERKY:  Your Honor, that's not a
7    question.
8           MS. TAYLOR:  He's a CPA.
9           MS. PERKY:  That wasn't a question.
10   That's testimony from counsel.
11          THE COURT:  Why don't you just restate
12   the question, Ms. Taylor.
13   BY MS. TAYLOR:
14   Q.      When you use a business credit card for a
15   personal expense, that is to be included in personal
16   income; correct?
17   A.      Unless it's a de minimis fringe benefit.
18   Q.      You kept using the business credit card for
19   personal meals on an ongoing basis after being
20   requested not to?
21          MS. PERKY:  Your Honor, it's been
22   asked and answered three times now.
23          THE COURT:  Sustained on that.
24          MS. TAYLOR:  I can't figure out the
25   answer.

Page 145

1           THE COURT:  All right.  What he's
2    saying -- where we're getting hung up here is, he's
3    going to call every personal meal a de minimis fringe
4    benefit.  So I know what he's saying.  I know what
5    you're saying.  I've got to make a decision on it.
6    BY MS. TAYLOR:
7    Q.      When you take someone out on a date and use
8    the company credit card, that's not an appropriate use
9    of a company credit card, is it?
10          MS. PERKY:  Calls for speculation,
11   Your Honor.
12          THE COURT:  No.  I'm going to let him
13   answer that.  He can answer that.
14          THE WITNESS:  That's not a business
15   expense, and it is something I never did.
16   BY MS. TAYLOR:
17   Q.      Do you recall in your interrogatory answers
18   you state that you went to Carrabba's on August the
19   8th, 2014, with a date?
20   A.      I don't recall the exact date, but that
21   sounds probably right.  But I can assure you that I
22   never used the company credit card to pay for a date.
23   Absolutely not.
24          MS. TAYLOR:  Your Honor, unfortunately
25   we'll have to share this exhibit, but I'll show it to

37 (Pages 142 to 145)

Page 146

1    Mr. Gentry first.
2              MS. PERKY:  Can I actually see it
3    first, please?
4    BY MS. TAYLOR:
5    Q.      You show a charge on the credit card to
6    Carrabba's on August the 8th of 2014.
7    A.      There is a charge on there for $40.  If I
8    were to go on a date -- and Kathy knows this -- the
9    bill would never be $40.  That would be enough for one
10   person, which is exactly what this meal was, was for
11   myself.
12          If I go to Carrabba's and I go with another
13   person, we have a bottle of wine, we'll usually have
14   appetizers.  Kathy and I always did that.  And if it
15   were a date, the bill would probably be 120 to $180
16   probably.  So this -- this meal here is absolutely me
17   by myself.
18             MS. TAYLOR:  I'd like to mark this as
19   the next exhibit, Your Honor.
20             THE COURT:  It will be Exhibit No. 15.
21             (Marked Exhibit 15.)
22   BY MS. TAYLOR:
23   Q.      Do you recall, Mr. Gentry, in answer to
24   Interrogatory No. 25, asking about women you had dated,
25   you said you went to Janelle (phonetic) --

Page 147

1              MS. PERKY:  Objection, Your Honor, as
2    to relevance.  I mean, again, if it's going to be
3    couched in financial issues, then I'm fine with that.
4    But if we're just talking about whether or not
5    Mr. Gentry has gone on dates, I mean, I don't think
6    that that's relevant to the issues that the Court has
7    to determine today.
8              MS. TAYLOR:  If I could complete his
9    answer, please, Your Honor.
10             It says, We had one date around
11   8/8/14.  We met at Carrabba's at Indian Lake.
12             MS. PERKY:  What's the question?
13   BY MS. TAYLOR:
14   Q.      You went to Carrabba's with her when you
15   used the company credit card; correct?
16   A.      I did not use the company credit card with
17   Janelle.
18             THE COURT:  That wasn't her question.
19   Her question was, did you use the company credit card
20   when you went to Carrabba's with her?
21             THE WITNESS:  No, I did not.
22             THE COURT:  All right.  You might want
23   to reask it again, Ms. Taylor.  I'm not sure he's . . .
24             THE WITNESS:  Was the question did I
25   use the credit card --

Page 148

1              THE COURT:  It's not for her.  The
2    question is did you use the company credit card, even
3    if it's for yourself, when you went to dinner with her.
4              THE WITNESS:  Oh, no, I did not.
5              THE COURT:  Okay.  I don't think we're
6    on the same page here.  Let me try again.
7              THE WITNESS:  You're asking -- so if
8    we went and I -- maybe we went Dutch or I paid
9    separately for myself or something like that, and used
10   the company credit card?  No, sir, I did not.
11             THE COURT:  All right.  So you're
12   saying that on August 8, 2008, this Carrabba's charge
13   does not line up with this interrogatory answer?
14             THE WITNESS:  I believe it's not, sir.
15             THE COURT:  Okay.
16   BY MS. TAYLOR:
17   Q.      Okay.  Mr. Gentry, even if there was an
18   agreement, in your words, in that prior e-mail to use
19   the company credit card for personal expenses, you said
20   it should be a limit of $225 per month; correct?
21   A.      I believe so.  Kathy also mentioned that we
22   could revisit the amount and have it more or less, if
23   we needed.
24   Q.      The two of you did not agree to do that,
25   did you?

Page 149

1    A.      Kathy wrote me an e-mail, said she had
2    reviewed my meal spending on the credit card and said
3    that it was totally understandable.
4    Q.      When was that e-mail, Mr. Gentry?
5    A.      I believe that was in late July or early
6    August.
7    Q.      You don't have that with you, do you?
8    A.      Yes, we do.  It's in a binder here.
9    Q.      Mr. Gentry, I'm going to show you a
10   transaction list of spending on Capital One.  That's
11   the business credit card; correct?
12   A.      That's correct.
13   Q.      This goes back, and the last page starts
14   with September the 4th of 2014, through November the
15   21st; correct?
16   A.      Yes.
17             MS. TAYLOR:  I'd like to mark that the
18   next exhibit.
19             THE COURT:  All right.  That's No. 16.
20             (Marked Exhibit 16.)
21   BY MS. TAYLOR:
22   Q.      These are all charges made by you on the
23   business credit card; correct?
24   A.      That looks about right, yes.
25             MS. TAYLOR:  Your Honor, I would

BERTRAM REPORTING SERVICES
(615)758-6496

Page 150

1    submit that they exceed the agreed-to amount.
2              THE WITNESS:  Pardon me?
3    BY MS. TAYLOR:
4    Q.        They exceed the agreed-to limit of 225 per
5    month; correct?
6    A.        Yes, they do.  As I mentioned before, Kathy
7    had said that it was totally understandable.  She
8    mentioned in an e-mail, I see that you went way over
9    your budget.  It's totally understandable.
10             I wrote her back and said I didn't really
11   go over budget by that much.  It's customary for me.  I
12   generally work from home and not in the store.  But I
13   was in shipping, and packing boxes every day, so I
14   would treat myself to lunch as an overtime meal.
15   Q.        It was after these continued charges, then,
16   that Ms. Gentry canceled your use of the business
17   credit card; right?
18   A.        No.  I think that she canceled the business
19   credit card after I went on a trip to Tunica and went
20   to a casino there for a night.  And Kathy had pinged me
21   several times, I think, and that was when she had
22   canceled my credit card.  I think it was because she
23   was annoyed that I was in Tunica.
24   Q.        And used the business credit card?
25   A.        Pardon?

Page 151

1    Q.        And used the business credit card?
2    A.        No, I did not use the business credit card.
3    Q.        You used the business credit card to get
4    gas to get down there?
5    A.        No.  She had already canceled my gas long
6    before that.  It was after -- she canceled my gas back
7    in August.  That was just after Thanksgiving that I
8    went.
9    Q.        Let's go to this account that was pinged.
10   You, in fact, are the person who set up the Apple
11   devices at the house so they had the "Follow My iPhone"
12   app on them; correct?
13   A.        I did not set them up so that they had
14   "Find My iPhone," but I did set up the devices in the
15   iTunes account.
16   Q.        Mr. Gentry, going back to the issues -- I'm
17   going to move on from this and go to the issues
18   regarding THE MAT.  During the description of what you
19   said you did as a co-inventor of THE MAT, that was done
20   when you were working at Sweet Wise; correct?
21   A.        It's when we were partners at Sweet Wise,
22   yes.
23   Q.        Okay.  But you -- that was where you saw
24   Ms. Gentry teaching the class; correct?
25   A.        Say it again.

Page 152

1    Q.        That is where you saw Ms. Gentry teaching
2    the class you referred to?
3    A.        Yes.
4    Q.        Okay.  And you said that you were a
5    co-inventor.  All of this work occurred while you were
6    receiving a salary from Sweet Wise?
7    A.        That's correct.
8    Q.        Okay.  And Sweet Wise paid you for all the
9    salary you did while working on that; correct?
10   A.        Sweet Wise -- I don't understand your
11   question.
12   Q.        Sweet Wise paid you a salary during the
13   time you said you were being the co-inventor on THE
14   MAT?
15   A.        That's correct.
16   Q.        In fact, you're the one who determined what
17   your salary was?
18   A.        Yes, I did.
19   Q.        All of these contacts you made, talking
20   about the wholesaler and the person in Seattle, these
21   were contacts that came about through Sweet Wise?
22   A.        I don't understand what you mean by "Sweet
23   Wise."
24   Q.        The business Sweet Wise.  That's where you
25   knew these contacts and these wholesalers; correct?

Page 153

1    A.        I don't know.  How I found them was I
2    looked up on the Internet for plastics manufacturers
3    and I called them.
4    Q.        And the Internet you were using while you
5    were working at Sweet Wise?
6    A.        Just using my Internet at home.
7    Q.        Through the Sweet Wise account?
8    A.        Sweet Wise was paying for the Internet.
9    I'm not sure if Sweet Wise was paying for that then or
10   not.  Might have been.
11   Q.        And when you -- you said you went to
12   Seattle.  Who paid for that trip?
13   A.        I never went to Seattle.
14   Q.        I thought you said you went to Washington.
15   A.        We went to Washington for the
16   manufacturing, so virtually.
17   Q.        Who paid for that trip?
18   A.        I didn't travel to Washington.
19   Q.        You said you went to Washington.
20   A.        I'm saying we -- we went with a
21   manufacturer in Washington State.
22   Q.        Okay.
23   A.        We selected them to manufacture our
24   product.
25   Q.        You didn't go to meet with them?

BERTRAM REPORTING SERVICES
(615)758-6496

Case 3:17-cv-00020   Document 49-2   Filed 04/17/17   Page 39 of 56 PageID #: 1422

Page 154

1    A.    No, ma'am.
2    Q.    Did you go to meet with any other suppliers
3  about this mat?
4    A.    No, ma'am.
5    Q.    On the issue of the use of the company car,
6  you recall in this letter of October 2nd between the
7  attorneys that you were asked to cease using the
8  company car for dating?
9    A.    I don't remember it mentioning dating in
10  there.
11    Q.    Let me show you this letter, Mr. Gentry,
12  that was sent to your attorney on October 2nd, 2014.
13          MS. PERKY:  Your Honor, I would object
14  to this coming in as evidence unless Mr. Gentry also
15  received a copy of this letter and reviewed it.
16  Otherwise, it's hearsay of Ms. Taylor.
17          THE COURT:  All right.  Hang on,
18  before we get too far with our speaking objection.
19          Mr. Gentry, have you seen this letter
20  before?
21          THE WITNESS:  I did, sir.  My attorney
22  forwarded it to me.
23          THE COURT:  All right.  Go ahead,
24  Ms. Taylor.
25

Page 155

1  BY MS. TAYLOR:
2    Q.    Going to the last paragraph, Mr. Gentry, we
3  asked that you stop using the company car to go on
4  personal excursions where you were drinking at bars and
5  then driving the car that put the company at risk;
6  correct?
7    A.    They asked me in the letter, yes.
8    Q.    Okay.  Did you do that, or did you keep
9  doing it?
10    A.    I continued my normal behavior from before
11  we filed for divorce.  And my normal behavior is I go
12  out to restaurants.  I always have.  Kathy and I went
13  out quite often.
14    Q.    Ms. Gentry was concerned that you were
15  putting the business at risk when you drank and drove
16  in the company car; correct?
17          MS. PERKY:  Objection.  This is
18  speculation.  He doesn't know what Ms. Gentry --
19          THE COURT:  Sustained.
20  BY MS. TAYLOR:
21    Q.    Were you putting the company at risk when
22  you used the company car after you had been drinking?
23    A.    Absolutely not.
24    Q.    How is that?
25    A.    I drive well within the legal limits.  I

Page 156

1  would never drive intoxicated.
2    Q.    Mr. Gentry, I'm going to show you an
3  e-mail --
4          THE COURT:  Do you want to make this
5  an exhibit?
6          MS. TAYLOR:  I'm sorry, Your Honor.  I
7  keep losing myself.  Yes, sir, please.
8          THE COURT:  All right.  That's fine.
9  That will be No. 17.
10          (Marked Exhibit 17.)
11  BY MS. TAYLOR:
12    Q.    Do you -- did you send this e-mail of
13  October 7, 2014, to Jimmy "Lander," asking what would
14  happen if alcohol were involved?
15    A.    Yeah.  Jimmy Anders is our -- yes, I did.
16  Jimmy Anders is our insurance agent.  And after Kathy
17  had taken my car, I didn't think that it was justified
18  that she took my car.  And even if I went and had a
19  couple of glasses of wine with dinner, I wanted to find
20  out if we were protected.  We have a million-dollar
21  umbrella policy, as well as the vehicles are insured.
22  I didn't think it was an issue, and I just wanted to
23  confirm that.
24          And what I found out was that the vehicles
25  weren't properly insured.  They should have been on

Page 157

1  commercial policies, which Kathy later did add after
2  she had taken the car away from me.  And under that --
3  if they had been moved under that, there would have
4  been a million-dollar umbrella and there wouldn't have
5  been any issue even if I were drinking and driving.
6    Q.    But the way the policy was set up at that
7  time, there was no umbrella coverage because there
8  was --
9    A.    Because it was on a personal policy, that's
10  correct.
11    Q.    It was on a personal policy, which you had
12  been in charge of handling; correct?
13    A.    That's correct.
14          MS. TAYLOR:  I would like to mark that
15  the next exhibit, Your Honor.
16          THE COURT:  No. 18.
17          (Marked Exhibit 18.)
18  BY MS. TAYLOR:
19    Q.    You then turned the car in voluntarily?
20    A.    I did not.
21    Q.    You did not?
22    A.    I did not.  I e-mailed Kathy and I said,
23  What you're doing, taking this car away from me, is
24  violating the status quo.  However, I'll return the car
25  because I think you'll call the police on me, and I

40  (Pages 154 to 157)

Page 158

1    don't want to deal with the hassle of that.
2         So it was under protest I returned the car.
3    Q.     You then bought a Mercedes?
4    A.     I leased a Mercedes. It's all I could
5    afford.
6    Q.     There were certainly less expensive cars to
7    lease than a Mercedes?
8    A.     Kathy's car payment on her Nissan
9    Pathfinder is $642 a month. The payment on my Lexus
10   that the company bought was $849 a month.
11        The lease on my new car is about $400. So
12   it's half of the lease -- or it's half of the amount
13   that we used to pay on my previous vehicle, and it's
14   $200 less per month than what Kathy spends on her car.
15        I did a fantastic job negotiating with the
16   dealer, and I had them knock off quite a bit of the
17   price. I think it was a great deal.
18        MS. TAYLOR: Your Honor, can we submit
19   the answer to my question was "yes"?
20        THE COURT: Yes.
21   BY MS. TAYLOR:
22   Q.     Is this a picture of you standing in front
23   of your new car, Mr. Gentry?
24        MS. TAYLOR: And I'd like to mark that
25   as the next exhibit, please.

Page 159

1         THE COURT: Nineteen.
2         (Marked Exhibit 19.)
3         THE WITNESS: This picture, the
4    dealer -- or the sales rep that I worked with, he asked
5    me to stand in front of the car and said, you know, We
6    always do this for new Mercedes buyers.
7    BY MS. TAYLOR:
8    Q.     So that is a picture of you with your new
9    car?
10   A.     Yes, it is.
11   Q.     Do you recall then bragging about how you
12   were driving the new car and you were driving at
13   115 miles an hour?
14   A.     I did try it out.
15   Q.     And you told the employee in an e-mail that
16   you got it up to 115 miles an hour; correct?
17   A.     Did you say --
18   Q.     115 miles per hour?
19   A.     115, yes, ma'am.
20   Q.     And that's what you did?
21   A.     Yes, ma'am. Briefly.
22        MS. TAYLOR: Your Honor, if you'll
23   give me a few moments, I may have no further questions.
24        THE COURT: Okay.
25        (Brief pause.)

Page 160

1    BY MS. TAYLOR:
2    Q.     Mr. Gentry, I'll show you another e-mail of
3    December 1, 2014. This is after your Capital One card
4    was canceled; correct?
5    A.     Yes.
6    Q.     And Ms. Gentry did tell you if you would
7    keep your receipts that valid meal charges would be
8    reimbursed to you through the business; correct?
9    A.     Yes.
10        MS. TAYLOR: I would like to mark that
11   the next exhibit, Your Honor.
12        THE COURT: All right. Number 20.
13        (Marked Exhibit 20.)
14   BY MS. TAYLOR:
15   Q.     Before Ms. Gentry told you you were no
16   longer needed at Sweet Wise, you told her you were
17   beginning to transition out of the company?
18   A.     Yes, I did. I sent an e-mail to three key
19   people: Paveo, who does all of our accounting; Dancho;
20   and Kathy. Dancho does all of our marketing and our
21   purchasing, and I copied Kathy. I said, Over the next
22   several months -- and my intent was during pendency,
23   until the divorce was final, that this would be my
24   transition, because I'm going to not contest and give
25   the company to Kathy, and that during that period of

Page 161

1    time I would like to give them an opportunity to stand
2    on their own without my leadership. And I would wait
3    for them and give them an opportunity to stand up and
4    make things happen, or fall down, and then I would be
5    there to help them and guide them.
6         It was totally an e-mail with the intent of
7    saying, I want to help you guys be successful. I want
8    to do everything that I can to make sure that this
9    business continues after I leave. That was the whole
10   intent of it.
11        Kathy wrote me an e-mail in response to
12   that and said, Why don't you go get your tools and get
13   your things and get out of here.
14        And I responded back and said, That would
15   be a violation of the status quo. My intent is just to
16   help you guys during pendency.
17   Q.     When you were working at the business,
18   Mr. Gentry, you've called Ms. Gentry bad names, have
19   you not?
20        MS. PERKY: Objection, Your Honor. I
21   don't see -- I mean --
22        THE COURT: Tell me how that's
23   relevant, Ms. Taylor.
24        MS. TAYLOR: Well, Mr. Gentry says he
25   didn't do these things on the separation notices, and

41 (Pages 158 to 161)

Page 162

1    I'd like to go into the insubordination and harassment,
2    along with the other items.
3              THE COURT: To be honest with you, I
4    don't put a whole lot on the language of that
5    separation notice. I don't need to hear that, not this
6    late in the day.
7              MS. TAYLOR: Thank you, Your Honor.
8    If I could talk to my client one moment, please.
9              THE COURT: Yes, ma'am.
10             (Brief pause.)
11             MS. TAYLOR: I have no further
12   questions, Your Honor.
13             THE COURT: Okay. Thank you.
14   Ms. Perky, redirect?
15             MS. PERKY: Yes, Your Honor.
16
17             REDIRECT EXAMINATION
18   BY MS. PERKY:
19   Q.    Mr. Gentry, Ms. Taylor asked you about this
20   eStart company that you have started; correct?
21   A.    Yes.
22   Q.    Have you received any income from that
23   business?
24   A.    Zero.
25   Q.    Okay. And is that -- do you have any idea

Page 163

1    about when you're supposed to receive any income from
2    that business? Do you have anything, any accounts
3    receivable or anything that's in the pipeline?
4    A.    There's nothing in the pipeline at this
5    time.
6    Q.    Ms. Taylor also asked about the match.com
7    account. How much total monies did you spend on that
8    account?
9    A.    Total money?
10   Q.    Mm-hmm.
11   A.    Maybe 120, $180.
12   Q.    Okay. And what other monies have you
13   spent, if any, on any kind of date that you've gone on?
14   A.    Say again, please.
15   Q.    What other monies, if any, have you spent
16   on going on dates?
17   A.    Going on dates?
18   Q.    Mm-hmm.
19   A.    Maybe a couple hundred dollars, 200, 300
20   maybe.
21   Q.    Okay. Ms. Taylor also talked about how you
22   have not filed an income and expense statement with the
23   Court. Do you recall that?
24   A.    Yes, I do.
25   Q.    Exhibit 7 is a list of your expenses, is it

Page 164

1    not?
2    A.    It is, yes.
3    Q.    And your income is none; correct? Your
4    present income is zero; correct?
5    A.    It's zero right now, yes.
6    Q.    Ms. Taylor also asked you a lot about
7    personal expenses which were paid through the business;
8    correct?
9    A.    Yes.
10   Q.    And this was done -- was this done in
11   agreement -- in agreement with your wife?
12   A.    It was done in agreement with her, and we
13   both did it the same way exactly.
14   Q.    Did she object to the payment of those
15   expenses prior to the filing for this divorce?
16   A.    No.
17   Q.    She also asked you about which personal
18   expenses had been paid late. You talked about the
19   Comcast bill. Was that for the marital residence, the
20   Comcast bill at the marital residence?
21   A.    The business residence -- or the business
22   bill.
23   Q.    Okay. And when you say "the business
24   bill," is that for -- like, the Comcast is actually at
25   Sweet Wise or --

Page 165

1    A.    Yes, it's actually at Sweet Wise. It's our
2    cable and -- it's our Internet and our phone service.
3    Q.    Okay. But she did let your health
4    insurance lapse; correct?
5    A.    Yes, she did.
6    Q.    Ms. Taylor also showed you Exhibit 14,
7    which was a July 13, 2014, e-mail; correct? Do you
8    recall that e-mail where she said --
9    A.    Yes.
10   Q.    -- where it talks about y'all setting up a
11   budget of what kind of expenses would be paid through
12   the business?
13   A.    Yes.
14   Q.    Do you recall that?
15         And the copy of the e-mail that Ms. Taylor
16   entered into evidence doesn't have the complete chain
17   of the communications, does it?
18   A.    No, it did not.
19   Q.    What does it have in here that was not
20   included in Ms. Taylor's chain?
21   A.    Kathy's last response to it was, I think
22   I'm going to spend my food allowance on a massage
23   today. Smiley face.
24   Q.    Now, this credit card charge that you have
25   at Carrabba's, what credit card did you use to pay

42 (Pages 162 to 165)

Page 166

1    that?
2    A.      For that charge that Kathy's attorney
3    showed me, that was the company's Capital One credit
4    card.
5    Q.      Okay.  Now, you also talked about how y'all
6    agreed to an initial budget of around $250 for meals
7    and expenses; correct?
8    A.      Yes.
9    Q.      And then you said that there was an e-mail
10   later on that she -- that you had gone over the budget;
11   correct?
12   A.      Yes.
13   Q.      And that Ms. Gentry responded to you,
14   That's totally understandable.  I think that was what
15   your testimony was; correct?
16   A.      That's correct.
17           THE COURT:  Before you show him that
18   one, do you want to make this one an exhibit?
19           MS. PERKY:  Yes, Your Honor.  I
20   apologize.
21              (Marked Exhibit 21.)
22   BY MS. PERKY:
23   Q.      Now, is this that e-mail that you talked
24   about that was in August of 2014?
25   A.      Yes, it is.

Page 167

1    Q.      And in that e-mail does Ms. Gentry talk to
2    you about going over the budget that y'all had
3    initially --
4              (Brief interruption.)
5    BY MS. PERKY:
6    Q.      So this August 2014 e-mail, does that have
7    in there where Ms. Gentry talks to you about going over
8    the budget?
9    A.      Yes, it is.  She says in the e-mail that
10   it's totally understandable that my budget was exceeded
11   some time back.
12   Q.      And why does she say it was totally
13   understandable?
14   A.      I had gone in -- I had mentioned to the
15   Court earlier, I had gone in and was taking over all of
16   the shipping for about a four-month period.  It saved
17   the company $10,000 in wages, plus I identified savings
18   opportunities of over $50,000.
19           So my meal spending, going to lunch every
20   day, was more than offset by the cost savings and by
21   the potential cost savings down the road.
22   Q.      Does Ms. Gentry also talk in that e-mail
23   about taking her kids out to dinner to celebrate
24   something or other, and that she wants to use the
25   company credit card to do that?

Page 168

1    A.      Yes, she does.  She mentioned in the e-mail
2    that she also went and had two meals by herself, alone,
3    and she wanted to get my approval for her to take Logan
4    and then Lindsey, her two kids, out to dinner.
5    Q.      So she's asking for your approval about her
6    expenses?
7    A.      Yes, she is.
8    Q.      Okay.  And did you agree that that was
9    fine?
10   A.      I wrote back and told her in an e-mail, I
11   don't think I've ever complained about your spending.
12   I'm glad we have the resources to support things like
13   that.
14   Q.      Okay.  Now, she talks a lot about --
15   Ms. Taylor talked a lot about these letters that were
16   sent between counsel, e-mails that Ms. Gentry sent you
17   talking about we want you to limit your spending, we
18   want you to not spend on personal expenses, just
19   business expenses; correct?
20   A.      The counsel mentioned that, yes.
21   Q.      Okay.  And that was inconsistent with what
22   y'all did during the marriage, isn't it?
23   A.      It was completely contradictory, yeah, and
24   inconsistent.
25   Q.      Okay.  Now, Exhibit 18 that Ms. Taylor

Page 169

1    entered was this e-mail with an insurance agent where
2    you talk about whether or not coverage would apply in
3    the event of somebody drinking while driving a company
4    vehicle; correct?
5    A.      Yes.
6    Q.      Was that e-mail sent after Ms. Gentry took
7    away your car?
8    A.      Yes, it was.
9    Q.      Lastly, Mr. Gentry, you talk about this --
10   Ms. Taylor asked you some questions about an e-mail you
11   sent and you're talking about transitioning out of the
12   business; correct?
13   A.      Yes.
14   Q.      And in your response -- I mean, in that
15   e-mail, you weren't saying that you're not an owner,
16   were you?
17   A.      No.
18   Q.      And you weren't saying that you shouldn't
19   receive your fair share of the business, were you?
20   A.      No.  I wasn't saying that at all.
21           MS. PERKY:  Okay.  Thank you, Your
22   Honor.
23           THE COURT:  Do you want to make this
24   last e-mail an exhibit?
25           MS. PERKY:  Yes, please, Your Honor.

43 (Pages 166 to 169)

Page 170

1      THE COURT:  All right.  It will be
2  No. 22.
3          (Marked Exhibit 22.)
4      THE COURT:  Any recross, Ms. Taylor?
5      MS. TAYLOR:  Just a few, Your Honor.
6  I'll be brief.
7
8      RECROSS-EXAMINATION
9  BY MS. TAYLOR:
10      Q.    Mr. Gentry, how many rTsumTs have you sent
11  out since April of 2014, when the divorce started,
12  looking for work as a CPA?
13      MS. PERKY:  Objection, Your Honor.  I
14  think that this is outside of her cross.
15      THE COURT:  It is.  But I'm going to
16  tell you, if she didn't ask, I was.
17      MS. PERKY:  Okay.
18      THE COURT:  So go ahead.
19      MS. TAYLOR:  Pardon?
20      THE COURT:  I was going to ask it if
21  you didn't.  Go ahead.
22      THE WITNESS:  I haven't sent out any.
23  I'm working on eStart.  And I'm expecting that as an
24  owner of Sweet Wise, I should be compensated for it.
25  ///

Page 171

1  BY MS. TAYLOR:
2      Q.    And with eStart, you have been telling
3  people you are not going to launch it until after this
4  divorce is final?
5      MS. PERKY:  Objection.  Asked and
6  answered, Your Honor.  We've already talked about this.
7      THE COURT:  Sustained.  We had several
8  questions on that earlier.
9  BY MS. TAYLOR:
10      Q.    So you haven't tried to find any work as a
11  CPA?
12      A.    Pardon me?
13      Q.    No work that you've tried to find as a CPA?
14      MS. PERKY:  Asked and answered, Your
15  Honor.  We've already talked about his efforts to
16  find other employment.  He says he's been --
17      THE COURT:  Hang on.
18      I think your answer is you haven't
19  applied anywhere to be employed as a CPA, have you?
20      THE WITNESS:  I've not sought
21  employment anywhere.
22  BY MS. TAYLOR:
23      Q.    After your health insurance was canceled,
24  Ms. Gentry immediately had it reinstated; correct?
25      A.    No.  I had to go through and apply for it.

Page 172

1  And it was very painstaking because it had been
2  canceled, and so I couldn't get a decent policy.  I had
3  to take one that's -- it's not that expensive, but it
4  has very minimal benefits.
5      Q.    In fact, you didn't even have insurance
6  until the end of 2013, because you said you didn't want
7  health insurance?
8      MS. PERKY:  Objection as to relevance,
9  Your Honor.
10      MS. TAYLOR:  It is relevant, Your
11  Honor.  He's complaining he had to reapply, when he
12  never had it.  The only time he had it were the six
13  months Ms. Gentry had him get it.
14      THE COURT:  All right.  Let me ask
15  this question.  Do you have health insurance now?
16      THE WITNESS:  Yes, sir, I do.
17      THE COURT:  When you had health
18  insurance through -- was your health insurance through
19  the company before --
20      THE WITNESS:  Yes, sir.
21      THE COURT:  -- the divorce?
22  Who's paying it now?
23      THE WITNESS:  The company is
24  reimbursing me now.
25      THE COURT:  Okay.  All right.

Page 173

1      MS. TAYLOR:  Your Honor, so we'll make
2  sure we understand, it was a personal health insurance
3  the company paid, the company didn't provide it.
4      THE COURT:  No, I understood as much.
5  BY MS. TAYLOR:
6      Q.    And you -- if the personal spending with
7  the business money is contradictory, as you say, then
8  the tax returns you filed on the business showing those
9  expenses as business expenses are incorrect?
10      A.    I stand behind the tax returns that I
11  prepared as being correct.  So if you're asking me are
12  they not correct, I would say they are correct.
13      Q.    Even though there are personal expenses on
14  there not included as income?
15      A.    Well, it's very easy to say -- you know, if
16  I go into the store and I buy myself lunch -- I usually
17  work from home -- but I'm in the store, it's overtime,
18  it's a de minimis fringe benefit.
19      Q.    Now, going back to the return of the car,
20  Ms. Gentry told you she wanted you to return the car on
21  or about October the 2nd; correct?
22      A.    What was your question again?
23      Q.    On the return of the business car,
24  Ms. Gentry told you on or about October 2nd she wanted
25  you to return it?

44  (Pages 170 to 173)

Page 174

1    A.     I believe it was October 6th.  But yes.
2    Q.     Okay.  And then you made the inquiry about
3    the insurance coverage, about drinking while driving?
4    A.         Then I made an inquiry if there was any
5    risk to the company.
6    Q.     And then it was not until after the --
7    A.     It wasn't about drinking and driving,
8    because I don't drink and drive, in the sense that when
9    you say drinking and driving, most people interpret
10   that as saying you're driving under the influence or
11   intoxicated.  I don't do that.
12   Q.     But you do drive fast?
13   A.     I do drive fast.
14   Q.     Now, you did not turn the car back in until
15   after the response from the insurance company?
16   A.         Kathy e-mailed me, I think it was
17   October 6th.  It was on a weekend.  It was a Sunday
18   morning, as a matter of fact.  And she said, I want you
19   to return the car because you're putting the company at
20   risk.
21          I wrote her and said, I think you're
22   violating the status quo.  You're doing this just to be
23   mean, taking my car away from me.
24          And she said in her e-mail that she wanted
25   it returned to her, like, on the next Wednesday or

Page 175

1    something.  And I said, Okay, I'll return it to you
2    Wednesday.
3          MS. TAYLOR:  Your Honor, I submit to
4    the Court the answer to my question is, yes, he
5    returned the car after the e-mail.
6          THE WITNESS:  Oh.
7          MS. TAYLOR:  His prior testimony was
8    that he -- he sent the e-mail after she told -- after
9    he returned the car.
10         THE WITNESS:  I apologize if I
11   misunderstood.  Was your question did I e-mail the
12   insurance agent after or before the car was taken?
13   BY MS. TAYLOR:
14   Q.     Correct.
15   A.     I e-mailed the insurance agent after my car
16   was taken.
17   Q.     And, in fact, Mr. Gentry, your car -- you
18   did not return it until a day or two after the
19   insurance company letter?
20   A.     I returned it when Kathy instructed me to
21   return it.
22          MS. TAYLOR:  I have no further
23   questions, Your Honor.
24          THE COURT:  Ms. Perky?  All right.
25   Mr. Gentry, do you have a mortgage?

Page 176

1          THE WITNESS:  Pardon me?
2          THE COURT:  Do you have a mortgage?
3          THE WITNESS:  Yes, sir.  I'm a month
4    late on the mortgage right now.
5          THE COURT:  All right.  Do you have
6    utilities other than the cell phone bill and the cable
7    bill?  I assume you have electric and water and --
8          THE WITNESS:  Yes, sir.
9          THE COURT:  All right.  I'm not going
10   to prolong his testimony, because we're going to need
11   to get out of here.  But you're going to need to file a
12   late-filed exhibit with his living expenses.
13          I understand what you've put in here,
14   but I need to know what his living expenses are.  So I
15   need to know things like, you know, what his health
16   insurance cost is, what his mortgage is, what his -- I
17   mean, there's a lot of eating out.  Does he have a
18   grocery bill?  Utilities bills.  Just the cost of
19   living.  He's got his car payment in here and some of
20   the utilities, but I'm going to need the rest of that.
21          All right.  Mr. Gentry, you can step
22   down.
23          MS. TAYLOR:  Your Honor, I have a
24   question about the timing on the rest of this hearing.
25          THE COURT:  Mm-hmm.

Page 177

1          MS. TAYLOR:  I understand we have two
2    witnesses who are here, and that we may, with the
3    Court's indulgence, hear from them.
4          As far as continuing with Ms. Gentry's
5    testimony, I just -- I mean, the direct and cross could
6    go on, if it's like Mr. Gentry's, another few hours.  I
7    have an early-morning appointment and I need to be out
8    of here.
9          THE COURT:  I've got a jury trial
10   tomorrow.  So we're starting to -- I think we're all
11   starting to get some diminishing returns here.
12          Here's the concern I have.  I don't
13   have any testimony from her on her ability to pay.  I'm
14   going to need some testimony from her.
15          As I think I suspected at the very
16   beginning, this issue of the ownership interest in the
17   business, whether he's going to be allowed to run it,
18   because there's some sort of implied partnership or
19   whether there's not, that's awfully fact-intensive, and
20   I don't think there's any way I'm going to get to that
21   today.
22          I'm going to address the issue of
23   temporary support today.  I can't make a ruling because
24   I don't have everything I need from him.  But I need
25   her ability to pay, and I don't think I -- I don't know

45 (Pages 174 to 177)

TRANSCRIPT OF PROCEEDINGS        MARCH 10, 2015

1    that I have that yet.
2            So why don't we put her on for the
3    limited purpose of getting some testimony with respect
4    to her ability to pay. And then we can reschedule, if
5    we need to; okay?
6            MS. TAYLOR: Your Honor, what about
7    the two witnesses? Wait on those?
8            THE COURT: I mean, they're going to
9    testify as to who's running the business, aren't they,
10   Ms. Perky?
11           MS. TAYLOR: Yes.
12           THE COURT: They're going to testify
13   about who's running the business?
14           MS. TAYLOR: I think the parties can
15   testify as to that.
16           MS. PERKY: Your Honor, the only
17   concern that I have is the gentleman who works at Sweet
18   Wise was flown here from Europe in order to be here
19   today.
20           THE COURT: Okay.
21           MS. PERKY: His testimony, from my
22   perspective, is very short. But it is, Your Honor -- I
23   do need to clarify to the Court that it is limited to
24   not really the financial aspects, other than, you know,
25   I believe his testimony will be consistent with

1    Mr. Gentry's, that they did pay personal expenses out
2    of the business, but it does have primarily to do with
3    who did what.
4            THE COURT: I'm not interested in his
5    opinion on how they paid what. I am interested in his
6    opinion with respect to what Mr. and Ms. Gentry's
7    relative roles were in the day-to-day operation of the
8    business based upon on whatever knowledge he has.
9            MS. PERKY: Right. And he will
10   testify to that.
11           THE COURT: All right. Let's limit
12   his testimony to that.
13           What about the other witness?
14           MS. PERKY: I believe that that's
15   Ms. Gentry's witness.
16           THE COURT: Okay. Since he's flown
17   in -- does he fly in regularly?
18           MS. TAYLOR: Yes, Your Honor, he does.
19   He's actually been visiting friends in Washington,
20   D.C., before he came down here. So this is --
21           MS. PERKY: Your Honor, my client says
22   he comes once or twice a year. We had to pay for him
23   to be here, and he doesn't have any money.
24           THE COURT: All right. Well, look,
25   I'm going to limit his testimony to his observations of

1    the Gentrys' involvement in the business. That's what
2    we're going to do today. And then, obviously, you'll
3    be able to question him. You'll be able to
4    cross-examine him. I'm not interested in personal bill
5    paying.
6            And then after that, we're going to
7    hear from Ms. Gentry on her ability to pay. And we're
8    going to have to -- I'm going to want to hear from her
9    on her position on THE MAT, her position on her role in
10   the business. But I can't -- we can't do that tonight.
11           MS. TAYLOR: My client is more than
12   prepared to testify about all of that and wants to have
13   the whole story heard by the Court.
14           THE COURT: Well, that sort of runs
15   counter to you wanting to get out of here quickly.
16           MS. TAYLOR: Well, wanting to run to
17   get out and wanting my client to tell the whole story
18   are not counterintuitive when I believe that we have
19   been going with Mr. Gentry, what, since about 3 o'clock
20   or --
21           THE COURT: 4:00, but yes.
22           MS. TAYLOR: -- 3:00 or 4:00, so we're
23   three hours into it. I want her to be able to have the
24   same opportunity --
25           THE COURT: So what you're saying is

1    you want to make sure she has a full opportunity.
2            MS. TAYLOR: Of course.
3            THE COURT: And I agree. I'm going to
4    reserve -- I'm going to rule on temporary support
5    today.
6            You pled in the alternative. So it
7    may be that I rule on -- well, I say rule on temporary
8    support. I'm going to take all the proof on temporary
9    support today. It may be after we have another hearing
10   where she does have an opportunity to fully testify
11   that we convert that to something else.
12           But for today's purpose, let's have
13   our witness and let's have Ms. Gentry on her ability to
14   pay. And I'll make a ruling after I get Mr. Gentry's
15   information.
16           MS. TAYLOR: Your Honor, I will
17   certainly respect where you are. But if we have a
18   ruling today on her paying temporary support and
19   she's -- if she is ordered to pay support, we don't
20   have a full income and expense statement for
21   Mr. Gentry --
22           THE COURT: Oh, I'm not going to rule
23   today. I've still got to get his expense statement.
24           MS. TAYLOR: As long as I have a
25   chance to cross-examine it and we don't have a ruling

Page 182

1  today.
2       THE COURT: Yeah. I'm going to let
3  him submit his expense statement. You know, here's the
4  thing. On temporary support, it's just that. It's
5  temporary. I think there might have been some
6  testimony about a mortgage payment already. I sort of
7  know what utility bills look like. And they eat out a
8  lot. So I've got a pretty good idea.
9       I'm going to make a ruling after he
10  submits an expense statement. If you want to file an
11  objection to it, I'm going to let you. But I'm going
12  to get something in place, depending on what her
13  ability to pay is.
14       MS. PERKY: Your Honor, we actually
15  have an income and expense statement. I'm sorry. My
16  client just gave it to me.
17       THE COURT: All right. Let's do this.
18  Let's get your witness in here and let's go ahead and
19  hear that testimony. And then let's hear from
20  Ms. Gentry on what her expenses are, and what her
21  income is.
22       And then I'll make a ruling at some
23  point. Not this evening; okay?
24       And I'll let you give that to
25  Ms. Taylor.

Page 183

1       I'll let you respond to it either
2  before we leave tonight or in writing later, if you
3  want to.
4       Come on up here, sir. Stand in front
5  of the witness chair there.
6            (Witness was sworn.)
7
8       DANCHO GJORGJIJEVSKI,
9  was called as a witness, and having been duly worn, was
10  examined and testified as follow:
11
12       DIRECT EXAMINATION
13  BY MS. PERKY:
14  Q.     Will you please state your name for the
15  Court.
16  A.     My name is Dancho Gjorgjijevski.
17  Q.     And where are you employed?
18  A.     Sweet Wise, Inc., and University American
19  College in Skopje.
20       THE COURT: All right. Let's stop.
21       COURT REPORTER: American University
22  College in?
23       THE WITNESS: Skopje, Macedonia.
24       COURT REPORTER: I'm sorry?
25       THE WITNESS: University American

Page 184

1  College in Skopje, Macedonia.
2       THE COURT: Spell "Skopje."
3       THE WITNESS: S-K-O-P-J-E.
4       THE COURT: Spell your first and last
5  name.
6       THE WITNESS: D-A-N-C-H-O, first name.
7  Second name, G-J-O-R-G-J-I-J-E-V-S-K-I.
8       THE COURT: All right.
9  BY MS. PERKY:
10  Q.     And, please, if you can try to speak
11  slowly, that would be helpful to us.
12  A.     Okay.
13  Q.     Now, what are your responsibilities -- how
14  long have you been employed at Sweet Wise?
15  A.     This July, six years.
16  Q.     And what are your general responsibilities,
17  just briefly?
18  A.     Purchasing, digital marketing, pricing,
19  coordination about IT and Web design, general strategy,
20  operations.
21  Q.     Is there any other employee, in your
22  opinion, who knows more about the business other than
23  Mr. and Ms. Gentry?
24  A.     Not that I -- I -- I don't know.
25  Q.     You don't know. Okay.

Page 185

1       Now, are you familiar with Mr. Gentry's
2  responsibilities when he worked at Sweet Wise?
3  A.     Yes, I am.
4  Q.     And what were those activities?
5  A.     Overlooking and controlling the operation
6  of the business, in every stage of it, all the
7  purchasing, and accounting, finance reporting, general
8  decision about strategy and operation of the business,
9  shipping, new systems, new product lines, general --
10  everything connected with the operations.
11  Q.     And who provided -- I'm sorry. What did
12  you say?
13  A.     And finance.
14  Q.     And who provided your training and
15  supervision?
16  A.     The most part, John did.
17  Q.     And how many hours per week did Mr. Gentry
18  work?
19  A.     Fifty, 60. A lot.
20  Q.     Now, are you -- do you have knowledge about
21  Ms. Gentry's responsibilities at Sweet Wise prior to
22  Mr. Gentry leaving the business?
23  A.     Until April 2014, mostly Kathy Gentry's
24  what we call the face of the company, our person
25  responsible about making videos, promoting new product

47 (Pages 182 to 185)

Page 186

1   lines or existing product lines. After April 2014, she
2   was getting more involved in the operations and the
3   general things of the business finances and . . .
4   Q.      So there was a change in her -- a
5   significant change in her involvement from April of
6   2014 through the present, you know, from the time she
7   filed for divorce until the present?
8   A.      Yes. Not so in the beginning. Most of the
9   changes come later in the summer. She's thinking about
10  about operations and financing.
11  Q.      So how many hours would you estimate she
12  was working before April of 2014?
13  A.      It's tough to judge that, because I was not
14  connected so much about what she was doing. I cannot
15  tell how much it takes to prepare for the video and the
16  film -- the filming, I think, is not a lot, but just
17  prepare for that. I cannot tell for sure. Maybe -- I
18  don't know. I will not have a number.
19  Q.      Okay. Who would you say has been primarily
20  responsible for the growth and success of Sweet Wise?
21  A.      Probably John Gentry.
22  Q.      Did you ever hear Ms. Gentry talk about
23  Mr. Gentry being a co-owner of Sweet Wise?
24  A.      Yes.
25  Q.      Okay. Tell the Court about what -- about

Page 187

1   the times that you heard her say that.
2   A.      I cannot remember the exact date. I think
3   it was like 15th of May or something. Mr. Gentry
4   called me on the phone and telling me that I'll be
5   getting 5 percent of the company, and John Gentry will
6   get 45 percent of the company, and Kathy will get
7   50 percent of the company.
8           Also, we went to a party -- a dinner. John
9   was telling Kathy that he wants to give -- give me
10  15 percent of the company. And Kathy said, You can do
11  whatever you want with half of the company, your half
12  of the company.
13          That's something that I can remember
14  clearly.
15  Q.      So is your general understanding as an
16  employee that the company was owned by both Mr. and
17  Ms. Gentry?
18  A.      Yes.
19  Q.      Are you aware of how Mr. and Ms. Gentry's
20  compensation was determined?
21  A.      Yes, I am.
22  Q.      And who determined their compensation?
23  A.      I think it was mutual agreement, but John
24  was the one that drew the numbers.
25  Q.      Now, after Ms. Gentry filed for divorce in

Page 188

1   April 2014, did her attitude towards Mr. Gentry change
2   in the workplace?
3   A.      Both of their attitudes changed toward each
4   other. She was trying to take some of the
5   responsible -- responsibility that he was having and
6   have more control on the business than before, if you
7   translate that as a change of behavior.
8   Q.      Are you aware of whether or not Ms. Gentry
9   instructed the employees at the company to contact the
10  police in the event that they saw Mr. Gentry on the
11  property?
12          MS. TAYLOR: Objection, Your Honor.
13          THE COURT: Hang on Mr. -- may I call
14  you Dancho?
15          THE WITNESS: Yes, sir.
16          THE COURT: Because I can't pronounce
17  your name.
18          MS. TAYLOR: Objection, Your Honor.
19  He's not here. He's in Europe. He's not going to know
20  what the employees in the local store were told.
21          MS. PERKY: I can lay a foundation,
22  Your Honor, if you would like.
23          THE COURT: All right. Well, I think
24  you're going to need to.
25          And then I'm going to let her ask,

Page 189

1   with the proper foundation, and then I would imagine
2   you'll have some cross-examination questions on that
3   issue.
4   BY MS. PERKY:
5   Q.      Were you copied on any e-mail that
6   Ms. Gentry sent to the employees talking about to call
7   the police in the event that they saw Mr. Gentry on the
8   property?
9   A.      Yes, I was.
10  Q.      And what did the e-mail say?
11  A.      That effective from today, John Gentry is
12  no longer an employee at Sweet Wise, and if he's trying
13  to come -- walk in the store -- I don't know the exact
14  words, just, you know, if you cannot handle it with him
15  peacefully, tell him to leave, call the police.
16  Something like that.
17  Q.      And she copied this e-mail -- she copied
18  all the employees on this e-mail; correct?
19  A.      I cannot tell for sure. I was part of it.
20  Q.      Did Ms. Gentry change the locks to Sweet
21  Wise?
22  A.      I was in another part of the world. I
23  guess she did, but I cannot know for sure. I wasn't
24  there.
25  Q.      Okay.

48 (Pages 186 to 189)

TRANSCRIPT OF PROCEEDINGS        MARCH 10, 2015

Page 190

1    A.      So I guess she did.
2    Q.      Now, in the event that the Court orders
3  either Mr. Gentry or Ms. Gentry to run Sweet Wise by
4  themselves without the other person, are you
5  comfortable being a point of contact for the parties,
6  whoever's not running Sweet Wise, to keep them apprised
7  of the business ongoings?
8    A.      If that's a Court decision and applies to
9  the general policy of the company, that would be -- I
10 would do it, but not just personally.
11   Q.      Right.  I understand you're in a little bit
12 of an uncomfortable position right now.
13         MS. PERKY:  That's all, Your Honor.  I
14 pass the witness.
15         THE COURT:  All right.  Ms. Taylor.
16
17              CROSS-EXAMINATION
18 BY MS. TAYLOR:
19   Q.      May I also call you Dancho?
20   A.      Of course.
21   Q.      With regard to Ms. Gentry's duties at the
22 business, are you also aware of the fact she was the
23 one who handled the company newsletters?
24   A.      Me and her were working on that.  She was
25 the final one that makes the approvals and the final

Page 191

1  say.
2    Q.      Okay.  She also handled the training of the
3  staff, the instructors, the teachers who were doing
4  some of the classes; correct?
5    A.      Correct.  I apologize I didn't mention that
6  before.  So classes, how they teach it, deciding on --
7  if I can add to her questions.  So Kathy Gentry's
8  training of staff and classes, creating classes that we
9  sold, teaching some of them when needed.  She helped
10 the store when short-staffed, and also did control
11 about making final decisions with John regarding major
12 strategic moves and other more general stuff in the
13 company, not that much on a daily operation, more in a
14 general strategy.
15   Q.      In fact, the procedure was that no major
16 decisions were finalized and implemented without
17 Ms. Gentry being a part of it?
18   A.      Correct.  Mr. Gentry always insists on an
19 opinion from Kathy Gentry.
20   Q.      Ms. Gentry also did all of the -- the
21 shooting of the videos that are a very important part
22 of the Web site; right?
23   A.      As I said, Kathy was the face of the
24 company and the person that Sweet Wise would mostly
25 recognize.

Page 192

1    Q.      When you go onto the Sweet Wise Web site,
2  it's Ms. Gentry's likeness, and the character is
3  modeled exactly after her; correct?
4    A.      Yes.  As I said, the face of the company.
5  The character that we use is made for her.  All the
6  videos -- or 99 percent of the videos are her.
7    Q.      She had the background on the cake and the
8  candy decorating, and she was the one who was very
9  involved with all of the product choices that were
10 sold?
11   A.      Both of them were.  She made probably the
12 final decision about product.  Her -- her knowledge was
13 taken always as the final -- final one.
14   Q.      Now, Dancho, when you were talking about
15 this information you found out when Ms. Gentry told the
16 employees that Mr. Gentry was not to be on the
17 property, that was in December of 2014; correct?
18   A.      Correct.
19   Q.      You -- what was it that happened with the
20 accounts that caused Ms. Gentry to tell you that?
21         MS. PERKY:  Your Honor, I would
22 object.  I think she's getting into the issue that you
23 just told counsel not to get into.  I didn't get into
24 it because that was the Court's instruction.
25         THE COURT:  All right.  Tell me what

Page 193

1  you're -- where are we going with this, Ms. Taylor?
2          MS. TAYLOR:  Your Honor, Mr. Dancho is
3  the one who knew that the company Google account had
4  been accessed and the funds diverted by Mr. Gentry to
5  his account.  And he told Ms. Gentry about it.  Which
6  would certainly come out in her testimony, but that --
7          THE COURT:  Are you trying to get at
8  he went to tell her about it because he viewed
9  her as a key decision-maker in the company?  Is that
10 what you're trying to get at?
11         MS. TAYLOR:  I'm viewing it that they
12 brought up Ms. Gentry saying the police were to be
13 called, and he knows why.
14         THE COURT:  Okay.  I've got ya.
15         MS. TAYLOR:  They brought it up.
16         THE COURT:  All right.  Go ahead.
17         THE WITNESS:  Tell the Google stuff --
18 BY MS. TAYLOR:
19   Q.      Yes.
20   A.      -- you're asking me?
21   Q.      Yes.
22   A.      First, the Google account, together with
23 the -- with the YouTube account, was compromised in a
24 way from John Gentry.  He took the AdSense so we
25 couldn't access.  And due to AdSense -- we make money

49 (Pages 190 to 193)

Page 194

1  out of AdSense.  We couldn't have access to that.
2          THE COURT:  Are you saying ad sales?
3          THE WITNESS:  AdSense.  It's a part of
4  Google that you make -- that Google pays you.
5          THE COURT:  Oh, okay.
6          MS. TAYLOR:  Advertising services.
7          THE WITNESS:  Advertising.
8          THE COURT:  Yeah.  I knew he was
9  saying "ad."  I couldn't tell what the second word was.
10         THE WITNESS:  So when we -- when I was
11  able to go back into the account, Mr. Gentry's personal
12  account was connected with Google, with AdSense.  But
13  no funds were transferred because no verification was
14  done.
15  BY MS. TAYLOR:
16  Q.      But he had tried to send them to his
17  personal account?
18  A.      It was set up like that.
19  Q.      And also, Mr. Dancho, Mr. Gentry tried to
20  get you to quit the business, did he not?
21  A.      He said it's a last step -- if not -- if
22  the things doesn't go as he thinks that's supposed to
23  go, that the solution would be if I quit the company
24  together with him, and Kathy will be forced to --
25  because between me and him run most of the operations,

Page 195

1  so it will be forced in a way that Kathy will have to
2  give what he was asking for or find a middle ground.
3  Q.      The business would not run well without the
4  Google and the YouTube accounts, would it?
5  A.      They're a significant part of the company.
6  Not the business would fold, but YouTube is one of the
7  major marketing channels, but it's affecting -- it's
8  important.  But I don't want to say like that the
9  business would fall down, but it is an important part
10  of the business.
11  Q.      And you have told Ms. Gentry that you and
12  Ms. Gentry can run the business without Mr. Gentry,
13  have you not?
14  A.      When she asked me -- and this was also a
15  request for John.  If something happens, that I'll stay
16  in the business and run the business together with
17  Kathy.  And I said, you know, we'll give our best and
18  that we'll succeed in doing that.
19  Q.      When Mr. Gentry wanted you to quit the
20  business, that was in December of 2014; right?
21  A.      I think the conversation we had on the
22  phone was in September or October.  I would say it was
23  September.
24  Q.      Okay.
25  A.      Earlier.

Page 196

1  Q.      And he wanted you to quit the business if
2  Ms. Gentry would not give him what he was asking for?
3  A.      It was more in the line that if things go
4  to that point, that, you know, that's something that
5  maybe we should do, so we make sure that the company
6  stays in -- until a solution is final.
7          MS. TAYLOR:  I have no further
8  questions, Your Honor.
9          THE COURT:  Okay.  Thank you,
10  Ms. Taylor.
11          Ms. Perky, do you have any redirect?
12          MS. PERKY:  Yes, Your Honor, just a
13  few short questions.
14          THE COURT:  All right.
15
16          REDIRECT EXAMINATION
17  BY MS. PERKY:
18  Q.      Mr. Dancho, isn't it true that in these
19  conversations that Ms. Taylor characterized as quitting
20  the business in the event that Ms. Gentry didn't give
21  Mr. Gentry what he wanted, wasn't it not that he said
22  let's quit the business, he said let's go on strike?
23  A.      Yes.  Yes.  The one time he said go on
24  strike.  The other time he said, you know, for me to
25  quit and then he will do my job and, you know, prove

Page 197

1  Kathy that he can do the job, and get me back then.
2  Q.      Okay.  But my question was did y'all use
3  the words "quit the business" or did you use the words
4  "go on strike"?
5          MS. TAYLOR:  Your Honor, asked and
6  answered.  He just said he used the word "strike" and
7  used the word "quit."
8          THE COURT:  All right.  I'm going to
9  let her ask it, simply because English isn't his first
10  language.
11          THE WITNESS:  Sorry.
12          THE COURT:  She's asking you a very
13  specific question; all right?
14          THE WITNESS:  Okay.  So the one time,
15  he said we should go on strike, both of us, and try to
16  convince the other person who works with us, Paveo, the
17  accountant, to join us so Kathy will not have choice.
18          The other time, he said I need to quit
19  the job.  He will do my job, to prove Kathy that he's
20  capable of doing all the jobs.  And as soon as Kathy
21  awards him the part that he is asking for, he will hire
22  me back.
23          THE COURT:  All right.
24  BY MS. TAYLOR:
25  Q.      And you talked about this Google account

50 (Pages 194 to 197)

Page 198

1  that was compromised.  How long was it compromised?
2  A.    A day.  I -- 24 hours.  I cannot have the
3  right answer.  Kathy called Google or something.  They
4  traced back who was the original owner of Sweet Wise or
5  something.
6  Q.    So a day or less?
7  A.    Something like that.  I don't know.
8       MS. PERKY:  Okay.  That's all I have.
9       THE COURT:  Anything further,
10 Ms. Taylor?
11      MS. TAYLOR:  No, Your Honor.
12      THE COURT:  All right.  Thank you,
13 sir.  Be careful stepping down.  Thank you for being
14 patient and waiting today.
15      MS. TAYLOR:  Your Honor, may I release
16 the other witness?
17      THE COURT:  You may.  You may.
18      All right.  That concludes what we're
19 going to hear today from Mr. Gentry; is that correct?
20      MS. PERKY:  Yes, Your Honor.
21      THE COURT:  All right.  So I'll let
22 you decide, Ms. Taylor -- well, we're going to hear
23 from Ms. Gentry now, aren't we?
24      MS. TAYLOR:  Yes, Your Honor.  You
25 want to hear from her on the issue of the --

Page 199

1       THE COURT:  Yeah.  If she wants to
2  testify about his Exhibit No. 7, or -- I want to be
3  mindful, because it's 7:30.  But I need some
4  information on what the parties were taking out of the
5  company, what reserve she has to make these payments,
6  that sort of thing.
7       MS. PERKY:  And, Your Honor, I had
8  provided the income and expense statement to
9  Ms. Taylor.  I don't know if Your Honor wants to enter
10 that as an exhibit.
11      THE COURT:  Well, I'm going to have to
12 take a look at it at some point.
13      Go ahead and swear her in.
14         (Witness was sworn.)
15      MS. TAYLOR:  Your Honor, I may need
16 another copy of Exhibit 7.  I don't know that
17 Ms. Gentry has a copy.
18      THE COURT:  All right.  I'll let you
19 refer to this.  Just remember to give it back to me.
20      MS. TAYLOR:  Thank you, Your Honor.
21      THE COURT:  I had to last week pull
22 the camera to see who walked out with one of my
23 exhibits.  It worked.  We found them.
24 ///
25 ///

Page 200

1          KATHERINE WISE GENTRY,
2  was called as a witness, and having been duly sworn,
3  was examined and testified as follows:
4
5          DIRECT EXAMINATION
6  BY MS. TAYLOR:
7  Q.    Ms. Gentry, would you please state your
8  full name for the record.
9  A.    Katherine Wise Gentry.
10 Q.    You are listed as the owner of Sweet Wise;
11 correct?
12 A.    Yes.
13 Q.    And what income do you receive per month
14 from Sweet Wise?
15 A.    Per month?  Currently it is 6,000 a month.
16 We get paid weekly.  It's 1500 a week before taxes.
17 Q.    So that would be a yearly salary of 72,000?
18 A.    Seventy-eight.
19 Q.    Seventy-eight.
20      MS. TAYLOR:  Sorry, Your Honor.
21      THE COURT:  That's all right.
22 BY MS. TAYLOR:
23 Q.    And was Mr. Gentry receiving a similar
24 income in 2014 when he was employed there?
25 A.    Yes.

Page 201

1  Q.    And you have looked -- you have Exhibit 7
2  in front of you; correct?
3  A.    Yes.
4  Q.    Were there certain expenses as shown by
5  Mr. Gentry that were paid for by the business?
6  A.    Yes.
7  Q.    And this was paid for his work in the
8  business; correct?
9  A.    Yes.
10      THE COURT:  Ms. Taylor, will you pull
11 that microphone down just a little bit, the one on your
12 lectern there.
13      MS. TAYLOR:  Is this one working?
14      THE COURT:  Yes.
15      MS. TAYLOR:  Oh, I'm sorry.
16      THE COURT:  I think it might help.
17 BY MS. TAYLOR:
18 Q.    Okay.  Now, on this Exhibit 7, Ms. Gentry,
19 where it had the home, cable, and Internet, was that
20 for doing company work at home?
21 A.    Yes.
22 Q.    Mr. Gentry is no longer doing that, is he?
23 A.    Correct.
24 Q.    And that was when you-all were living in
25 the same house and you both used the company Internet

51 (Pages 198 to 201)

Page 202

1    from home?
2    A.    Yes.
3    Q.    The health insurance we've had an issue
4    about. You did -- it was canceled; correct?
5    A.    It was never canceled.
6    Q.    Through no fault of your own, did it not
7    get paid one month? Or tell the Court what happened on
8    the health insurance.
9    A.    Okay. BlueCross BlueShield -- we had paid
10   by check, as we had always done, the health insurance
11   to BlueCross BlueShield, and they returned it saying
12   they didn't know what account to apply it to.
13         I immediately sent an e-mail to Dancho, who
14   basically prepares our accounts payable and then I sign
15   the checks. I authorize them and sign the checks. So
16   I immediately sent him an e-mail saying, Hey, we need
17   to make sure this gets paid.
18         And immediately, like I think within that
19   day or the next day, we wrote another check to make
20   sure that they had all the information to know where to
21   apply it. But by the time that they received it, it
22   had passed the time period where they would accept it
23   and canceled the policy.
24         I again, once we got that notification, I
25   again immediately notified Mr. Gentry and let him know

Page 203

1    what had happened. I believe I copied him on all those
2    e-mails as well, just to keep him in the loop. But I
3    let him know exactly what happened, with all the steps,
4    and to go ahead and apply for insurance. And he agreed
5    that he would.
6    Q.    Ms. Gentry, do you have the resources to
7    pay support to Mr. Gentry if he's no longer working in
8    the business?
9    A.    I don't. I'm borrowing money from my
10   parents as it is.
11   Q.    Your Honor, I do have an income and expense
12   statement from Ms. Gentry. I will say, it has not been
13   signed by her, but I'm happy to submit --
14         THE COURT: Well, we're -- what's good
15   for the goose is good for the gander. So go ahead and
16   submit it.
17         I'm going to mark Mr. Gentry's monthly
18   expenses as 23. We'll mark Ms. Gentry's as 24.
19         (Marked Exhibits 23 and 24.)
20         THE COURT: Have you seen that,
21   Ms. Perky?
22         MS. PERKY: No, Your Honor.
23         THE COURT: Ms. Taylor, will you give
24   her a copy of that.
25         MS. TAYLOR: For some reason, I only

Page 204

1    have one copy. Let me see if I can -- I'm sorry, Your
2    Honor. Here it is. I had turned it upside down.
3         THE COURT: Okay.
4         MS. TAYLOR: I thought I had made
5    enough.
6         THE COURT: All right. This is what
7    we're going to do. We're not going to sit here and
8    cross-examine each other over these things we've had at
9    the last minute.
10        Let me do this. Ms. Gentry, have you
11   replaced Mr. Gentry? Has his position been filled at
12   Sweet Wise?
13        THE WITNESS: He has not been
14   replaced. We've actually found that between Dancho and
15   I that we're able to handle the duties that he had.
16        THE COURT: All right. And do you
17   have -- look at number -- let me see. Were you shown
18   the exhibit which showed the proceeds from the sale of
19   THE MAT? I don't know if that's on Exhibit 7 or not.
20        MS. PERKY: I believe THE MAT sales is
21   Exhibit 4, Your Honor.
22        THE COURT: Yeah. Exhibit 4. Those
23   were gross total product profit he had from 2011-2014,
24   around $821,000. Is that number -- are you disputing
25   that number?

Page 205

1         THE WITNESS: I'd like to put it in
2    context.
3         THE COURT: I want you to.
4         THE WITNESS: Okay. When he says it's
5    profit -- and can I go ahead and give this other
6    exhibit back to you, before I get accused of -- before
7    the cameras catch me?
8         THE COURT: Yeah, yeah.
9         MS. TAYLOR: I'll put it right here.
10        THE WITNESS: When he calls it profit,
11   that's not so much going into we had that money laying
12   around. What it is, yes, it pays our salaries, hourly
13   employees' wages. It pays rent. When you look at our
14   tax returns, it's not a profitable company. We don't
15   have that money laying around.
16        THE COURT: All right. So, then,
17   where are those proceeds going? What do they pay for?
18        THE WITNESS: All of our operating
19   expenses.
20        THE COURT: All right. Does Sweet
21   Wise -- how many bank accounts does it have right now?
22        THE WITNESS: It has one account
23   -- no. I'm sorry. Two accounts. One is a funding
24   account that we would like to put money aside in. It's
25   got about $3,000 in it right now.

BERTRAM REPORTING SERVICES
(615)758-6496

Page 206

1      THE COURT: Mm-hmm. And the other is
2  an operating account?
3      THE WITNESS: The other is an
4  operating account. It pays utilities, and payroll, all
5  of our other operating expenses.
6      THE COURT: All right. And what's the
7  current balance in that account?
8      THE WITNESS: I'd have to look. I
9  didn't prepare myself for that today. I'm going to
10  guess it's around $30,000.
11      THE COURT: All right.
12      THE WITNESS: Again, though, we have a
13  credit card bill coming up that we'll need to pay.
14  BY MS. TAYLOR:
15  Q.    How much would that be?
16  A.    The American Express bill usually runs, any
17  month, from 23,000 to $35,000.
18      THE COURT: All right.
19      MS. TAYLOR: Your Honor, may I
20  interrupt and ask a question?
21      THE COURT: Yeah.
22  BY MS. TAYLOR:
23  Q.    Ms. Gentry, on the monies that have been
24  produced from the sale of THE MAT, which I believe is
25  what Mr. Gentry is saying is the profit, that's

Page 207

1  actually the income the business has made from THE MAT;
2  correct?
3  A.    Correct. That's revenue.
4  Q.    Okay. Have there also been expenses
5  associated with the production of THE MAT, the
6  marketing, the shipping, the patent, everything that
7  would be offsetting that amount?
8  A.    Absolutely. But if you'll -- if you'll
9  look at how he's broken this down, he's giving this
10  profit number. There's a quantity sold, an extended
11  cost, and extended price. So he's broken it down as to
12  what the price is each year and then totaled it here.
13  This is -- if you'll look at what we made in 2014, as
14  far as profit, $143,000, not 820.
15      THE COURT: Right.
16      THE WITNESS: So, again, though that
17  sounds like a large number. With much inventory as
18  comes in and out of the business, and the employees
19  that we have, it's certainly designated for other
20  purposes and, again, does not show up as a profit on
21  our tax returns each year.
22      THE COURT: Okay. Do I have a copy of
23  the tax return for the company for 2013?
24      MS. TAYLOR: Not the complete return,
25  Your Honor. I believe there's a -- in light of the

Page 208

1  exhibits, the first page is attached but not the
2  complete return.
3      THE COURT: All right.
4      MS. PERKY: Your Honor, if you'll look
5  at Exhibit 2, it has the first -- the first page.
6      THE COURT: It has page 1.
7      MS. PERKY: Page 1, yes, Your Honor.
8      THE COURT: All right. I don't have
9  No. 19, which is going to be -- or Line Item 19.
10  That's other deductions, $718,000.
11      All right. Do you have that in your
12  possession, Ms. Taylor?
13      MS. TAYLOR: I cannot locate the
14  exhibit right now.
15      THE COURT: Okay. And I'm not asking
16  you to. But I want you to file the 2013 return as a
17  late-filed exhibit to this hearing.
18      THE WITNESS: Yes, Your Honor. We'll
19  file the complete return.
20      THE COURT: Yeah.
21      (Late-Filed Exhibit 25 to be
22      provided.)
23      THE COURT: Y'all have both been hit
24  with income and expense statements that I generally
25  make people file before the hearing. I'm not going to

Page 209

1  beat you up, because you're beating each other up with
2  it right now. But this is what you -- what I'll let
3  you do. If you-all want to file written objections to
4  the other's income and expense statement, I'm going to
5  let you.
6      Again, this is a temporary support
7  hearing. I do want the 2013 tax return. And then
8  we're going to have to reset the hearing on this
9  operator thing. I will tell you -- hang on just a
10  second.
11      Before we have the hearing, I want
12  you -- I don't know that this is directly on point, but
13  there's a case called Bass vs. Bass, 814 S.W.2d 38,
14  that has sort of the implied partnership that Ms. Perky
15  was referencing. It's a slightly different set of
16  facts, but that's going to drive a lot of this with
17  respect to where we end up. So before we have that
18  final hearing, I need a little bit of law from both of
19  you on that.
20      Also, this patent issue I'm really
21  concerned about. I don't want the patent -- I don't
22  want these -- it's not going to do either one of these
23  folks any good to have this patent process
24  short-circuited. What I'm most interested in is
25  getting the patent approved, if we can, and then this

53 (Pages 206 to 209)

TRANSCRIPT OF PROCEEDINGS        MARCH 10, 2015

Page 210

1     Court having the ability to either allocate the patent
2     or the revenue from the patent based upon the proof.
3            I would hate for either party to take
4     a risk with that process.  And, quite frankly, I don't
5     know enough about IP to speak intelligently about it.
6     So I would like for you to help me with that a little
7     bit, too.
8            So we're going reset the hearing to
9     have some more proof.  I want to hear Ms. Gentry's full
10    story on what her role in the business has been, as
11    opposed to Mr. Gentry's story.
12           MS. GENTRY:  Thank you.
13           THE COURT:  And then I want -- if
14    either one of you want to file written objections to
15    the other's income and expense statements, get that
16    done for me.  Is ten days too quickly?
17           MS. TAYLOR:  To have another hearing?
18           THE COURT:  No, to get a written
19    objection filed, if you have any, on the income and
20    expense statements.
21           MS. PERKY:  That's fine, Your Honor.
22           THE COURT:  Can you do that?
23           MS. TAYLOR:  That would be the end of
24    next week?
25           THE COURT:  Mm-hmm.

Page 211

1            MS. TAYLOR:  If I could have, Your
2     Honor, at least until the following Monday, just
3     because the scheduling -- the close of business on that
4     Monday.
5            THE COURT:  That's fine.
6            MS. PERKY:  So the 23rd is when we're
7     going to --
8            THE COURT:  Right, the 23rd.  And then
9     I'll make a ruling -- I'm going to tell you right now,
10    it's going to be as temporary support.  To the extent I
11    award anything, it will be as temporary support.  It
12    won't be -- because we just don't have enough proof on
13    the other issue yet, and I want to give Ms. Gentry a
14    chance to tell her side of the story.  I'm not saying
15    that I'm awarding anything, but if I do, it will be as
16    temporary support.
17           MS. TAYLOR:  Your Honor, I would -- I
18    know it's late and we all need to go.  In the sense
19    that it goes to the issue of temporary support, I think
20    some of my client's -- we've heard a lot from
21    Mr. Gentry about his position on the monies, the
22    business plan, things like that.  I would ask the Court
23    to consider that Ms. Gentry's testimony on that would
24    be important also before a temporary award amount is
25    set.

Page 212

1            We're going just on Mr. Gentry's
2     testimony about what he did, or the expenses that were
3     paid.  Ms. Gentry has a different testimony on some of
4     that, a different testimony on their spending and their
5     discussions.
6            So I do submit to the Court that by
7     answering a temporary support without letting
8     Ms. Gentry tell her side of the story, it seems to be a
9     bit biased in Mr. Gentry's behalf, because we're taking
10    it on his testimony without her input.  Yes, I had a
11    chance to cross-examine him, but there's not the
12    complete story that I would ask the Court to hear
13    before there's a temporary support.
14           THE COURT:  Let's do this, then.  You
15    go ahead and submit -- I want you to go ahead and
16    submit your written responses by the 23rd.
17           And let me say this to both parties.
18    When you divorce, your standard of living changes.
19    Period.  It's a lot more expensive for two people than
20    it is for one family household.  So the amount of
21    eating out, and the nice cars, and all that sort of
22    stuff, that's going to be -- it changes.
23           Go ahead and submit the stuff by the
24    23rd.  I'm going to keep in mind two things.  One, it
25    is a temporary order.  But, two, if I believe there's

Page 213

1     further elucidation I need from Ms. Gentry, I'm going
2     to give her a chance to come back in.
3            You know -- let me just leave it at
4     that for now; okay?  I understand.  I hear exactly what
5     you're saying, but I think I've got what I need at this
6     point; all right?
7            MS. TAYLOR:  I don't want to stand
8     here and argue with the Court, but I -- from my
9     perspective, there's other information that might be
10    relevant.  What I would ask the Court is, once the
11    award is made, I can put on proof --
12           THE COURT:  Oh, sure.
13           MS. TAYLOR:  -- if we --
14           THE COURT:  Oh, absolutely.
15           MS. TAYLOR:  Oftentimes, a Court will
16    not modify a temporary order once it's down.
17           THE COURT:  Oh, no, no.  Look, no, no,
18    no.  I've modified temporary awards, and I've even
19    taken into account an erroneous temporary award or an
20    award of temporary support that I ordered based upon
21    one set of proof in the temporary hearing, and later on
22    in the final hearing had a vastly different story.  And
23    I took that into account in the final disposition.
24           MS. TAYLOR:  Yes.  That's my concern,
25    is that we have not had the complete story about work

54  (Pages 210 to 213)

Page 214

1  and --
2        THE COURT:  No.  I'm trying to be --
3  I'm trying to mix a few things, combine a couple of
4  things here.  One, we've been at it now for almost five
5  hours.  And, two, I've got these income and expense
6  statements.  I'm going to let both of you submit
7  written responses.  Three, it's just going to be a
8  temporary award.  Four, if I believe, based upon your
9  objections or the statements that have been submitted,
10  that I need more information, we can have a hearing on
11  that; okay?  With just the parties.
12        MS. TAYLOR:  Just the parties.
13        THE COURT:  Yeah.  I mean, on the
14  temporary support issue.  I can do a separate hearing
15  just on that.  I think getting this other matter
16  resolved, we're going to need a little more time on
17  that.
18        MS. PERKY:  And, Your Honor, when do
19  you want to reset this to finish up the testimony?
20        THE COURT:  Well, I will tell you -- I
21  will tell you there are three things we're going to be
22  battling over the next couple of months.  I've got
23  Tennessee Judicial Conference next week.  I'm out the
24  last week of March on a prearranged thing that I can't
25  do anything about.  And I'm gone for two weeks at the

Page 215

1  end of April and beginning of May for National Judicial
2  College.  So it will be tight.
3        And Ms. Gross keeps the calendar.  So
4  it's hard for me to sit here and give you good, firm
5  dates on all of this.
6        MS. PERKY:  I just want to make sure
7  that this doesn't languish too long, Your Honor.  My
8  client filed this back in October.
9        THE COURT:  I understand.  And, again,
10  we're doing triage.  The first issue I'm going to
11  address is temporary support.  I can still, at a final
12  hearing, take into account that award, one way or the
13  other.  But I've got to address that issue first.
14        MS. TAYLOR:  And, Your Honor, also,
15  I'm sure you'll see from the record, the motion about
16  who's going to control the business --
17        THE COURT:  We're not close on that.
18        MS. TAYLOR:  -- was just filed.  It
19  wasn't filed back in October.
20        THE COURT:  No.  And we're not close
21  to the proof on that right now.
22        MS. TAYLOR:  And I submit to you, the
23  business isn't a part of this lawsuit.  So --
24        THE COURT:  Well, that's why we get
25  into this issue.  That's why I gave you that case that

Page 216

1  I gave you.  You know, the lines get blurred between
2  whether she owns it all but he's attributed to the
3  appreciation of the value.  And so we may be talking
4  some legal distinctions that, when all is said and
5  done, don't have a lot of practical difference.  I'm
6  not sure yet, though.
7        MS. TAYLOR:  The question is, is that
8  a temporary issue or an issue for the final hearing?
9        THE COURT:  Well, I'm not getting into
10  that now.  Ms. Perky wants it to be a temporary issue.
11  I've allowed her to put her proof on.  I certainly want
12  your client to be able to put her proof on.  But as far
13  as something that's urgent, if I felt like it was
14  urgent, we would continue to have that hearing tonight.
15        MS. TAYLOR:  Yes, Your Honor.
16        On the contempt, I would ask for a
17  directed verdict that there is no contempt.
18        THE COURT:  Tell me about that,
19  Ms. Perky.  What do you think about that?
20        MS. PERKY:  Well, I think, Your Honor,
21  the proof was pretty clear that, you know, one, she has
22  removed him as signatory on accounts that were in both
23  of their names, that they both have access to.
24        She removed him -- she took away and
25  canceled credit cards that, although business credit

Page 217

1  cards, were used for personal expenses.  That's the
2  only one he had.  He went to go pay for his gas.  Runs
3  it.  Rejected.  Same thing when he's in Tunica.  He
4  tries to run the credit card.  Declined.
5        I mean, I think that's exactly what
6  the statutory restraining order is trying to prevent,
7  parties from financially bankrupting the other party
8  and trying to put pressure on them.  You know, one
9  party using their financial leverage to prevent the
10  other party from proceeding as the status quo in
11  marriage, and secondly, to, you know, defend the
12  divorce proceedings.  And that's essentially what's
13  happened here.
14        He's had to rely on credit cards in
15  his own name, max them out.  He's taking cash advances
16  from credit cards in order to pay marital expenses.
17  This is exactly what the statutory restraining order
18  was created to prevent.
19        THE COURT:  Well, the only reason I
20  would disagree with you a little bit is because
21  Mr. Gentry's and my definition of de minimis are very
22  different.
23        MS. PERKY:  Sure.
24        THE COURT:  And so what's happened is
25  we've had an utter and complete commingling of the

55 (Pages 214 to 217)

Page 218

1   personal life and the business life.  And I think for a
2   finding of contempt, I have to find willful behavior
3   with respect to specific conduct.
4           And the problem that I have with
5   respect to that standard is, I think the conduct of the
6   parties -- I think if she had asked for some sort of
7   contempt against him, she'd be in the same boat.  They
8   just -- there is no delineation between the two.
9           And so I can't find her conduct
10  willful when there was no bright-line distinction as
11  far as how the parties operated with respect to their
12  personal finances and their business finances.  So I'm
13  going to grant Ms. Taylor's motion on the contempt.
14          Now, that might have -- this
15  commingling may have some value, as far as the standard
16  of living of the parties and things of that nature, on
17  final hearing.  But as far as contempt, I'm going to
18  grant Ms. Taylor's directed verdict motion.
19          All right.  Do we know where we all
20  are?
21          MS. PERKY:  Just a little bit of
22  thought.  My client, I know, the minute we get out of
23  here is going to ask me when he finds out if he's going
24  to get support and how much it's going to be, because
25  he really is destitute at this point.  So can Your

Page 219

1   Honor guide me as to how to advise my client?
2           THE COURT:  Well, I'm asking for
3   objections to these income and expense statements to be
4   submitted on or before the 23rd, I think was our
5   deadline day.  So I'm not going to make any ruling
6   before the 23rd, because I need to know if your
7   attorney objects to anything Ms. Gentry has put in, and
8   if Ms. Taylor objects to anything you've put in.
9           So as soon as I get that, assuming I
10  don't feel I need any additional information, I'll make
11  a ruling.  All right?
12          MS. TAYLOR:  Your Honor, with our
13  objections to the expense statements, we do, I guess,
14  like a closing argument statement with that, about, for
15  example, Mr. Gentry is underemployed?
16          THE COURT:  Right, right.  That's why
17  I was going to ask him the same questions about, you
18  know, what jobs he's seeking and his position with
19  respect to that.  So, yeah, just sort of a closing
20  argument in written form.  All right?
21          MS. TAYLOR:  Thank you, Your Honor.
22          MS. PERKY:  Thank you for your
23  patience.
24          THE COURT:  Thank you for your
25  patience and suffering through the heat.

Page 220

1           Get with Ms. Gross sooner rather than
2   later, because we don't have a lot of time built in
3   over the next couple of months, next three months even.
4           MS. TAYLOR:  And your schedule and
5   mine seem to be at odds with each other, with some
6   travel that I already had planned.
7           THE COURT:  All right.  Thank you.
8           MS. TAYLOR:  Thank you, Your Honor.
9           (Proceedings concluded at
10          approximately 8:03 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 221

1           REPORTER'S CERTIFICATE
2   STATE OF TENNESSEE  }
3   COUNTY OF WILSON    }
4           I, Carolyn J. Bertram, Licensed Court
5   Reporter, Registered Professional Reporter, Certified
6   Court Reporter, and Notary Public for the State of
7   Tennessee at Large, hereby certify that I reported the
8   foregoing proceedings at the time and place set forth
9   in the caption thereof; that the proceedings were
10  stenographically reported by me; and that the foregoing
11  proceedings constitute a true and correct transcript of
12  said proceedings to the best of my ability.
13          I FURTHER CERTIFY that I am not
14  related to any of the parties named herein, nor their
15  counsel, and have no interest, financial or otherwise,
16  in the outcome or events of this action.
17          IN WITNESS THEREOF, I have hereunto
18  affixed my official signature and seal of office this
19  23rd day of April, 2015.
20
21  _____
22          CAROLYN J. BERTRAM, LCR #390
            Registered Professional
23          Reporter and Notary Public in
            and for the State of Tennessee
24          at Large
25  My Commission Expires:
    May 30, 2017