

**U.S. Department of Justice**

Civil Rights Division

Office for Access to Justice

*Washington, D.C. 20530*

March 14, 2016

Dear Colleague:

The Department of Justice ("the Department") is committed to assisting state and local courts in their efforts to ensure equal justice and due process for all those who come before them. In December 2015, the Department convened a diverse group of stakeholders—judges, court administrators, lawmakers, prosecutors, defense attorneys, advocates, and impacted individuals—to discuss the assessment and enforcement of fines and fees in state and local courts. While the convening made plain that unlawful and harmful practices exist in certain jurisdictions throughout the country, it also highlighted a number of reform efforts underway by state leaders, judicial officers, and advocates, and underscored the commitment of all the participants to continue addressing these critical issues. At the meeting, participants and Department officials also discussed ways in which the Department could assist courts in their efforts to make needed changes. Among other recommendations, participants called on the Department to provide greater clarity to state and local courts regarding their legal obligations with respect to fines and fees and to share best practices. Accordingly, this letter is intended to address some of the most common practices that run afoul of the United States Constitution and/or other federal laws and to assist court leadership in ensuring that courts at every level of the justice system operate fairly and lawfully, as well as to suggest alternative practices that can address legitimate public safety needs while also protecting the rights of participants in the justice system.

Recent years have seen increased attention on the illegal enforcement of fines and fees in certain jurisdictions around the country—often with respect to individuals accused of misdemeanors, quasi-criminal ordinance violations, or civil infractions.[1] Typically, courts do not sentence defendants to incarceration in these cases; monetary fines are the norm. Yet the harm

---

[1] *See, e.g.*, Civil Rights Division, U.S. Department of Justice, *Investigation of the Ferguson Police Department* (Mar. 4, 2015), http://www.justice.gov/crt/about/spl/documents/ferguson_findings_3-4-15.pdf (finding that the Ferguson, Missouri, municipal court routinely deprived people of their constitutional rights to due process and equal protection and other federal protections); Brennan Center for Justice, *Criminal Justice Debt: A Barrier to Reentry* (2010), *available at* http://www.brennancenter.org/sites/default/files/legacy/Fees%20and%20Fines%20FINAL.pdf (reporting on fine and fee practices in fifteen states); American Civil Liberties Union, *In for a Penny: The Rise of America's New Debtors' Prisons* (2010), *available at* https://www.aclu.org/files/assets/InForAPenny_web.pdf (discussing practices in Louisiana, Michigan, Ohio, Georgia, and Washington state).

1

## EXHIBIT 2

caused by unlawful practices in these jurisdictions can be profound. Individuals may confront escalating debt; face repeated, unnecessary incarceration for nonpayment despite posing no danger to the community[2]; lose their jobs; and become trapped in cycles of poverty that can be nearly impossible to escape.[3] Furthermore, in addition to being unlawful, to the extent that these practices are geared not toward addressing public safety, but rather toward raising revenue, they can cast doubt on the impartiality of the tribunal and erode trust between local governments and their constituents.[4]

To help judicial actors protect individuals' rights and avoid unnecessary harm, we discuss below a set of basic constitutional principles relevant to the enforcement of fines and fees. These principles, grounded in the rights to due process and equal protection, require the following:

(1) Courts must not incarcerate a person for nonpayment of fines or fees without first conducting an indigency determination and establishing that the failure to pay was willful;

(2) Courts must consider alternatives to incarceration for indigent defendants unable to pay fines and fees;

(3) Courts must not condition access to a judicial hearing on the prepayment of fines or fees;

(4) Courts must provide meaningful notice and, in appropriate cases, counsel, when enforcing fines and fees;

(5) Courts must not use arrest warrants or license suspensions as a means of coercing the payment of court debt when individuals have not been afforded constitutionally adequate procedural protections;

(6) Courts must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release; and

(7) Courts must safeguard against unconstitutional practices by court staff and private contractors.

In court systems receiving federal funds, these practices may also violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, when they unnecessarily impose disparate harm on the basis of race or national origin.

---

[2] Nothing in this letter is intended to suggest that courts may not preventively detain a defendant pretrial in order to secure the safety of the public or appearance of the defendant.

[3] See Council of Economic Advisers, Issue Brief, *Fines, Fees, and Bail: Payments in the Criminal Justice System that Disproportionately Impact the Poor*, at 1 (Dec. 2015), *available at* https://www.whitehouse.gov/sites/default/files/page/files/1215_cea_fine_fee_bail_issue_brief.pdf (describing the disproportionate impact on the poor of fixed monetary penalties, which "can lead to high levels of debt and even incarceration for failure to fulfil a payment" and create "barriers to successful re-entry after an offense").

[4] See Conference of State Court Administrators, 2011-2012 Policy Paper, *Courts Are Not Revenue Centers* (2012), *available at* https://csgjusticecenter.org/wp-content/uploads/2013/07/2011-12-COSCA-report.pdf.

As court leaders, your guidance on these issues is critical. We urge you to review court rules and procedures within your jurisdiction to ensure that they comply with due process, equal protection, and sound public policy. We also encourage you to forward a copy of this letter to every judge in your jurisdiction; to provide appropriate training for judges in the areas discussed below; and to develop resources, such as bench books, to assist judges in performing their duties lawfully and effectively. We also hope that you will work with the Justice Department, going forward, to continue to develop and share solutions for implementing and adhering to these principles.

1. Courts must not incarcerate a person for nonpayment of fines or fees without first conducting an indigency determination and establishing that the failure to pay was willful.

The due process and equal protection principles of the Fourteenth Amendment prohibit "punishing a person for his poverty." *Bearden v. Georgia*, 461 U.S. 660, 671 (1983). Accordingly, the Supreme Court has repeatedly held that the government may not incarcerate an individual solely because of inability to pay a fine or fee. In *Bearden*, the Court prohibited the incarceration of indigent probationers for failing to pay a fine because "[t]o do otherwise would deprive the probationer of his conditional freedom simply because, through no fault of his own, he cannot pay the fine. Such a deprivation would be contrary to the fundamental fairness required by the Fourteenth Amendment." *Id.* at 672-73; *see also Tate v. Short*, 401 U.S. 395, 398 (1971) (holding that state could not convert defendant's unpaid fine for a fine-only offense to incarceration because that would subject him "to imprisonment solely because of his indigency"); *Williams v. Illinois*, 399 U.S. 235, 241-42 (1970) (holding that an indigent defendant could not be imprisoned longer than the statutory maximum for failing to pay his fine). The Supreme Court recently reaffirmed this principle in *Turner v. Rogers*, 131 S. Ct. 2507 (2011), holding that a court violates due process when it finds a parent in civil contempt and jails the parent for failure to pay child support, without first inquiring into the parent's ability to pay. *Id.* at 2518-19.

To comply with this constitutional guarantee, state and local courts must inquire as to a person's ability to pay prior to imposing incarceration for nonpayment. Courts have an affirmative duty to conduct these inquiries and should do so sua sponte. *Bearden*, 461 U.S. at 671. Further, a court's obligation to conduct indigency inquiries endures throughout the life of a case. *See id.* at 662-63. A probationer may lose her job or suddenly require expensive medical care, leaving her in precarious financial circumstances. For that reason, a missed payment cannot itself be sufficient to trigger a person's arrest or detention unless the court first inquires anew into the reasons for the person's non-payment and determines that it was willful. In addition, to minimize these problems, courts should inquire into ability to pay at sentencing, when contemplating the assessment of fines and fees, rather than waiting until a person fails to pay.

3

Under *Bearden*, standards for indigency inquiries must ensure fair and accurate assessments of defendants' ability to pay. Due process requires that such standards include both notice to the defendant that ability to pay is a critical issue, and a meaningful opportunity for the defendant to be heard on the question of his or her financial circumstances. *See Turner*, 131 S. Ct. at 2519-20 (requiring courts to follow these specific procedures, and others, to prevent unrepresented parties from being jailed because of financial incapacity). Jurisdictions may benefit from creating statutory presumptions of indigency for certain classes of defendants—for example, those eligible for public benefits, living below a certain income level, or serving a term of confinement. *See, e.g.*, R.I. Gen. Laws § 12-20-10 (listing conditions considered "prima facie evidence of the defendant's indigency and limited ability to pay," including but not limited to "[q]ualification for and/or receipt of" public assistance, disability insurance, and food stamps).

2. <u>Courts must consider alternatives to incarceration for indigent defendants unable to pay fines and fees.</u>

When individuals of limited means cannot satisfy their financial obligations, *Bearden* requires consideration of "alternatives to imprisonment." 461 U.S. at 672. These alternatives may include extending the time for payment, reducing the debt, requiring the defendant to attend traffic or public safety classes, or imposing community service. *See id.* Recognizing this constitutional imperative, some jurisdictions have codified alternatives to incarceration in state law. *See, e.g.*, Ga. Code Ann. § 42-8-102(f)(4)(A) (2015) (providing that for "failure to report to probation or failure to pay fines, statutory surcharges, or probation supervision fees, the court shall consider the use of alternatives to confinement, including community service"); *see also Tate*, 401 U.S. at 400 n.5 (discussing effectiveness of fine payment plans and citing examples from several states). In some cases, it will be immediately apparent that a person is not and will not likely become able to pay a monetary fine. Therefore, courts should consider providing alternatives to indigent defendants not only after a failure to pay, but also in lieu of imposing financial obligations in the first place.

Neither community service programs nor payment plans, however, should become a means to impose greater penalties on the poor by, for example, imposing onerous user fees or interest. With respect to community service programs, court officials should consider delineating clear and consistent standards that allow individuals adequate time to complete the service and avoid creating unreasonable conflicts with individuals' work and family obligations. In imposing payment plans, courts should consider assessing the defendant's financial resources to determine a reasonable periodic payment, and should consider including a mechanism for defendants to seek a reduction in their monthly obligation if their financial circumstances change.

3. <u>Courts must not condition access to a judicial hearing on prepayment of fines or fees.</u>

State and local courts deprive indigent defendants of due process and equal protection if they condition access to the courts on payment of fines or fees. *See Boddie v. Connecticut*, 401 U.S. 371, 374 (1971) (holding that due process bars states from conditioning access to

4

compulsory judicial process on the payment of court fees by those unable to pay); *see also Tucker v. City of Montgomery Bd. of Comm'rs*, 410 F. Supp. 494, 502 (M.D. Ala. 1976) (holding that the conditioning of an appeal on payment of a bond violates indigent prisoners' equal protection rights and "'has no place in our heritage of Equal Justice Under Law'" (citing *Burns v. Ohio*, 360 U.S. 252, 258 (1959)).[5]

This unconstitutional practice is often framed as a routine administrative matter. For example, a motorist who is arrested for driving with a suspended license may be told that the penalty for the citation is $300 and that a court date will be scheduled only upon the completion of a $300 payment (sometimes referred to as a prehearing "bond" or "bail" payment). Courts most commonly impose these prepayment requirements on defendants who have failed to appear, depriving those defendants of the opportunity to establish good cause for missing court. Regardless of the charge, these requirements can have the effect of denying access to justice to the poor.

4. Courts must provide meaningful notice and, in appropriate cases, counsel, when enforcing fines and fees.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950); *see also Turner*, 131 S. Ct. at 2519 (discussing the importance of notice in proceedings to enforce a child support order). Thus, constitutionally adequate notice must be provided for even the most minor cases. Courts should ensure that citations and summonses adequately inform individuals of the precise charges against them, the amount owed or other possible penalties, the date of their court hearing, the availability of alternate means of payment, the rules and procedures of court, their rights as a litigant, or whether in-person appearance is required at all. Gaps in this vital information can make it difficult, if not impossible, for defendants to fairly and expeditiously resolve their cases. And inadequate notice can have a cascading effect, resulting in the defendant's failure to appear and leading to the imposition of significant penalties in violation of the defendant's due process rights.

Further, courts must ensure defendants' right to counsel in appropriate cases when enforcing fines and fees. Failing to appear or to pay outstanding fines or fees can result in incarceration, whether through the pursuit of criminal charges or criminal contempt, the imposition of a sentence that had been suspended, or the pursuit of civil contempt proceedings. The Sixth Amendment requires that a defendant be provided the right to counsel in any criminal proceeding resulting in incarceration, *see Scott v. Illinois*, 440 U.S. 367, 373 (1979); *Argersinger v. Hamlin*, 407 U.S. 25, 37 (1972), and indeed forbids imposition of a suspended jail sentence on a probationer who was not afforded a right to counsel when originally convicted and sentenced,

---

[5] The Supreme Court reaffirmed this principle in *Little v. Streater*, 452 U.S. 1, 16-17 (1981), when it prohibited conditioning indigent persons' access to blood tests in adversarial paternity actions on payment of a fee, and in *M.L.B. v. S.L.J.*, 519 U.S. 102, 107 (1996), when it prohibited charging filing fees to indigent persons seeking to appeal from proceedings terminating their parental rights.

5

*see Alabama v. Shelton*, 535 U.S. 654, 662 (2002). Under the Fourteenth Amendment, defendants likewise may be entitled to counsel in civil contempt proceedings for failure to pay fines or fees. *See Turner*, 131 S. Ct. at 2518-19 (holding that, although there is no automatic right to counsel in civil contempt proceedings for nonpayment of child support, due process is violated when neither counsel nor adequate alternative procedural safeguards are provided to prevent incarceration for inability to pay).[6]

5.  Courts must not use arrest warrants or license suspensions as a means of coercing the payment of court debt when individuals have not been afforded constitutionally adequate procedural protections.

The use of arrest warrants as a means of debt collection, rather than in response to public safety needs, creates unnecessary risk that individuals' constitutional rights will be violated. Warrants must not be issued for failure to pay without providing adequate notice to a defendant, a hearing where the defendant's ability to pay is assessed, and other basic procedural protections. *See Turner*, 131 S. Ct. at 2519; *Bearden*, 461 U.S. at 671-72; *Mullane*, 339 U.S. at 314-15. When people are arrested and detained on these warrants, the result is an unconstitutional deprivation of liberty. Rather than arrest and incarceration, courts should consider less harmful and less costly means of collecting justifiable debts, including civil debt collection.[7]

In many jurisdictions, courts are also authorized—and in some cases required—to initiate the suspension of a defendant's driver's license to compel the payment of outstanding court debts. If a defendant's driver's license is suspended because of failure to pay a fine, such a suspension may be unlawful if the defendant was deprived of his due process right to establish inability to pay. *See Bell v. Burson*, 402 U.S. 535, 539 (1971) (holding that driver's licenses "may become essential in the pursuit of a livelihood" and thus "are not to be taken away without that procedural due process required by the Fourteenth Amendment"); *cf. Dixon v. Love*, 431 U.S. 105, 113-14 (1977) (upholding revocation of driver's license after conviction based in part on the due process provided in the underlying criminal proceedings); *Mackey v. Montrym*, 443 U.S. 1, 13-17 (1979) (upholding suspension of driver's license after arrest for driving under the influence and refusal to take a breath-analysis test, because suspension "substantially served" the government's interest in public safety and was based on "objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him," making the risk of erroneous deprivation low). Accordingly, automatic license suspensions premised on determinations that fail to comport with *Bearden* and its progeny may violate due process.

---

[6] *Turner*'s ruling that the right to counsel is not automatic was limited to contempt proceedings arising from failure to pay child support to a custodial parent who is unrepresented by counsel. *See* 131 S. Ct. at 2512, 2519. The Court explained that recognizing such an automatic right in that context "could create an asymmetry of representation." *Id.* at 2519. The Court distinguished those circumstances from civil contempt proceedings to recover funds due to the government, which "more closely resemble debt-collection proceedings" in which "[t]he government is likely to have counsel or some other competent representative." *Id.* at 2520.

[7] Researchers have questioned whether the use of police and jail resources to coerce the payment of court debts is cost-effective. *See, e.g.*, Katherine Beckett & Alexes Harris, *On Cash and Conviction: Monetary Sanctions as Misguided Policy*, 10 CRIMINOLOGY & PUB. POL'Y 505, 527-28 (2011). This strategy may also undermine public safety by diverting police resources and stimulating public distrust of law enforcement.

Even where such suspensions are lawful, they nonetheless raise significant public policy concerns. Research has consistently found that having a valid driver's license can be crucial to individuals' ability to maintain a job, pursue educational opportunities, and care for families.[8] At the same time, suspending defendants' licenses decreases the likelihood that defendants will resolve pending cases and outstanding court debts, both by jeopardizing their employment and by making it more difficult to travel to court, and results in more unlicensed driving. For these reasons, where they have discretion to do so, state and local courts are encouraged to avoid suspending driver's licenses as a debt collection tool, reserving suspension for cases in which it would increase public safety.[9]

6. Courts must not employ bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release.

When indigent defendants are arrested for failure to make payments they cannot afford, they can be subjected to another independent violation of their rights: prolonged detention due to unlawful bail or bond practices. Bail that is set without regard to defendants' financial capacity can result in the incarceration of individuals not because they pose a threat to public safety or a flight risk, but rather because they cannot afford the assigned bail amount.

As the Department of Justice set forth in detail in a federal court brief last year, and as courts have long recognized, any bail practices that result in incarceration based on poverty violate the Fourteenth Amendment. *See* Statement of Interest of the United States, *Varden v. City of Clanton*, No. 2:15-cv-34-MHT-WC, at 8 (M.D. Ala., Feb. 13, 2015) (citing *Bearden*, 461 U.S. at 671; *Tate*, 401 U.S. at 398; *Williams*, 399 U.S. at 240-41).[10] Systems that rely primarily on secured monetary bonds without adequate consideration of defendants' financial means tend to result in the incarceration of poor defendants who pose no threat to public safety solely because they cannot afford to pay.[11] To better protect constitutional rights while ensuring defendants' appearance in court and the safety of the community, courts should consider transitioning from a system based on secured monetary bail alone to one grounded in objective risk assessments by pretrial experts. *See, e.g.*, D.C. Code § 23-1321 (2014); Colo. Rev. Stat. 16-

---

[8] *See, e.g.*, Robert Cervero, et al., *Transportation as a Stimulus of Welfare-to-Work: Private versus Public Mobility*, 22 J. PLAN. EDUC. & RES. 50 (2002); Alan M. Voorhees, et al., *Motor Vehicles Affordability and Fairness Task Force: Final Report*, at xii (2006), *available at* http://www.state.nj.us/mvc/pdf/About/AFTF_final_02.pdf (a study of suspended drivers in New Jersey, which found that 42% of people lost their jobs as a result of the driver's license suspension, that 45% of those could not find another job, and that this had the greatest impact on seniors and low-income individuals).

[9] *See* Am. Ass'n of Motor Veh. Adm'rs, *Best Practices Guide to Reducing Suspended Drivers*, at 3 (2013), *available at* http://www.aamva.org/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=3723&libID=3709 (recommending that "legislatures repeal state laws requiring the suspension of driving privileges for non-highway safety related violations" and citing research supporting view that fewer driver suspensions for non-compliance with court requirements would increase public safety).

[10] The United States' Statement of Interest in *Varden* is available at http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/02/13/varden_statement_of_interest.pdf.

[11] *See supra* Statement of the United States, *Varden*, at 11 (citing Timothy R. Schnacke, U.S. Department of Justice, National Institute of Corrections, FUNDAMENTALS OF BAIL: A RESOURCE GUIDE FOR PRETRIAL PRACTITIONERS AND A FRAMEWORK FOR AMERICAN PRETRIAL REFORM, at 2 (2014), *available at* http://nicic.gov/library/028360).

7

4-104 (2014); Ky. Rev. Stat. Ann. § 431.066 (2015); N.J. S. 946/A1910 (enacted 2015); *see also* 18 U.S.C. § 3142 (permitting pretrial detention in the federal system when no conditions will reasonably assure the appearance of the defendant and safety of the community, but cautioning that "[t]he judicial officer may not impose a financial condition that results in the pretrial detention of the person").

7. Courts must safeguard against unconstitutional practices by court staff and private contractors.

In many courts, especially those adjudicating strictly minor or local offenses, the judge or magistrate may preside for only a few hours or days per week, while most of the business of the court is conducted by clerks or probation officers outside of court sessions. As a result, clerks and other court staff are sometimes tasked with conducting indigency inquiries, determining bond amounts, issuing arrest warrants, and other critical functions—often with only perfunctory review by a judicial officer, or no review at all. Without adequate judicial oversight, there is no reliable means of ensuring that these tasks are performed consistent with due process and equal protection. Regardless of the size of the docket or the limited hours of the court, judges must ensure that the law is followed and preserve "both the appearance and reality of fairness, generating the feeling, so important to a popular government, that justice has been done." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (internal quotation marks omitted); *see also* American Bar Association, MODEL CODE OF JUDICIAL CONDUCT, Canon 2, Rules 2.2, 2.5, 2.12.

Additional due process concerns arise when these designees have a direct pecuniary interest in the management or outcome of a case—for example, when a jurisdiction employs private, for-profit companies to supervise probationers. In many such jurisdictions, probation companies are authorized not only to collect court fines, but also to impose an array of discretionary surcharges (such as supervision fees, late fees, drug testing fees, etc.) to be paid to the company itself rather than to the court. Thus, the probation company that decides what services or sanctions to impose stands to profit from those very decisions. The Supreme Court has "always been sensitive to the possibility that important actors in the criminal justice system may be influenced by factors that threaten to compromise the performance of their duty." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987). It has expressly prohibited arrangements in which the judge might have a pecuniary interest, direct or indirect, in the outcome of a case. *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (invalidating conviction on the basis of $12 fee paid to the mayor only upon conviction in mayor's court); *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 61-62 (1972) (extending reasoning of *Tumey* to cases in which the judge has a clear but not direct interest). It has applied the same reasoning to prosecutors, holding that the appointment of a private prosecutor with a pecuniary interest in the outcome of a case constitutes fundamental error because it "undermines confidence in the integrity of the criminal proceeding." *Young*, 481 U.S. at 811-14. The appointment of a private probation company with a pecuniary interest in the outcome of its cases raises similarly fundamental concerns about fairness and due process.

\* \* \* \* \*

8

The Department of Justice has a strong interest in ensuring that state and local courts provide every individual with the basic protections guaranteed by the Constitution and other federal laws, regardless of his or her financial means. We are eager to build on the December 2015 convening about these issues by supporting your efforts at the state and local levels, and we look forward to working collaboratively with all stakeholders to ensure that every part of our justice system provides equal justice and due process.

Sincerely,

Vanita Gupta
Principal Deputy Assistant Attorney General
Civil Rights Division

Lisa Foster
Director
Office for Access to Justice

9